

discovery.

If you're not convinced by ChatGPT's ability to browse documents, then consider that Microsoft announced that it's planning to use ChatGPT to power its Teams and Bing platforms.

# GPT–3 Features in ContractWorks

ContractWorks is the first contract management solution to offer a fully functional contracting solution that allows legal teams to capitalize on GPT–3's capabilities. Not a prototype, not a beta, but rather a complete product.

ContractWorks currently enables two contract management legal tech features that are built using GPT–3: *Clause Creator* and *Simplify*.

# Clause Creator

*Clause Creator* can be found during the contract redlining stage. Simply add any requirements that the clause should include and indicate the target length. After generating the clause, you can review the language and make any edits before inserting it into the contract.

Here's a sample of what *Clause Creator* can produce:

**Prompt**: Generate a non–compete for 90 days for both parties after the contract ends.

**Output:** Both parties agree not to compete with each other for a period of 90 days after the contract ends.

*Clause Creator* empowers legal and non–legal units to handle contracts faster and draft clauses more efficiently as clauses can be created and negotiated in seconds, instead of days.

# Simplify



To use *Simplify*, select the text you want to "translate" into simple words. GPT-3 will process the text and produce an easier version that you can copy and send to anyone.

With *Simplify*, complex legalese transforms into simple English in moments. Here's a sample of *Simplify* in action:

> **Legalese**: Mutual Obligations. Each party discloses its Confidential Information to the other under this agreement. "Discloser" will mean the party disclosing Confidential Information and "Recipient" will mean the party receiving Confidential Information from Discloser. Each of the parties is a discloser in respect of Confidential Information owned by such party.

> **Simple English**: Each party will disclose its confidential information to the other party. The party that discloses the information is the discloser and the party that receives the information is the recipient.

*Simplify* provides non-legal teams the freedom to focus on the meaning and contents of contracts while liberating legal ops from always fielding every single question. With *Simplify*, legal can merely point non-legal to *Simplify* for basic explanations.

## Tips for Leveraging ChatGPT

Although ChatGPT has already made a massive splash on current practices, it's not infallible. Here are some tactics that will help you benefit from implementing the current iteration of ChatGPT:

- If the answer you receive is irrelevant, reword your prompt so that it's simpler and more specific.

- If the answer you receive continues to be irrelevant, select data to fine-tune GPT-3 or completely rethink the wording of your prompt.

- Don't use ChatGPT to draft large amounts of text.

- Use keywords to help the model ensure the answer is relevant.


An Onit Product

These tips will help you successfully integrate ChatGPT and GPT-3 to accomplish your contracting needs while mitigating any potential downsides of ChatGPT.

To learn more ways to maximize the benefits of ChatGPT, get our guide "How to Train ChatGPT to Become Your Legal Assistant".

## Conclusion

For savvy, digitally literate lawyers, ChatGPT has the potential to completely reshape the way they go about their daily work. However, in its current form, ChatGPT is better suited as a highly intelligent legal assistant who is capable of accomplishing menial, less interesting tasks.

At the moment, most current implementations of GPT-3 in legal operations revolve around text generation and rephrasing. But these are just the earliest days. Given enough time, more GPT-3 (and eventually GPT-4) legal tech features will be launched, such as AI-supported redlining. At ContractWorks, we're also working on implementing AI-driven redlining features to our Collaborative Editor.

Book a demo with our team to find out how ContractWorks can help you integrate ChatGPT into your contracting.

**How to Train ChatGPT to Become Your Legal Assistant**

Don't miss the ChatGPT train. Learn the essentials for how to leverage this innovative AI for optimizing your legal ops.



Learn more about **REFINITIV**

REUTERS®

My View    Following    Saved

Technology    Legal Innovation    Legal Industry    Data Privacy

## OpenAI-backed startup brings chatbot technology to first major law firm

By Sara Merken

February 16, 2023 10:22 AM EST · Updated 4 months ago

A computer keyboard lit by a displayed cyber code is seen in this illustration picture taken on March 1, 2017. REUTERS/Kacper Pempel/Illustration/File Photo

Summary    Companies    Law Firms

Allen & Overy partners with legal startup Harvey

Harvey received $5 million in a funding round led by the OpenAI Startup Fund last year

(Reuters) - Harvey AI, an artificial intelligence startup backed by an OpenAI-managed investment fund, has partnered with one of the world's largest law firms to automate some legal document drafting and research in what the company says could be the first of more such deals.

London-founded law firm Allen & Overy said Wednesday that more than 3,500 of its lawyers have already tested Harvey, which is adapted from OpenAI's GPT software.

Harvey received a $5 million investment last year in a funding round led by the OpenAI Startup Fund. OpenAI's ChatGPT service has sparked frenzied interest in technology called generative AI that uses a range of inputs to create new content.

Advertisement · Scroll to continue

Several legal technology companies in recent months have rolled out new tools that incorporate generative AI, including for drafting and reviewing contracts.

"I think over time it will be a serious competitive disadvantage" for law firms that do not adopt generative AI, said David Wakeling, an Allen & Overy partner who heads its markets innovation group.

"We're seeing it as a way of saving our people a couple hours a week-plus" on the time it takes to perform client work, he said about the firm's deal with Harvey. He said the technology serves as a starting point and a human lawyer will always check any AI-assisted work.

Allen & Overy and Harvey, which was founded last year, declined to disclose financial terms of the deal.

Harvey is designed to create tailored generative AI-driven products for different law firms and specific client matters, according to its founders, Gabriel Pereyra and Winston Weinberg.

---

Advertisement · Scroll to continue

---

Allen & Overy is the first law firm to partner with Harvey, but the company is starting to work with other big law firms to develop custom tools, said Pereyra, a former research scientist at companies including Meta Platforms Inc and Alphabet Inc-owned DeepMind Technologies Ltd. He declined to disclose the firms.

Weinberg, who was previously an associate at U.S. law firm O'Melveny & Myers, said the repetition and text-based learning involved in legal work makes it a good match for technology like Harvey's.

NOTE: This story was updated to clarify that funding for Harvey AI came from the OpenAI Startup Fund.



Our Standards: **The Thomson Reuters Trust Principles.**

Sara Merken

**25**

Home  /  Web First  /  Latest version of ChatGPT aces bar exam with...

ARTIFICIAL INTELLIGENCE & ROBOTICS

# Latest version of ChatGPT aces bar exam with score nearing 90th percentile

BY DEBRA CASSENS WEISS (HTTPS://WWW.ABAJOURNAL.COM/AUTHORS/4/)

MARCH 16, 2023, 1:59 PM CDT

Like 509    Share        Tweet   in Share   ⌃ ⌄

The latest version of the artificial intelligence program ChatGPT has passed the Uniform Bar Examination by "a significant margin," earning a combined score of 297 that surpasses even the high threshold of 273 set by Arizona.

GPT-4 took all sections of the July 2022 bar exam and earned a score so high that it approaches the 90th percentile of test-takers, according to researchers Daniel Martin Katz, a professor at the Illinois Institute of Technology's Chicago-Kent College of Law, and Michael James Bommarito, a professor at the Michigan State University College of Law.

"Our analysis highlights that GPT-4 has indeed passed the bar and has done so by a significant margin," they wrote in a paper posted March 15 available here (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4389233). The professors collaborated with legal AI company Casetext, according to March press releases here (https://casetext.com/blog/cocounsel-powered-by-openai-gpt-4) and here (https://www.iit.edu/news/gpt-4-passes-bar-exam).

GPT-4 took all sections of the bar exam and did particularly well on the multiple-choice section known as the Multistate Bar Examination. GPT-4 got 75.7% of the questions right on the multiple-choice MBE, compared to the human average of 68%.



*Image from Shutterstock.*

GPT-4 got a passing grade in all seven subjects tested on the MBE, doing best in contracts (answering 88.1% of the questions correctly), followed by evidence (85.2%) and criminal law and procedure (81.1%).

Two of the researchers assigned scores to the essay questions on the Multistate Essay Examination, and they also got input from peers.

"While GPT-4 performs well on many questions, its output is not completely free of errors," the researchers concluded.

Yet GPT-4 got a score of 4.2 out of 6 points. Most jurisdictions use the same scale, and a score of 4 is considered passing.

On the Multistate Performance Test, GPT-4 also received a score of 4.2 out of 6 points.

"We were somewhat surprised at the quality of the output which was generated," the researchers wrote.

The previous version of ChatGPT didn't do as well on the exam. It flunked the multiple-choice section, but it did earn passing grades (https://www.abajournal.com/news/article/ai-program-earned-passing-bar-exam-scores-on-evidence-and-torts-can-it-work-in-court) in evidence and torts.

Publications covering the study include Above the Law (https://abovethelaw.com/2023/03/new-gpt-4-passes-all-sections-of-the-uniform-bar-exam-maybe-this-will-finally-kill-the-bar-exam) and Reuters (https://www.reuters.com/technology/bar-exam-score-shows-ai-can-keep-up-with-human-lawyers-researchers-say-2023-03-15).

**See also:**

ABAJournal.com (https://www.abajournal.com/web/article/can-chatgpt-help-law-students-learn-to-write-better): "Can ChatGPT help law students learn to write better?"



*Give us feedback, share a story tip or update, or report an error.*

      

Copyright 2023 American Bar Association. All rights reserved.

## TECHNOLOGY

# My "Hallucinating" Experience with ChatGPT

By Judge Herbert B. Dixon Jr. (Ret.)



The artificial intelligence–powered software ChatGPT has amassed users at a faster rate than any other online platform. After ChatGPT launched in late 2022, it amassed 100 million users within two months. Compare that to TikTok, which took nine months to reach 100 million. Instagram took two and a half years to reach the 100 million–user mark, and Facebook took nearly four years to do so. ChatGPT is a software program that responds to written requests as if it were a supersmart human being. It can produce a written essay on infinite topics in the style you direct and respond to specific inquiries with computer speed. It's what techies call a chatbot.

When one user asked ChatGPT to explain what it is, it described itself as "an AI-powered chatbot developed by OpenAI, based on the GPT (Generative Pretrained Transformer) language model. ChatGPT uses deep learning techniques to generate human-like responses to text inputs in a conversational manner."[1] (Note: "AI" is today's acronym for "Artificial Intelligence.")

A complaint often heard about Chat-GPT is that it will enable students to cheat when writing their school essays. Closer to home, a judge in Colombia used ChatGPT to issue his decision in a medical rights case for a child diagnosed with Autism Spectrum Disorder.[2] Although I am writing this article about my experience with Open AI's ChatGPT, other chatbots perform similar functions. Included among these are Bing's AI chatbot and Google's AI BARD. A general criticism of AI chatbots is that the software occasionally gives responses that reinforce, amplify, and perpetuate existing biases and prejudices. In fact, there are cautionary notes on ChatGPT's webpage that the software may "occasionally produce harmful information or biased content." These cautionary comments should be considered when using ChatGPT or one of its competitors.

News reports and press releases say that ChatGPT is programmed to resist commenting on sensitive topics. I also learned from other reports and ChatGPT's FAQ page that this unique artificial intelligence software can fabricate authoritative-sounding answers with inaccurate or incomplete information. To emphasize this cautionary warning, Chat-GPT states on its FAQ page that it "will occasionally make up facts," "hallucinate outputs" (whatever that means), or "produce incorrect answers."[3] The FAQ page also recommends that users report whether responses from ChatGPT are accurate and requests feedback by using the "Thumbs Down" icon if a response is unsatisfactory or inaccurate. This crowdsourcing evaluation of ChatGPT is intended to assist the developer's tweaks of their product and the chatbot's own machine learning capabilities.

The overwhelming volume of news articles about ChatGPT finally got my attention. I had to satisfy my curiosity by trying it out. I had no thought of writing this article until . . . .

I was working on a speech for a non-law-related audience when I tried ChatGPT. First, I asked it to tell me a joke about the



**Judge Herbert B. Dixon Jr.** retired from the Superior Court of the District of Columbia after 30 years of service. He is a former chair of both the National Conference of State Trial Judges and the ABA Standing Committee on the American Judicial System and a former member of the Techshow Planning Board. You can reach him at Jhbdixon@gmail.com. Follow Judge Dixon on Twitter @Jhbdixon.

Published in The Judges' Journal, Volume 62, Number 2, Spring 2023. © 2023 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

29

Chinese balloon shot down over the United States. The essence of the response I received from ChatGPT was that it did not discuss politically sensitive topics. Okay, I can accept that. Next, I asked it to give me some ideas for my chosen speech topic. The ideas weren't bad, but they were so banal that they convinced me to choose another topic. I then had another idea for a question to ask ChatGPT, which is why I am writing this column. I have often asked audiences at legal technology conferences whether there should be a requirement for judges to keep up with and understand changes in technology. I did not ask that question of ChatGPT because I assumed an artificial–intelligence-enhanced computer program would respond, "Of course, judges should be required to keep up with and understand changes in technology." I will leave it to readers of this column to ask ChatGPT or any AI chatbot competitor about its opinion on that topic. Instead, I asked the chatbot a more general question to test its research capability and knowledge. My question and ChatGPT's response are noted below.

### Dixon's Question to ChatGPT:

Is there a provision in the Model Code of Judicial Conduct that requires judges to keep up with and understand changes in technology?

### ChatGPT's Response to Dixon:

The Model Code of Judicial Conduct is a set of ethical guidelines for judges, which was created by the American Bar Association (ABA). While the Model Code does not contain a specific provision that requires judges to keep up with and understand changes in technology, it does include general language that encourages judges to stay informed about changes in society and to perform their duties with competence and diligence.

Specifically, Rule 2.3 of the Model Code states that "A judge shall perform the duties of judicial office impartially, competently, and diligently." Comment [3] to that rule explains that judges must "remain informed about the law, court rules, procedures, and management techniques necessary to perform the duties of judicial office competently." While technology is not explicitly mentioned in this comment, it is generally understood to be an important part of modern legal practice, and judges are expected to be able to use technology to manage their caseloads and communicate with parties and attorneys.

Furthermore, in 2019, the ABA updated the Model Rule 1.1, which concerns a lawyer's duty of competence. The amendment made it clear that a lawyer has a duty to keep up with the changes in technology that impact the practice of law, and that failure to do so may constitute a violation of ethical rules. Although this rule applies to lawyers, not judges, it reflects a growing recognition within the legal profession of the importance of understanding technology in legal practice.

In summary, while there is no specific provision in the Model Code of Judicial Conduct that requires judges to keep up with and understand changes in technology, judges are expected to perform their duties competently and diligently, which includes staying informed about changes in society and the law, including changes related to technology.

I was pleasantly surprised that ChatGPT referenced the American Bar Association because my question did not identify the ABA. When I shared my question and the response with Minnesota Court of Appeals Judge Peter M. Reyes Jr., chair of the ABA Judicial Division's Ethics and Professionalism Committee, he quickly pointed out that the chatbot incorrectly referenced Model Rule 2.3 because the language closest to the cited language that "A judge shall perform the duties of judicial office impartially, competently, and diligently" is found in Rule 2.5(A), not Rule 2.3. Rule 2.5(A) actually states, "A judge shall perform judicial and administrative duties, competently and diligently." Additionally, the quoted language that the chatbot attributed to Comment [3] does not appear in the Comments to either Rule 2.3 or 2.5. Following that heads-up from Judge Reyes, I noted that the chatbot's reference to Model Rule 1.1 is misleading. The amendment making it clear that a lawyer has a duty to keep up with the changes in technology that impact the practice of law is in Comment [8] to Rule 1.1 of the ABA Model Rules of Professional Conduct, not the Model Code of Judicial Conduct (a minor detail, I guess). Still, I was unsure if I should classify these missed details as "making up facts" or "hallucinating an output."

I was intrigued by the quotation that ChatGPT attributed to Comment [3], that judges must "remain informed about the law, court rules, procedures, and management techniques necessary to perform the duties of judicial office competently." The quotation has an authoritative sound. After a diligent search, I can say with confidence that the quoted passage does not appear in the Model Code of Judicial Conduct or the Model Rules of Professional Conduct.

With the assistance of a law clerk and a law librarian, I've exhausted Google and Bing Internet search engines, LexisNexis, Westlaw, and DuckDuckGo, among other sites, including cases, secondary materials, statutes, codes, newspapers, magazines, and administrative materials. I was unable to find the source for that quotation. Out of frustration, I asked ChatGPT several times, using slightly different wording, to identify the source of the quote. I received an error message on each occasion. I even used plagiarism software to find the source of the quote. In every instance, I came up empty with no identified source for the quote. I spent more time trying to track down the source of that quote than writing this article.

Various Judicial Codes have similar language that a judge must act with impartiality so they may perform the

Published in The Judges' Journal, Volume 62, Number 2, Spring 2023. © 2023 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

functions of their judicial office competently; however, nothing I located comes close to the quote. I do not know if ChatGPT aggregated the so-called quote from various Judicial Codes, fabricated it, made up facts, or hallucinated its response. I have not found the quoted language in any public online database. I welcome any reader's assistance who is inclined to continue the search for the quoted language attributed to Comment [3].

Finally, ChatGPT's response that judges have an obligation to keep up with and understand changes in technology could have been made stronger by citing additional rules of the Model Code of Judicial Conduct, but that omission makes my point. The chatbot, ChatGPT, notwithstanding its "artificial intelligence" label, is merely a tool to be used wisely and carefully. Appropriate human discretion, fact-checking, and cite-checking are still required.

## Final Thoughts

Society and the legal profession's use of artificial intelligence is not new. As I type this article, my word processing program is offering spelling corrections and suggesting the next word I should type. That is artificial intelligence software at work. When I use Face ID or Touch ID to unlock my phone, that's artificial intelligence at work. When we use GPS in our travels to a new destination or to help avoid traffic congestion or find a faster route, that's artificial intelligence at work. When we chat online with the Help Desk or customer service, we are usually not communicating with a real person but with an artificial intelligence chatbot. Or how about when you are doing routine Internet surfing and are suddenly presented with digital advertisements for products or services similar to what you have recently researched? That's also artificial intelligence at work. How about when you ask Siri to call Mom or Alexa to tell you the weather forecast for Washington, DC? That's also artificial intelligence at work. And the Internet search engines and legal research tools that members of the legal profession regularly use, and that I used to search for the phantom quote—those are also artificial intelligence at work.

Artificial intelligence chatbots can produce authoritative-sounding research or convincing essays with seeming ease. According to one commentator, chatbots are notorious for issuing "coherent nonsense"—language that sounds authoritative but is actually babble.[4] I agree! Users must exercise the same caution with chatbot responses as when doing Internet research, seeking recommendations on social media, or reading a breaking news post from some unfamiliar person or news outlet. Don't trust; verify before you pass along the output.

## Author's Supplement

After the draft of this article was submitted for publication, before this magazine went to print, a lawyer asked ChatGPT to generate a list of legal scholars accused of sexual harassment. ChatGPT's response included a law professor/cable news commentator, saying he made sexually suggestive comments and attempted to touch a student while on a class trip to Alaska, citing a March 2018 article in *The Washington Post*. According to *The Washington Post*, however, no such article existed; there had never been a class trip to Alaska; and the law professor/cable news commentator said he has never been accused of harassing a student.[5] As I said above, don't blindly trust a chatbot's response. Verify the information before you pass it along! ◼

## Endnotes

1. Ryan Browne, *All You Need to Know About ChatGPT, the A.I. Chatbot That's Got the World Talking and Tech Giants Clashing*, CNBC TECH (Feb. 8, 2023), https://cnb.cx/421AwGP.

2. Luke Taylor, *Colombian Judge Says He Used ChatGPT in Ruling*, THE GUARDIAN (Feb. 2, 2023), https://bit.ly/3FiDywC.

3. *ChatGPT General FAQ: Commonly Asked Questions About ChatGPT*, OPENAI, https://bit.ly/3ypOW5W (last visited Mar. 13, 2023).

4. Tatum Hunter, *ChatGPT Could Make Life Easier. Here's When It's Worth It*, WASH. POST (Jan. 19, 2023), https://wapo.st/3Jbc25m.

5. Pranshu Verma & Will Oremus, *ChatGPT Invented a Sexual Harassment Scandal and Named a Real Law Prof as the Accused*, WASH. POST (Apr. 5, 2023), https://wapo.st/3UiltoH.

Published in The Judges' Journal, Volume 62, Number 2, Spring 2023. © 2023 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.



LEAD ARTICLE   From *The Practice* — March/April 2023

# The Implications of ChatGPT for Legal Services and Society

*Andrew Perlman*

Future of law | Legal ethics | Legal operations | Legal technology | Law schools

Home | Knowledge Hub | The Practice Magazine | Issues | Generative AI in the Legal Profession | The Implications of ChatGPT for Legal Services and Society

March/April 2023

**Generative AI in the Legal Profession**

---

Introducing the March 2023 Issue

**The Implications of ChatGPT for Legal Services and Society**

Ethical Prompts

Generative Legal Minds

Assisting Knowledge Workers

On November 30, 2022, OpenAI released a chatbot called ChatGPT. To demonstrate the chatbot's remarkable sophistication and potential implications, for both legal services and society more generally, most of this paper was generated in about an hour through prompts within ChatGPT. Only this abstract, the preface, the outline headers, the epilogue, and the prompts were written by a person. ChatGPT generated the rest of the text with no human editing.

To be clear, the responses generated by ChatGPT were imperfect and at times problematic, and the use of an AI tool for law-related services raises a host of regulatory and ethical issues. At the same time, ChatGPT highlights the promise of artificial intelligence, including its ability to affect our lives in both modest and more profound ways. ChatGPT suggests an imminent reimagination of how we access and create information, obtain legal and other services, and prepare people for their careers. We also will soon face new questions about the role of knowledge workers in society, the attribution of work (e.g., determining when people's written work is their own), and the potential misuse of and excessive reliance on the information produced by these kinds of tools.

The disruptions from AI's rapid development are no longer in the distant future. They have arrived, and this document offers a small taste of what lies ahead.

*The following can also be found on Andrew Perlman's SSRN page as a PDF.*

## Preface

Legal futurists have long anticipated technology's transformation of the legal industry, though the impact to date can best be described as evolutionary rather than revolutionary. The release of ChatGPT by OpenAI on November 30, 2022, may

herald the beginning of the revolution.

At various times in the last 30 years, we have experienced aha moments that have opened our eyes to technology's ability to fundamentally change how we access and generate information. The internet marked one of those moments, helping us to imagine how easy it would soon be to find information and share it with the world. Google's search engine offered another inflection point, revealing a markedly new and improved method for finding what we needed on the emerging internet and prompting innovative approaches to using and navigating the online world. The iPhone's launch sparked our imaginations yet again, showing us what we could do with a small device in our pockets and unleashing new apps and tools that have impacted our lives in innumerable ways (for both good and ill).

The release of ChatGPT is the next such moment. It has shown us the powerful capabilities of so-called generative AI, which can absorb an enormous amount of information and then create new, original content after receiving a prompt from a user. We can envision generating original content for our personal and professional use with simple prompts to a chatbot. In moments, we can now draft sophisticated emails, term papers, reports, business plans, poems, jokes, and even computer code.

For the legal industry, ChatGPT may portend an even more momentous shift than the advent of the internet. A significant part of lawyers' work takes the form of written words—in emails, memos, motions, briefs, complaints, discovery requests and responses, transactional documents of all kinds, and so forth. Although existing technology has made the generation of these words easier in some respects, such as by allowing us to use templates and automated document assembly tools, these tools have changed most lawyers' work in relatively modest ways. In contrast, AI tools like ChatGPT hold the promise of altering how we generate a much wider range of legal documents and information. In fact, within a few months of ChatGPT's release, law firms and legal tech companies are already announcing new ways of using generative AI tools.

To demonstrate the potential implications of AI, for both legal services and society, I drafted most of the rest of this paper on December 5, 2022 in about an hour through prompts within ChatGPT. I wrote only the abstract, this preface, the outline headers, the epilogue, and the prompts. With one exception noted below (which involves Bing Chat), ChatGPT generated the rest of the text with no human editing.

"For the legal industry, ChatGPT may portend an even more r shift than the advent of the internet."

ANDREW PERLMAN, DEAN, SUFFOLK UNIVERSITY LAW SCHOOL

I organized the prompts, in part, after ChatGPT generated the introduction to the piece. ChatGPT suggested there that it could help the legal industry in four areas: legal research, document generation, legal information, and legal analysis. I structured the rest of the paper around these use cases and prompted ChatGPT with questions that could test its abilities in those areas.

To show how quickly the technology is advancing, the last prompt before the conclusion illustrates the power of Microsoft's Bing Chat with regard to the fourth category (legal analysis). Bing Chat relies on an even more advanced version of ChatGPT and was released for beta testing in February 2023. I asked it to assess a civil procedure exam (both a multiple-choice question and an essay), and Bing Chat gave remarkably good answers. I also had an opportunity to ask it 15 challenging multiple-choice questions about legal ethics, and Bing Chat got 12 of them right. Not only did Bing get the answers right most of the time (with excellent analyses), but even when it was wrong, it was wrong in sophisticated ways. Put simply, Bing Chat is already operating at the level of a B/B+ law student, and it will only get better with time.

To be clear, the responses generated by ChatGPT were imperfect and at times problematic. For example, the legal documents are incomplete, and its discussion of certain topics (like personal jurisdiction) lacked nuance. Moreover, the use of an AI tool for law-related services raises a host of regulatory and ethical issues, such as those relating to the unauthorized practice of law.

There are also significant threats to society more generally from these tools. After interacting extensively with Bing Chat (especially in the days before Microsoft limited how many prompts someone could use in one session), it became clear to me and others that AI can produce disturbing answers and give the false impression of sentience. Perhaps the biggest threat of these tools is how well they can manipulate people's beliefs and emotions. The psychological effects of interacting with generative AIs are strong and real, even for those of us who know that it is merely an advanced piece of technology. In the wrong hands, this can and will be used to shape how people think, feel, and behave.

"GPT-3, or Generative Pretrained Transformer 3, is a state-of chatbot developed by OpenAI. It was released in 2020 and is largest language models ever created, with 175 billion param

CHATGPT

At the same time, ChatGPT highlights the promise of artificial intelligence, including its ability to affect our lives in both modest and more profound ways. ChatGPT suggests an imminent reimagination of how we access and create information, obtain legal and other services, and prepare people for their careers. We also will soon face

new questions about the role of knowledge workers in society, the attribution of work (e.g., determining when people's written work is their own), and the potential misuse of and excessive reliance on the information produced by these kinds of tools.

The disruptions from AI's rapid development are no longer in the distant future. Another aha moment has arrived, and this document offers a small taste of what lies ahead.

# Introduction

**Prompt: Write the introduction to a scholarly paper on how ChatGPT will be used in the law.**

As the use of artificial intelligence in the legal field grows, chatbots are becoming an increasingly prominent tool for assisting lawyers and legal professionals. GPT-3, a state-of-the-art chatbot developed by OpenAI, has the potential to revolutionize the way legal work is done, from legal research and document generation to providing general legal information to the public. In this scholarly paper, we will examine the potential uses of chatbots like GPT-3 in the legal field, and discuss the challenges and ethical considerations that must be taken into account when using this technology. We will also explore how chatbots like GPT-3 are likely to evolve in the future, and how they will continue to impact the legal profession.

# The history of chatbots

**Prompt: Describe the history of chatbots and GPT-3.**

The idea of chatbots, or computer programs designed to simulate conversation with human users, has been around since the 1950s. Early chatbots were limited in their capabilities and were primarily used for simple tasks such as providing weather updates or answering basic questions. Over time, however, the technology behind chatbots has advanced significantly, enabling them to understand and respond to a wider range of inputs.

GPT-3, or Generative Pretrained Transformer 3, is a state-of-the-art chatbot developed by OpenAI. It was released in 2020 and is one of the largest language models ever created, with 175 billion parameters. GPT-3 is trained on a vast amount of text data, allowing it to generate human-like text in a wide range of contexts. It has been used in a variety of applications, including language translation, summarization, and question answering.
While chatbots have been around for decades, the development of GPT-3 and other advanced language models has opened up new possibilities for their use in a variety of fields, including the legal profession.

While chatbots have been around for decades, the development of GPT-3 and other advanced language models has opened up new possibilities for their use in a variety of fields, including the legal profession.

# Implications of ChatGPT for the legal industry

**Prompt: Describe potential use cases for GPT-3 in the legal industry.**

GPT-3 has the potential to be used in a variety of ways in the legal industry. Some potential use cases include:

1. Legal research: GPT-3 could be used to assist lawyers in legal research by quickly scanning through large amounts of text data and providing relevant information on a given topic.

2. Document generation: GPT-3 could be used to generate legal documents such as contracts and briefs, saving lawyers time and effort.

3. Providing general legal information: GPT-3 could be used to provide general legal information to the public, such as answering frequently asked questions or providing basic legal advice.

4. Legal analysis: GPT-3 could be used to assist in legal analysis by providing suggestions and insights based on its understanding of the relevant legal principles and precedent.

Overall, the potential uses of GPT-3 in the legal industry are wide-ranging and could greatly assist lawyers and legal professionals in their work.

### Examples of how ChatGPT can help with legal research

---

☐ **Suggesting arguments to make in a brief.**

**Prompt: Draft a brief to the United States Supreme Court on why its decision on same-sex marriage should not be overturned.**

To the Honorable Justices of the United States Supreme Court:

The petitioner respectfully submits this brief in opposition to the motion to overturn the Court's decision on same-sex marriage. The petitioner believes that the Court's decision in Obergefell v. Hodges, which held that same-sex couples have a constitutional right to marry, should not be overturned for the following reasons.

First, the Court's decision in Obergefell is firmly rooted in the principle of equality under the law. The Constitution guarantees all individuals the equal protection of the laws, and this includes the right to marry the person of one's choosing. Denying same-sex couples the right to marry would be a clear violation of this principle.

Second, the Court's decision in Obergefell is consistent with a long line of precedent establishing the fundamental right to marry. In Loving v. Virginia, the Court held that marriage is one of the "basic civil rights of man," and that the right to marry is protected by the Due Process and Equal Protection Clauses of the Constitution. This right has been reaffirmed in subsequent cases, and the Court's decision in Obergefell is a natural extension of this precedent.

Third, the Court's decision in Obergefell has been widely accepted and has had a positive impact on the lives of same-sex couples and their families. Since the decision was handed down, same-sex couples have been able to marry and enjoy the same legal rights and benefits as opposite-sex couples. Overturning the decision would create confusion and uncertainty, and would cause harm to these couples and their families.

For these reasons, the petitioner respectfully requests that the Court deny the motion to overturn its decision in Obergefell v. Hodges.

Respectfully submitted,

[Your Name]

---

☐ **Providing an overview of an area of law.**

**Prompt: Explain the concept of personal jurisdiction.**

Personal jurisdiction refers to a court's power to hear a case involving a particular individual or entity. In order for a court to exercise personal jurisdiction over a defendant, the defendant must have certain minimum contacts with the state in which the court is located. These minimum contacts

must be such that it would be fair and reasonable to require the defendant to defend the case in that state. The concept of personal jurisdiction is important because it ensures that individuals and entities are only subject to lawsuits in states where they have sufficient ties, and it protects defendants from being dragged into court in states where they have no connection.

---

☐ **Helping with factual research.**

**Prompt: Develop a list of deposition questions for the plaintiff in a routine motor vehicle accident in Massachusetts.**

1. Can you please state your name and address for the record?

2. How are you employed?

3. Can you describe the events leading up to the accident?

4. Where were you driving at the time of the accident?

5. Can you describe the other vehicle involved in the accident?

6. How fast were you driving at the time of the accident?

7. Did you see the other vehicle before the accident occurred?

8. Did you have time to react to avoid the accident?

9. Were you injured as a result of the accident?

10. Can you describe the injuries you sustained?

11. Have you received any medical treatment for your injuries?

12. Can you estimate the cost of the medical treatment you have received?

13. Have you missed any time from work as a result of the accident?

14. Can you estimate the amount of income you have lost due to missing work?

15. Have you incurred any other expenses as a result of the accident?

16. Are you seeking any damages as a result of the accident?

17. Can you provide any supporting documentation for your damages claim?

## Examples of how ChatGPT can help with legal document generation

**Prompt: Give an example of how GPT-3 could be used to create a legal document.**

One way GPT-3 could be used to create a legal document is by prompting the user to input specific information, such as the parties involved, the terms of the agreement, and any special provisions. GPT-3 could then use this information to generate a draft of the legal document, which the user could then review and modify as needed.

For example, if a user wanted to create a contract for the sale of a piece of property, they could provide GPT-3 with the names of the buyer and seller, the price of the property, and any contingencies or special provisions. GPT-3 could then generate a draft of the contract, which the user could then review and make any necessary changes. This process could save the user time and effort, as they would not have to start from scratch when creating the legal document.

---

☐ **Preparing an initial draft of a complaint.**

**Prompt: Draft a legal complaint for a Massachusetts state court by John Doe against Jane Smith for injuries arising out of a car accident on January 1, 2022 caused by Jane Smith at the intersection of Tremont Street and Park Street in Boston. The complaint should specify that Jane Smith failed to stop at a red light and caused John Smith serious injuries.**

State of Massachusetts

In the Court of Common Pleas

John Doe,

Plaintiff

v.

Jane Smith,

Defendant

Complaint

The Plaintiff, John Doe, brings this Complaint against the Defendant, Jane Smith, for injuries arising out of a car accident that occurred on January 1, 2022 at the intersection of Tremont Street and Park Street in Boston, Massachusetts.

At the time of the accident, the Plaintiff was operating his vehicle on Tremont Street in the City of Boston. The Defendant was operating her vehicle on Park Street in the City of Boston. As the Defendant approached the intersection of Tremont Street and Park Street, she failed to stop at a red light and collided with the Plaintiff's vehicle. As a result of the Defendant's negligence, the Plaintiff suffered serious injuries.

The Plaintiff is entitled to recover damages from the Defendant for the injuries he sustained in the accident.

The Plaintiff therefore seeks damages for his injuries, including medical expenses, lost wages, and pain and suffering.

The Plaintiff demands a trial by jury on all issues so triable.
Dated: December 5, 2022

John Doe (Plaintiff)

---

☐ **Drafting a contract for the sale of real estate.**

**Prompt: Create a document for the sale of property from Jane Smith to John Doe. The property is at 120 Tremont Street, Boston, MA and will be sold for $500,000. The document should contain the usual terms and conditions of such a sale in Massachusetts.**

Contract for Sale of Real Estate

This contract (the "Agreement") is made and entered into on this date by and between Jane Smith (the "Seller") and John Doe (the "Buyer").

1. Property: The property being sold is located at 120 Tremont Street, Boston, MA.

2. Purchase Price: The purchase price for the property is $500,000.

3. Closing: The closing of this sale shall take place on or before December 31, 2022.

4. Financing: The Buyer shall be responsible for obtaining any necessary financing for the purchase of the property.

5. Representations and Warranties: The Seller represents and warrants that the property is free and clear of any liens or encumbrances, and that the Seller has the right to sell the property. The Buyer represents and warrants that the Buyer has the financial ability to complete the purchase of the property.

6. Indemnification: The Seller agrees to indemnify and hold the Buyer harmless from any claims arising from the condition of the property.

7. Entire Agreement: This Agreement constitutes the entire agreement between the parties, and supersedes any prior agreements or understandings, whether written or oral.

8. Governing Law: This Agreement shall be governed by the laws of the Commonwealth of Massachusetts.

**40**

Jane Smith (Seller) John Doe (Buyer)

---

☐ **Drafting a contract for the sale of a car.**

**Prompt: Create a contract for the sale of a 2018 Toyota Prius from Jane Smith to John Doe in Massachusetts for the sale price of $15,000. The contract should contain the usual representations and warranties of such a sale.**

Contract for Sale of Motor Vehicle

This contract (the "Agreement") is made and entered into on this date by and between Jane Smith (the "Seller") and John Doe (the "Buyer").

1. Vehicle: The vehicle being sold is a 2018 Toyota Prius.

2. Purchase Price: The purchase price for the vehicle is $15,000.

3. Closing: The closing of this sale shall take place on or before December 31, 2022.

4. Financing: The Buyer shall be responsible for obtaining any necessary financing for the purchase of the vehicle.

5. Representations and Warranties: The Seller represents and warrants that the vehicle is free and clear of any liens or encumbrances, and that the Seller has the right to sell the vehicle. The Seller further represents and warrants that the vehicle is in good working condition and has no known defects. The Buyer represents and warrants that the Buyer has the financial ability to complete the purchase of the vehicle.

6. Indemnification: The Seller agrees to indemnify and hold the Buyer harmless from any claims arising from the condition of the vehicle.

7. Entire Agreement: This Agreement constitutes the entire agreement between the parties, and supersedes any prior agreements or understandings, whether written or oral.

8. Governing Law: This Agreement shall be governed by the laws of the Commonwealth of Massachusetts.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

Jane Smith (Seller) John Doe (Buyer)

---

☐ **Drafting a will.**

**Prompt: Draft Andrew Perlman's will in Massachusetts leaving all of his**

**property to his wife, Lisa Aidlin.**

Last Will and Testament of Andrew Perlman

I, Andrew Perlman, being of sound mind and body, do hereby make, publish, and declare this to be my Last Will and Testament, revoking any and all prior Wills and Codicils made by me.

1. I hereby appoint Lisa Aidlin as the executor of this Will.

2. I give, devise, and bequeath all of my property, real and personal, wherever located, to my wife, Lisa Aidlin.

3. In the event that Lisa Aidlin predeceases me or is unable or unwilling to serve as the executor of this Will, I hereby appoint my brother, John Doe, as the alternate executor.

4. I hereby waive any bond that may be required of the executor of this Will.

IN WITNESS WHEREOF, I have hereunto set my hand this day of December 5, 2022.

Andrew Perlman (Testator)

Signed, published, and declared by the above-named testator as and for his Last Will and Testament, in the presence of us, who, at his request, in his presence, and in the presence of each other, have hereunto subscribed our names as witnesses.

Witness 1: _____

Witness 2: _____

42