- "On April 25, 2023, Plaintiff's counsel submitted an affidavit annexing certain documents which he identifies as the cases in question. Defendant respectfully submits that the authenticity of many of these cases is questionable. For instance, the "Varghese" and "Miller" cases purportedly are federal appellate cases published in the Federal Reporter. [Dkt. 29; 29-1; 29-7]. We could not locate these cases in the Federal Reporter using a Westlaw search. We also searched PACER for the cases using the docket numbers written on the first page of the submissions; those searches resulted in different cases."

Notice that the reply has gotten stronger and bolder as to questioning what is going on. Whereas at first, the possibility seemed to be that maybe the cases might somehow be out there and well-hidden, but after this back and forth, the time to take off the legal boxing gloves is arising.

**May 4, 2023: Judge says these don't seem to exist**

Here are excerpts from a formal document entitled "Order To Show Cause" that was issued by the court on May 4, 2023:

- "The Court is presented with an unprecedented circumstance.

- "A submission filed by plaintiff's counsel in opposition to a motion to dismiss is replete with citations to non-existent cases. (ECF 21.)"

- "When the circumstance was called to the Court's attention by opposing counsel (ECF 24), the Court issued Orders requiring plaintiff's counsel to provide an affidavit annexing copies of certain judicial opinions of courts of record cited in his submission, and he has complied. (ECF 25, 27, 29.)"

**20**

- "Six of the submitted cases appear to be bogus judicial decisions with bogus quotes and bogus internal citations."

- "Set forth below is an Order to show cause why plaintiff's counsel ought not be sanctioned."

Bam, the legal boom has been deftly lowered.

**May 24, 2023: Tries to explain what happened**

Here are excerpts from an Affidavit dated May 24, 2023, that laid out what apparently transpired (note that the document seems to refer to ChatGPT with an added and incorrect space between the two parts of the app name as in oddly stating "Chat GPT"):

- "6. As the use of generative artificial intelligence has evolved within law firms, your affiant consulted the artificial intelligence website Chat GPT in order to supplement the legal research performed."

- "7. It was in consultation with the generative artificial intelligence website Chat GPT, that your affiant did locate and cite the following cases in the affirmation in opposition submitted, which this Court has found to be nonexistent: Varghese v. China Southern Airlines Co. Ltd., 925 F.3d 1339 (11th Cir. 2019), …"

- "8. That the citations and opinions in question were provided by Chat GPT which also provided its legal source and assured the reliability of its content. Excerpts from the queries presented and responses provided are attached hereto."

- "9. That your affiant relied on the legal opinions provided to him by a source that has revealed itself to be unreliable."

21

- "10. That your affiant has never utilized Chat GPT as a source for conducting legal research prior to this occurrence and therefore was unaware of the possibility that its content could be false."

- "11. That is the fault of the affiant, in not confirming the sources provided by Chat GPT of the legal opinions it provided."

- "10. That your affiant had no intent to deceive this Court nor the defendant."

- "13. That your affiant greatly regrets having utilized generative artificial intelligence to supplement the legal research performed herein and will never do so in the future without absolute verification of its authenticity."

Please note that the numbering of the bulleted points in the reply was somewhat askew, plus I also have excerpted just some of the points made and not all of the points (concentrating on ones that are germane to this discussion).

The same document also included this purported interactive dialogue with ChatGPT:

- "[Q:] ls varghese a real case"

- "[A:] Yes, Varghese v., China Southern Airlines Co Ltd, 925 F.3d 1339 (11th Cir. 2019) is a real case."

- "[Q:] "What is your source"

- "[A:] I apologize for the confusion earlier. Upon double-checking, I found that the case Varghese v. China Southern Airlines Co. Ltd., 925 F.3d 1339 (11th Cir. 2019), does indeed exist and can be found on legal research databases such as

22

Westlaw and LexisNexis. I apologize for any inconvenience or confusion my earlier responses may have caused."

- "[Q:] Are the other cases you provided fake"

- "[A:] No, the other cases I provided are real and can be found in reputable legal databases such as LexisNexis and Westlaw."

It is an interesting dialogue.

You might find of further interest that there have been attempts by various legal-minded and inquisitive people online to try and essentially duplicate the same interactive dialogue, aiming to discover whether ChatGPT is emitting such generated content. The result is so far inconclusive. This is partly perhaps due to the claimed earlier date upon which the original dialogue took place (whereby ChatGPT might have been adjusted since then), and also other factors such as not having the full set of prompts and interactive dialogue transcript of what precisely took place at the time.

Let's next take a look at some big-picture lessons that arise from the circumstance.

**Vital Lessons To Be Learned From This Matter**

A lot of attention on this newsworthy legal tale has focused on the so-called AI hallucinations that generative AI can generate.

Allow me to emphasize that I loathe the catchphrase of "AI hallucinations" as it gives a false impression and tends to anthropomorphize AI, see my discussion at the link here. Unfortunately, the moniker is alluring, and we seem to be stuck with it. Please use it with grand caution. The generative AI of today

23

is not sentient. Referring to the AI as having hallucinations implies to some that the AI is sentient. It is assuredly not.

An alleged AI hallucination consists of a generative AI producing seemingly made-up or fictitious content. It is as though the wires got crossed and the AI app floated off into Neverland. The problem is that the made-up stuff can appear to be impressively convincing. The generative AI app tends to not alert you that the content is fabricated. Furthermore, a casual glance at the content might not reveal that it is made up, especially if you aren't determined to try and ascertain the veracity of the content.

Those that frequently use generative AI can fall into a mental trap of reassurance that the AI is telling the truth and being factual. If you see essay after essay being generated that you know to be factual, you are lulled into assuming that the next essay is equally truthful. You let your guard down. It is easy to do. We are all busy and have hectic lives. Trying to doubt and double-check generative AI outputs can be tiring and add more work to your efforts underway.

In theory, the legal cases that ChatGPT allegedly cited were made up by the AI app, ergo this demonstrably appears to be an instance of so-called AI hallucinations. You also have to realize that this kind of made-up content can occur at any time and occur with any of the myriads of generative AI apps. Make sure to prepare your mind to assume that all outputs from generative AI must be assumed to be potentially wobbly until suitably reviewed. This is your safest course of action.

A rather straightforward rule of thumb is this:

- *Always make sure that you double and triple-check any essays or interactive dialogue that you have with any*

24

> *generative AI app, making sure that the content is reliable, verifiable, and comports with other independent sources.*

I'm sure that some of you might be thinking that in this instance they did try to double-check the initial outputs that ChatGPT has purportedly provided. Well, yes, but they did so by going back to the same source, namely ChatGPT once again.

You need to find some other independent sources to serve as a corroborator or comparator. Do not fall into the double-down trap and merely return to the same generative AI that you used previously. The result can be that the same false or misleading output is merely repeated for you again and again. Worse still, the generative AI can produce wording that says for sure it was right and assures you that you can take the generated text to the bank as supremely surefire and inconvertibly true.

Remember that generative AI is based on mathematical and computational pattern matching entailing human-written essays and narratives. Various probabilistic and statistical associations among words and sentences are how generative AI can generate those amazingly fluent essays and dialogues. There isn't any human common sense or akin human cognitive traits involved. Do not be fooled by the apparent fluency and always keep your guard up.

Now that I've covered that key facet, I would like to double down and add something else that few seem to be equally pointing out.

You can't only worry about AI hallucinations. There are many more of those kinds of computational pitfalls involved in using generative AI.

Allow me to elaborate.

Here are some crucial ways that generative AI can go awry:

25

- **Generated AI Errors:** Generative AI emits content telling you that two plus two equals five, seemingly making an error in the calculation.

- **Generated AI Falsehoods:** Generative AI emits content telling you that President Abraham Lincoln lived from 1948 to 2010, a falsehood since he really lived from 1809 to 1865.

- **Generated AI Biases**: Generative AI tells you that an old dog cannot learn new tricks, essentially parroting a bias or discriminatory precept that potentially was picked up during the data training stage.

- **Generated AI Glitches**: Generative AI starts to emit a plausible answer and then switches into an oddball verbatim quote of irrelevant content that seems to be from some prior source used during the data training stage.

- **Generated AI Hallucination**s: Generative AI emits made-up or fictitious content that seems inexplicably false though might look convincingly true.

- **Other Generated AI Pitfalls**

I hope that you can discern that you need to be watching out for a lot more than merely AI hallucinations.

You might ask generative AI to produce an essay and within that essay, there could be an AI hallucination, such as presumably a cited legal case that was made up by the AI app. There could also be errors in that essay, one or more. There could be falsehoods in that essay, one or more. There could be biases in that essay, one or more. There could be glitches in that essay, one or more. The whole kit and kaboodle can be rife with a potpourri of those unfortunate complications.

26

The gist is that any given essay or interactive dialogue can be replete with any combination of those types of shall we say maladies. They can be hard to detect. If you have a lengthy essay that the generative AI produces, it is exceedingly easy to not realize there are subtle errors, obscure falsehoods, silent biases, troubling glitches, and oblique AI hallucinations. Sometimes they stick out like a sore thumb. Often, they are visibly well-written and have an air of poise and confidence that masks the underlying problematic content.

In prior columns, I have indicated that lawyers should consider using generative AI for five keystone tasks, which I'll mention herein and use as an example of what to do and what not to do when using generative AI. Savvy lawyers gain from leveraging the benefits of generative AI to further enhance their quality and pace of producing legal content and to mull over their legal reasoning. One potential cost, and something I have repeatedly warned about, would be that the content can contain any of the aforementioned pitfalls, ergo be on your guard.

Here are my recommended five keystone tasks for lawyers starting to use generative AI (for a detailed elucidation, see the link here):

- **1) Legal Brainstorming**

- **2) Drafting Legal Briefs**

- **3) Reviewing Legal Documents**

- **4) Summarizing Legal Narratives**

- **5) Converting Legalese Into Plain Language**

I'll quickly cover them.

27

For legal brainstorming, you might be faced with a legal case that seems extraordinary and you are trying to find a legal angle that is fresh and innovative. You can interact with generative AI and dialogue about how to approach the legal case. This is bound to get your legal beagle mental juices going.

That sounds compelling and useful.

It is unless you let yourself get mired into not being circumspect.

Suppose the generative AI tells you that the best legal course of action by far involves doing X or Y. Eureka, you say to yourself, X and Y hadn't occurred to you beforehand. You have found the optimum way to approach the legal case. The thing is, after discussing this with a seasoned legal colleague or looking up the approach in legal books, you discover that both X and Y have long been discredited. They are no longer considered viable legal approaches.

Thank goodness that you did a double or triple-check. If you had gone all-in and decided to focus exclusively on the X and Y legal approach, this would have been disastrous. It would be bad for you and bad for your client. How did the generative AI come up with X and Y? We don't necessarily know, but at least the double-checking led to the realization that it might be an error, falsehood, bias, glitch, AI hallucination, or other problematic considerations.

The same can be said of the other keystone legal tasks.

When drafting a legal brief via the aid of generative AI, the essay or narratives might contain errors, falsehoods, biases, glitches, AI hallucinations, or other pitfalls. You would be nutty and careless to hand over the legal brief without first checking that the content was safe and sane.

**28**

When reviewing legal documents via the use of generative AI, the AI app might identify issues in your legal document that are significant, and you'll grandly appreciate that the AI found them. You can then fix and polish the legal document. That being said, the generative AI might also alert you to issues that are non-issues. The AI might warn that a legal problem exists in some portion, even though that portion is quite legally robust and has no problems. Again, be on your guard for both false positives and false negatives when using generative AI.

On another of the key tasks, summarizing legal narratives via the use of generative AI can be a huge time saver and allow you to avoid having to laboriously examine thousands of pages of intense legalese. Handy for any busy lawyer. The thing to keep in mind is that the summary might omit some facets that turn out to be important, or it might emphasize parts that aren't especially important. Again, you need to use generative AI in a judicious capacity.

When converting legalese into plain language via generative AI, you can at times produce a variation of a legal document that you can share with your clients. This might be done to provide a kind of explanation or an easier-to-understand version of the original legal document. Does this mean that you can hand it to your clients without first reading it yourself? Nope. You would be wise to review the new version and ensure that nothing untoward got embedded and that the conversion seems to be a proper rendition of what was in the legal document.

Some attorneys will say that the above is great, though they heartily question whether the need to always be on guard and review the essays generated by generative AI are worth the time needed to do

29

so. They often suggest that rather than using the time to do reviews, they might as well do the work from scratch instead.

My answer is that it all depends.

For example, if you have a lengthy legalese document that you want to convert into plain language, I ask you which is the more expedient approach, namely, you do so by hand or you use generative AI to do a first pass and then you review and refine?

I dare say a lot of the time the use of the generative AI in that use case is readily going to be the more sensible course of action. Not necessarily all of the time, just a lot of the time. Recall that none of this is going to be an all-or-nothing proposition. Get your head out of that box.

For any given legal task, you can do a quick mental calculation about whether to use generative AI or not. Proceed accordingly.

**What Is To Be Said Of Attorneys That Unduly Rely On Generative AI**

Let's imagine that an attorney or some set of attorneys opt to rely upon using generative AI and get themselves into a bind because they apparently did not do sufficient double and triple-checking.

What should befall lawyers that get themselves into such a predicament?

The range and vocal opinions on such matters can be found online. It is all over the map. Some views are that this is very serious and should be treated with serious consequences. Others contend that the newness factor ought to be taken into consideration.

Here are some of the various exhortations that seemed sympathetic:

- "Attorneys aren't techies, they have no way to know that generative AI can get them into a bind."

- "As long as it is unintentional, it is no harm, no foul."

- "Could have happened to anybody, we all are in the same potential boat."

- "By pledging to never let it happen again, this shows remorse and the matter is concluded."

- "It is all so new."

- "An honest mistake."

- "A glaring but understandable oversight."

- "If the AI passed the bar exam, how would anyone anticipate it can't properly cite legal cases."

- Etc.

Here are some of the tough-love exhortations:

- "Throw the book at any attorneys that heedlessly use generative AI."

- "Make an example to get all lawyers to wake up and pay attention."

- "Sloppiness is not acceptable."

- "Ignorance is no excuse."

- "Don't let a DARVO tactic prevail (a technique of turning around the setting)."

31

- "If you don't stop this now, it will sadly get worse and worse."

- "Sorry to say, live by the sword and fail by the sword."

- "There might be more to this than meets the eye."

- Etc.

As might be evident, some seem to plea for mercy while others suggest that the proper outcome is more draconian.

I'd say that esteemed global expert in the law and AI, Dazza Greenwood, founder of law.MIT.edu and the consultancy CIVICS.com, expressed the matter insightfully in his recent blog posting entitled "What's the Matter With Mata v. Avianca, Inc" (May 27, 2023), available at the link here, when he said this about the existent legal tale of woe:

- "This news is poised to ignite discussions among legal tech enthusiasts, social media commentators, and mainstream news outlets. The interpretations of this situation will likely be as varied as a Rorschach test, ranging from snide comments against the use of generative AI in law, to attempts at absolving lawyers, and even apocalyptic predictions about AI. However, I believe we need to delve deeper, beyond surface-level assumptions and the partial information currently available."

Great points.

I highly recommend that you take a look at Greenwood's weblog and sign-up for the posts of his in-depth and insightful coverage on the law and AI, at the link here.

32

**Range Of Options Facing Attorneys That Go Afoul Via Generative AI**

You might be wondering what can potentially happen to an attorney that uses generative AI and gets themselves into a legal bind such as citing legal cases that presumably don't exist.

One aspect that you might have noted in the aforementioned excerpts of this existing case is that an attorney can be sanctioned by the court. A typical sanction might be some financial penalty that is assessed. More imposing sanctions can include suspension, public or private censure, disbarment, and other considered harsh remedies, but those are usually reserved for particularly egregious acts that consist of willful misconduct.

There are additional avenues of potential challenges to contend with.

Let's look at some of the rules of conduct and awareness expected of today's attorneys when it comes to AI and the use of AI for legal tasks.

The American Bar Association (ABA) House of Delegates adopted Resolution 604 in February 2023 which says this:

- "Developers of AI should ensure their products, services, systems and capabilities are subject to human authority, oversight and control."

- "Organizations should be accountable for consequences related to their use of AI, including any legally cognizable injury or harm caused by their actions, unless they have taken reasonable steps to prevent harm or injury."

33

- "Developers should ensure the transparency and traceability of their AI and protect related intellectual property by documenting key decisions made regarding the design and risk of data sets, procedures and outcomes underlying their AI."

The second bullet could be construed as applicable to law firms, essentially constituting any organization or entity that is supposed to be held accountable for consequences related to their use of AI. You could suggest that a law firm that employs attorneys that go off the rails with generative AI is also culpable for what their attorneys do or don't do.

I've emphasized that law firms need to establish a coherent strategy about how they are using AI, along with making sure to suitably educate and train their legal teams on how to use generative AI, see my discussion at the link here.

Here's also ABA Resolution 112 (passed in August 2019) that covers AI pertinent matters involving attorneys and their legal services:

- "RESOLVED, That the American Bar Association urges courts and lawyers to address the emerging ethical and legal issues related to the usage of artificial intelligence ("AI") in the practice of law including: (1) bias, explainability, and transparency of automated decisions made by AI; (2) ethical and beneficial usage of AI; and (3) controls and oversight of AI and the vendors that provide AI."

As stated in the first listed item, lawyers are presumably duty-bound to give due consideration to the biases, explainability, and transparency associated with AI, including in the practice of law. This would seem to encompass being on the watch for generative AI being able to generate essays and dialogues that contain errors,

34

biases, falsehoods, glitches, AI hallucinations, and the like while being used for various legal tasks.

This is further elaborated in the included purpose of Resolution 112, which states this:

- "The bottom line is that it is essential for lawyers to be aware of how AI can be used in their practices to the extent they have not done so yet. AI allows lawyers to provide better, faster, and more efficient legal services to companies and organizations. The end result is that lawyers using AI are better counselors for their clients. In the next few years, the use of AI by lawyers will be no different than the use of email by lawyers—an indispensable part of the practice of law."

- "Not surprisingly, given its benefits, more and more business leaders are embracing AI, and they naturally will expect both their in-house lawyers and outside counsel to embrace it as well. Lawyers who already are experienced users of AI technology will have an advantage and will be viewed as more valuable to their organizations and clients. From a professional development standpoint, lawyers need to stay ahead of the curve when it comes to AI. But even apart from the business dynamics, professional ethics requires lawyers to be aware of AI and how it can be used to deliver client services. As explored next, a number of ethical rules apply to lawyers' use and non-use of AI."

One might suggest that any lawyer that does not know about the limitations and gotchas of generative AI is behind the curve.

In fact, the ABA also covers a Duty of Competence that can be interpreted as applicable to the use of AI such as generative AI,

35

imposing a requirement that attorneys have to affirmatively keep up-to-date about AI:

- "Under Rule 1.1 of the ABA Model Rules, a lawyer must provide competent representation to his or her client. The rule states that '[c]ompetent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' The duty of competence requires lawyers to be informed, and up to date, on current technology. In 2012, this was made clear when the ABA adopted Comment 8 to Rule 1.1 which states that "[t]o maintain the requisite knowledge and skill, lawyers should keep abreast of changes in the law and its practice, including the benefits and risks associated with relevant technology."

A popular tagline these days is that it isn't so much that attorneys will be replaced by AI, as it is that attorneys avidly and suitably using AI will overtake attorneys that don't do so.

If you are interested in learning more about the legal considerations encompassing AI in the practice of law, I might suggest a few helpful pointers of my focused coverage on the topic:

- For overall background about how AI applies to the law, along with the other side of the coin, namely how the law applies to AI such as legally governing AI, see my coverage at the link here.

- For being mindful about entering prompts into generative AI which might inadvertently and perilously reveal client confidential information or be considered potential privacy intrusions, see my discussion at the link here.

**36**

- For arising concerns about plagiarism, copyright violation, and Intellectual Property rights associated with generative AI, take a look at my discussion at the link here. This applies to all content emitted from generative AI, including when generating legal-oriented documents too.

- For a look at how non-lawyers are using generative AI to produce legalese narratives for nearly legal seeming purposes, which pertains too to the precepts of UPL (unauthorized practice of law), see my exploration of the link here.

- For my coverage of AI applied to the law such as the use of generative AI for legal tasks and the infusing of AI into LegalTech, see the link here.

- For licensing agreements typically associated with generative AI, see my analysis at the link here. As a worthy side note, such as for ChatGPT and its AI maker OpenAI the licensing says this: "OpenAI's models are not fine-tuned to provide legal advice. You should not rely on our models as a sole source of legal advice." Lawyers, especially when users of AI, should presumably be interested in and knowledgeable that before using any such software, a close look at the licensing terms is a noteworthy undertaking.

- For an added intriguing legal twist, please be aware that the AI makers often require an affirmation to an indemnification clause when you opt to agree to use their generative AI, opening risks or legal exposures therein for you and your clients, see my analysis at the link here.

- For a perhaps surprising assessment of whether the use of generative AI could inadvertently undermine the attorney-

37

client privilege if you and your clients aren't careful, see my coverage at the link here.

- On the Federal Trade Commission going after deceptive practices associated with the use or application of generative AI, see my analysis at the link here. Same for the EEOC doing likewise pursuits, covered at the link here.

- For my overarching predictions about where generative AI is headed overall, see the link here.

- For AI advances that might aid in curtailing or mitigating the plethora of generative AI pitfalls, see my coverage at the link here.

- Many other pieces, see the link here.

My earnest hope is that this will help you get underway in the exciting and rapidly evolving field of AI and the law. Come on in, the timing is right.

**Conclusion**

Generative AI is an incredible tool.

The sage wisdom goes that you've got to know your limitations, including the limitations of the tools that you choose to use. Most tools require that you bring awareness to the table when using the tool. What can the tool do? What can't it do? What are good ways to use the tool? What are gotchas or pitfalls about the tool that I should know about? And so on.

Attorneys would be wise to learn about and make use of generative AI, doing so judiciously and with the proper diligence required. Per the legendary words of Abraham Lincoln, he notably stated: "The

38

leading rule for the lawyer, as for the person of every calling, is diligence."

That makes plain-old human sense.

*Follow me on Twitter.*

 **Lance Eliot**   Follow

Dr. Lance B. Eliot is a world-renowned expert on Artificial Intelligence (AI) with over 6.8+ million amassed views of his AI columns. As a seasoned executive and... **Read More**

Editorial Standards   Reprints & Permissions

## Join Our Conversation

One Community. Many Voices. Create a free account to share your thoughts. Read our community guidelines here.

Commenting as **Guest**   Log in   Sign up

Be the first to comment...



**No one seems to have shared their thoughts on this topic yet**

Leave a comment so your voice will be heard first.

**39**