```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ROBERTO MATA,

 4                   Plaintiff,

 5           v.                              22 CV 1461 (PKC)

 6   AVIANCA, INC.,

 7                   Defendant.              Hearing
     ------------------------------x
 8                                           New York, N.Y.
                                             June 8, 2023
 9                                           12:00 p.m.

10   Before:

11                       HON. P. KEVIN CASTEL,

12                                           District Judge

13                             APPEARANCES

14   LEVIDOW LEVIDOW & OBERMAN, P.C.
             Attorneys for Plaintiff
15   BY:   THOMAS R. CORVINO

16   CONDON & FORSYTH LLP
             Attorneys for Defendant
17   BY:   BART BANINO
           DAMARA L. CAROUSIS
18         MARISSA N. LEFLAND

19   FRANKFURT KURNIT KLEIN & SELZ P.C.
             Attorneys for Interested Parties Levidow
20           Levidow & Oberman, P.C. and Steven Schwartz
     BY:   RONALD C. MINKOFF
21         TYLER MAULSBY
           ASHLEY K. ALGER
22
     MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.
23           Attorneys for Interested Party Peter LoDuca
     BY:   CATHERINE M. FOTI
24         PENINA MOISA

25
```

1          THE COURT:  This is Mata against Avianca, response on

2     the order to show cause.

3          Appearing for Peter LoDuca, please.

4          MS. FOTI:  Catherine Foti from the firm Morvillo

5     Abramowitz Grand Iason & Anello for Peter LoDuca, and my

6     associate.

7          MS. MOISA:  Penina Moisa.

8          THE COURT:  Good to see you, Ms. Foti.

9          Appearing for respondent Schwartz and for the law firm

10    of Levidow Levidow & Oberman.

11         MR. MINKOFF:  Ronald Minkoff, Tyler Maulsby, Ashley

12    Alger from the firm of Frankfurt Kurnit Klein & Selz.

13         THE COURT:  Good to see you, Mr. Minkoff.

14         Appearing for Avianca, please.

15         MR. BANINO:  Yes, your Honor.  Bart Banino, Marissa

16    Lefland, and Damara Carousis from Condon & Forsyth for

17    defendant Avianca.

18         THE COURT:  Thank you, sir.

19         As I understand the submissions, and I want to make

20    sure this is correct, it is not the desire of any of the three

21    respondents, the respondents being the two individuals, LoDuca,

22    Schwartz and the law firm, to affirmatively call any witnesses

23    at this response to the order to show cause.  However, they are

24    making individuals available for questioning by the Court.

25         Is that accurate, Mr. Minkoff?

1        MR. MINKOFF:  Yes, your Honor, it is.  Our clients

2   would like to make a statement to the Court at the appropriate

3   time.  We leave it in your hands as to the order of events.  We

4   are ready to argue.  We are ready to have them make statements.

5   Whichever you prefer.

6        THE COURT:  Thank you very much.

7        Ms. Foti, is that your position as well?

8        MS. FOTI:  Yes, it is, your Honor.

9        THE COURT:  At this point I would ask Ms. Foti that

10   you hand up the wet-ink original of the affidavit, if you would

11   hand it to my deputy.

12        MS. FOTI:  Of course.

13        THE COURT:  Thank you very much.

14        What I'd like to do, Ms. Foti, is, I have questions

15   that I would like to put to your client.  With your permission,

16   I would like to administer an oath to him.

17        MS. FOTI:  That's fine, your Honor.  He is prepared.

18        THE COURT:  Mr. LoDuca, if you will please stand.

19        (Peter LoDuca sworn)

20        THE COURT:  Now, your full name, please.

21        MR. LoDUCA:  Peter LoDuca.

22        THE COURT:  We will move that.  You may remain seated.

23   This will be fine.

24        Where are you admitted to practice?

25        MR. LoDUCA:  I practice in New York at the firm of

1   Levidow Levidow & Oberman.

2           THE COURT:  Where are your bar admissions?

3           MR. LoDUCA:  The Second Department.  I also practice

4   before the First Department.

5           THE COURT:  You're admitted to practice in this court?

6           MR. LoDUCA:  Yes.

7           THE COURT:  Are you admitted practice in any other

8   court?

9           MR. LoDUCA:  Also, the Eastern District.

10          THE COURT:  How long, approximately, have you been

11   admitted to practice in this court?

12          MR. LoDUCA:  Since 1989.

13          THE COURT:  You're experienced in the field of

14   litigation, is that correct?

15          MR. LoDUCA:  Correct, your Honor.

16          THE COURT:  And how many years have you been

17   practicing about?

18          MR. LoDUCA:  Thirty-seven now.

19          THE COURT:  So approximately how many cases have you

20   handled over your career?

21          MR. LoDUCA:  Probably, thousands.

22          THE COURT:  Have many of them required submissions

23   containing legal research in them?

24          MR. LoDUCA:  Yes.

25          THE COURT:  How do you do legal research?

1           MR. LoDUCA:  You read --

2           THE COURT:  How do you do legal research?  Not how

3    does one do legal research, but how you do legal research.

4           MR. LoDUCA:  Well, if I'm making a motion, I would

5    look for prior examples to establish some template.  Then I

6    would start looking for cases to back up my argument.  If I got

7    a motion in, I would read the motion, and then I would review

8    the cases and then see how it's applicable to the case and if

9    there is anything I can use in there, in my opposition, and

10   then do my own research.

11          THE COURT:  Mr. LoDuca, would you do this as book

12   research in a library?  Would you use Westlaw, Lexis?  Please

13   tell me.

14          MR. LoDUCA:  Recently, I've been using Fastcase.  It's

15   something similar to like Westlaw, Lexis.  Doesn't have all the

16   bells and whistles that they do, but it's a good tool for

17   locating cases.

18          THE COURT:  And are you trained in Westlaw?

19          MR. LoDUCA:  I was using Westlaw, but that goes way

20   back to my law school days.

21          THE COURT:  When did you last use Westlaw.

22          MR. LoDUCA:  Probably in the 1980s, sometime.

23          THE COURT:  What about Lexis?  Do you use Lexis?

24          MR. LoDUCA:  Also about the same time.

25          THE COURT:  And do you do research in libraries?

 1            MR. LoDUCA:  I did originally.  Now most of my

 2    research is done online.

 3            THE COURT:  When did Fastcase come into existence?

 4            MR. LoDUCA:  I'm not sure exactly when it came into

 5    existence.  I know I started using it with the firm that I'm

 6    with probably maybe about 15 years ago, maybe a little more.

 7            THE COURT:  That still leaves us a gap in time when

 8    you stopped using Westlaw after law school, if I understood

 9    that correctly?

10            MR. LoDUCA:  Yes.

11            THE COURT:  Then Fastcase came along.  What did you

12    use in the interim between your ceasing to use Westlaw and

13    starting to use Fastcase?

14            MR. LoDUCA:  In my early career, basically what I used

15    was the textbooks.

16            THE COURT:  Where did you do your research?

17            MR. LoDUCA:  Most of the time we had textbooks in the

18    offices.  If I needed to go to a law library, I would do that.

19            THE COURT:  What law library would you go to?

20            MR. LoDUCA:  At the time I was out in Nassau I would

21    use the law library over there.

22            THE COURT:  Nassau County Bar Association?

23            MR. LoDUCA:  Yes.  Once I started working in the city,

24    then I would use the library over at New York County.

25            THE COURT:  New York County --

1          MR. LoDUCA:  Or sometimes I remember going also to

2     Bronx County.

3          THE COURT:  I think there is the New York Law

4     Institute.  Did you ever use them?

5          MR. LoDUCA:  No .

6          THE COURT:  Or City Bar?

7          MR. LoDUCA:  No.

8          THE COURT:  And are you a member of any bar

9     association?

10          MR. LoDUCA:  No, I am not.

11          THE COURT:  What did you understand your obligation to

12     be when you signed the submission of March 1, which was your

13     affirmation in opposition to Avianca's motion to dismiss?

14          MR. LoDUCA:  My obligation was to submit the

15     affirmation that make arguments that were factual and truthful

16     to the Court and to represent my client.

17          THE COURT:  All right.  You're an experienced

18     practitioner.  You're familiar with the requirements of the

19     Federal Rules of Civil Procedure, are you not?

20          MR. LoDUCA:  Correct.

21          THE COURT:  And you're familiar with Rule 11, are you

22     not?

23          MR. LoDUCA:  Yes .

24          THE COURT:  And what did you understand your

25     obligation under Rule 11 to be?

1          MR. LoDUCA:  That any affidavit or affirmation that is

2     signed by myself would be truthful as to the contents therein.

3          THE COURT:  What about as to legal research, did you

4     have any obligation with regard to legal research under Rule

5     11?

6          MR. LoDUCA:  Legal research would also be the same, it

7     would be accurate and truthful.

8          THE COURT:  How did you go about satisfying yourself

9     that the research reflected in your affirmation was accurate

10    and truthful, as you have put it?

11         MR. LoDUCA:  I relied on a colleague in my firm,

12    Mr. Schwartz.

13         THE COURT:  Well, what do you mean by, you relied on

14    your colleague?  What did you do specifically that constituted

15    relying on your colleague?

16         MR. LoDUCA:  Mr. Schwartz is an attorney who has been

17    at Levidow for longer than I had.  He had this case at its

18    inception when it was originally filed in state court.  It was

19    then removed to the district court, and at that time it was

20    felt it would be best for Mr. Schwartz to continue working on

21    the file because he was most familiar with it.  So when it came

22    time to respond to the motion by the defendant, Mr. Schwartz

23    prepared the affirmation that did the research, as he was most

24    familiar with the case.

25         THE COURT:  I'm asking you now, you submitted your own

1  affirmation under penalties of perjury, is that right, Mr.

2  LoDuca, in the March 1 submission?

3          MR. LoDUCA:  I signed on the affirmation, yes.

4          THE COURT:  And what did you do, if anything, other

5  than see that Mr. Schwartz had done work and signed your

6  affirmation?  What else, if anything, did you do, or is that

7  what you did?

8          MR. LoDUCA:  Other than reading the affirmation, that

9  is what I did.

10          THE COURT:  What was your purpose in reading the

11  affirmation?  What were you looking for in that affirmation?

12          MR. LoDUCA:  I was basically looking for a flow, make

13  sure there was nothing untoward or no large grammatical errors.

14          THE COURT:  Did you read any of the cases cited in

15  your affirmation?

16          MR. LoDUCA:  No.

17          THE COURT:  Did you do anything to ensure that those

18  cases existed?

19          MR. LoDUCA:  No.

20          THE COURT:  Now, there came a time on or about March

21  15 that Avianca filed a reply memorandum in this action.

22          Do you remember that?

23          MR. LoDUCA:  Yes.

24          THE COURT:  And it was short, five pages in length,

25  correct?

```
 1              MR. LoDUCA:  I believe so.

 2              THE COURT:  What was your reaction when you read that

 3    memorandum?

 4              MR. LoDUCA:  I did not read that memorandum.

 5              THE COURT:  You're the attorney of record, correct?

 6              MR. LoDUCA:  That's correct.

 7              THE COURT:  You have the responsibility to the Court,

 8    correct?

 9              MR. LoDUCA:  Correct.

10              THE COURT:  And to the client, correct?

11              MR. LoDUCA:  Yes.

12              THE COURT:  And you had submitted an affirmation in

13    opposition to the motion, correct?

14              MR. LoDUCA:  I had submitted the affirmation, yes.

15              THE COURT:  Were you not curious to know what was said

16    in the reply?

17              MR. LoDUCA:  I gave the reply, referred it over to

18    Mr. Schwartz.  I felt at the time he had responded to their

19    motion.  The reply came in.  I knew that there was no further

20    response normally in that case.  And I felt Mr. Schwartz was

21    the most capable if anything needed to be done with respect to

22    the reply affirmation at all, that he would take care of it,

23    inform me, let me know.

24              THE COURT:  OK.  All right.

25              Now, you have since read the reply affirmation,
```

```
1    correct?

2              MR. LoDUCA:  Yes.

3              THE COURT:  And you know that it says very plainly,

4    although plaintiff ostensibly cites to a variety of cases in

5    opposition to this motion, the undersigned has been unable to

6    locate most of the case law cited in plaintiff's affirmation in

7    opposition, and the few cases which the undersigned has been

8    able to locate do not stand for the propositions for which they

9    are cited.

10             It goes on very specifically to refer to Varghese, for

11   example, in quotation marks because it disputes that there is

12   such a case.  It specifically notes that Varghese quotes

13   Zicherman v. Korean Airlines, and there is no such case at that

14   citation, but there is a Supreme Court case, not an Eleventh

15   Circuit case, that arises out of the Southern District, and it

16   has nothing to do with the limitations period under the Warsaw

17   Convention or the Montreal Convention.

18             You've seen this?

19             MR. LoDUCA:  I became aware of this after the judge's

20   order to show cause.

21             THE COURT:  And also footnote 1.  Did you look at

22   footnote 1 and see where, again, they say:  Plaintiffs cite

23   Ehrlich v. American Airlines, 360 N.J. Super. 360 (App. Div.

24   2003).  Could not locate any such case, but there is a Second

25   Circuit case by that name and it has nothing to do with the
```

 1   issues here.

 2           You saw that, correct?  You have read that?

 3           MR. LoDUCA:  I read that.

 4           THE COURT:  When did you read all this?

 5           MR. LoDUCA:  I read this after your order to show

 6   cause of May 4.

 7           THE COURT:  At any time after the filing of this reply

 8   memorandum, did Mr. Schwartz approach you and say, my goodness,

 9   they are saying that these cases don't exist?

10           MR. LoDUCA:  No, he did not.

11           THE COURT:  Did he alert you to any aspect of the

12   defendant's reply memorandum?

13           MR. LoDUCA:  He did not.

14           THE COURT:  Did there come a time that you got an

15   order from me, dated April 11, and another one, dated April 12?

16           MR. LoDUCA:  Yes, Judge.

17           THE COURT:  What did you do when you got those orders?

18           MR. LoDUCA:  When I saw those orders, I -- again, I

19   turned them over to Mr. Schwartz, and I indicated to him the

20   judge would like to see these cases.

21           THE COURT:  Did you have a discussion with him as to

22   why the Court would ask you to submit an affidavit, you, an

23   affidavit, annexing these cases?

24           MR. LoDUCA:  No, I didn't have a discussion with him

25   at that time.

1          THE COURT:  Well, what did you do in response to my

2     orders of April 11 and 12 other than turn this over to

3     Mr. Schwartz?

4          MR. LoDUCA:  Me, I didn't do anything other than turn

5     over to Mr. Schwartz to locate the cases that you had

6     requested.

7          THE COURT:  Let me see whether I can refresh your

8     recollection.  Do you recall writing to me and telling me that

9     you were going on vacation?  Do you remember that?

10          MR. LoDUCA:  Yes.

11          THE COURT:  And you told me that you would be on

12     vacation until April 18.  Do you remember that?

13          MR. LoDUCA:  Correct.

14          THE COURT:  And April 18 was the date I had ordered

15     the submission to be filed, correct?

16          MR. LoDUCA:  Correct.

17          THE COURT:  And you asked me to extend that to April

18     25, correct?

19          MR. LoDUCA:  Yes.

20          THE COURT:  And I did?

21          MR. LoDUCA:  Yes.

22          THE COURT:  Would you agree that a fair reading of

23     that was that you needed time when you got back from vacation

24     to prepare your submission?

25          MR. LoDUCA:  I would agree.

```
1          THE COURT:  And that the delay was because you, Peter
2    LoDuca, was going to be on vacation?
3          MR. LoDUCA:  Yes.
4          THE COURT:  Was that true?
5          MR. LoDUCA:  No, Judge.
6          THE COURT:  What did you do in terms of the review of
7    the affidavit that you filed with me annexing the cases?  How
8    did you go about assuring yourself that your affidavit was true
9    and correct?
10         MR. LoDUCA:  I read the affidavit.  I saw the cases
11   that were attached to it.  Mr. Schwartz had assured me that
12   this is what he could find with respect to the cases.  And I
13   submitted it to the Court.
14         THE COURT:  Did you look at the cases that you were
15   submitting to the Court?
16         MR. LoDUCA:  I looked at them.
17         THE COURT:  You were aware that the Court had ordered
18   you to submit copies of the cases, is that right?
19         MR. LoDUCA:  Right.
20         THE COURT:  And you understood that with respect to
21   what later turned out to be each of the six fake cases, the
22   entirety of the case was not submitted.  In no case was the
23   entirety of the case submitted.
24         MR. LoDUCA:  Right.  Mr. Schwartz had informed me that
25   this is what he was able to download from the search online.
```

1          THE COURT:  So you understood that this was not in

2   compliance with the Court's order?

3          MR. LoDUCA:  I understood that was the best that

4   Mr. Schwartz could find at the time based on the search that he

5   or -- the database that he had available to him.

6          THE COURT:  But you yourself knew that what you were

7   submitting was not what the Court had asked for?

8          MR. LoDUCA:  Correct.  It was not in its entirety.

9          THE COURT:  So you took a look at the cases.  Let's

10  take a look -- you have your affidavit there in front of you?

11         MR. LoDUCA:  I have it, Judge.

12         THE COURT:  Turn to the first case, Varghese.  And you

13  see that the case is purportedly brought by Susan Varghese

14  individually and as the personal representative of the Estate

15  of George Scaria Varghese, deceased, right?

16         MR. LoDUCA:  Yes, Judge.

17         THE COURT:  In the first sentence of the opinion it

18  says -- it's an appeal from the dismissal of her, meaning Susan

19  Varghese's wrongful death claim against China South Airlines,

20  correct?

21         MR. LoDUCA:  Yes.

22         THE COURT:  But in the second paragraph it goes in an

23  entirely different direction and says, Anish Varghese, a

24  resident of Florida, purchased a round-trip ticket, airline

25  ticket from China South Airlines -- I'm skipping over

1   irrelevancies here -- and she checked in in Bangkok or he

2   checked in in Bangkok for his flight to Guangzhou, but was

3   denied boarding due to overbooking.  China's Southern rebooked

4   him on a later flight, which caused him to miss the connecting

5   flight back to New York.  As a result, Varghese was forced to

6   purchase a new ticket to return home and incurred additional

7   expenses, and it goes on to say he is suing for breach of

8   contract, breach of the implied duty of fair dealing, and a

9   violation of the Montreal Convention.

10          Do you see that?  This is on the first page carrying

11  over to the second.

12          MR. LoDUCA:  Yes.

13          THE COURT:  What did you think when you read this?

14  That's gibberish.  It's a wrongful death claim by Susan

15  Varghese.  No.  It's a claim by Anish Varghese because he was

16  bumped from a flight and incurred additional expenses.

17          Does that make any sense to you?

18          MR. LoDUCA:  No, it doesn't.  But I had no reason to

19  doubt that this was an accurate reproduction of the case.  It

20  never dawned me on that this was a bogus case.

21          THE COURT:  Wouldn't that raise red flags?

22          MR. LoDUCA:  As to it being a bogus case?

23          THE COURT:  Yes.

24          MR. LoDUCA:  No, never crossed my mind, Judge.

25          THE COURT:  And when you got my order, you didn't

1    think to go back and say, maybe I should look at this reply

2    brief that was filed by Avianca to figure out why the judge is

3    asking these questions and why Schwartz is giving me a case

4    that contains what to an experienced lawyer like yourself would

5    appear to be gibberish?

6           MR. LoDUCA:  No, I did not, Judge.

7           THE COURT:  Now, with regard to the response, it

8    appears to me to be in multiple fonts, typeface, fonts.  Do you

9    agree with that?  Take a look at your affidavit of April 25.

10          MR. LoDUCA:  Yes, I'm looking at it, Judge.

11          THE COURT:  Does it appear to you to be in multiple

12   fonts?  Look at the listing of cases in paragraph 2.

13          MR. LoDUCA:  The cases seem to be outlined or

14   highlighted, as opposed to the rest of it, yes.

15          THE COURT:  That's true in paragraphs 2, 3, 4, 5?

16          MR. LoDUCA:  The cases seem to be highlighted.

17          THE COURT:  Highlighted.  Do they appear to be in a

18   different font?

19          MR. LoDUCA:  The print might be a little bit larger.

20          THE COURT:  Well, how about typeface, do they appear

21   to be in a different typeface, one appearing to be perhaps new

22   times roman and the other sans serif of some form?

23          MR. LoDUCA:  To me it appears that it is -- basically,

24   it's larger.

25          THE COURT:  Who typed it?

1          MR. LoDUCA:  I believe Mr. Schwartz put this together.

2          THE COURT:  Now, how did you go about satisfying

3     yourself that the things you were swearing to were truthful?

4          MR. LoDUCA:  I trusted the work done by Mr. Schwartz.

5          THE COURT:  Well, did you ask him any questions?

6          MR. LoDUCA:  Basically, yes.  Were you able to locate

7     the cases, and he told me this is what I found.

8          THE COURT:  You had an actual conversation with him?

9          MR. LoDUCA:  Yes.

10         THE COURT:  How many days before the affidavit was

11    shown to you?

12         MR. LoDUCA:  Before it was filed?

13         THE COURT:  Well, there is some -- take a look at the

14    notarization here.

15         MR. LoDUCA:  Right.

16         THE COURT:  The affidavit is dated April 25, 2023,

17    correct?

18         MR. LoDUCA:  Correct.

19         THE COURT:  And you agree that the notarization is the

20    25th day of January 20, 2023, correct?

21         MR. LoDUCA:  Correct.

22         THE COURT:  When did you sign this affidavit?

23         MR. LoDUCA:  I signed this on April 25, 2023.

24         THE COURT:  And when did you get a draft of it in

25    advance of signing it?

1          MR. LoDUCA:  It was either that same day or maybe the

2     day before.

3          THE COURT:  Did you have any conversations with

4     Mr. Schwartz before you received that draft?

5          MR. LoDUCA:  Yes.  To the effect that he needed to

6     find the cases.

7          THE COURT:  That what?

8          MR. LoDUCA:  That he needed to find the cases.

9          THE COURT:  This is before -- when the orders first

10    came in?

11         MR. LoDUCA:  Right.

12         THE COURT:  Did you have a vacation at all at that

13    time period?

14         MR. LoDUCA:  No.  Mr. Schwartz was away.

15         THE COURT:  But you said you had a vacation.

16         MR. LoDUCA:  Yes, your Honor.

17         THE COURT:  And do you agree that the six cases that

18    are referenced in the order to show cause are nonexistent

19    cases?

20         MR. LoDUCA:  Presently, yes, Judge.

21         THE COURT:  I think I have all the questions I needed

22    answered by you.  I thank you very much.  If you want to make a

23    statement, you're welcome to make one.

24         MR. LoDUCA:  Thank you, Judge.

25              Judge, first, the fact that my name went on a document

1    that had falsehoods in it that was presented to the Court just

2    pains me to no end.  I profusely apologize to the Court and to

3    the defendants just for that act alone, aside from any

4    inconvenience or extra work I may have done for them and for

5    yourself.

6          At the time I had no reason to doubt the veracity of

7    the work done by Mr. Schwartz.  I had worked with him in excess

8    of 27 years.  In that entire time nothing even remotely close

9    to this nature had occurred.  I had done nothing close to this

10   nature.

11         In hindsight, I should have been more skeptical.  I

12   apologize again for doing this, and I accept the responsibility

13   that I submitted this affidavit.  I can't go back to change

14   what was done, obviously.

15         What I can guarantee the Court is that this will never

16   happen again.  Not only have we taken precautions to prevent

17   this from happening, but I can personally guarantee you that I

18   will never sign off on an affirmation that has not been

19   thoroughly researched and every fact and every dot checked by

20   me personally.

21         If there ever came a time, and I would be resistant to

22   it, that another attorney said, I need you to file this for me,

23   they would have to wait until I looked at everything thoroughly

24   myself, basically turn the case over to me before I ever do

25   anything like this again.

1          THE COURT:  Thank you, Mr. LoDuca.

2          Mr. Schwartz, if you'll please stand, I'll administer

3     the oath to you.

4          (Steven Schwartz sworn)

5          THE COURT:  Where are you admitted to practice, sir?

6          MR. SCHWARTZ:  Second Department, Judge.

7          THE COURT:  How long have you been admitted,

8     approximately?

9          MR. SCHWARTZ:  Since June of 1992.

10         THE COURT:  And your field has been principally

11    litigation?

12         MR. SCHWARTZ:  Personal injury, workers compensation,

13    disability law.

14         THE COURT:  Approximately, round numbers, how many

15    cases do you think you've handled over your career?

16         MR. SCHWARTZ:  More than I can count.

17         THE COURT:  Would it be a thousand?

18         MR. SCHWARTZ:  I'd say that's fair.

19         THE COURT:  And how many of them have required you to

20    submit a document reflecting legal research, whether it's a

21    letter brief, an affirmation, a memorandum, appellate brief?

22         MR. SCHWARTZ:  Quite a few.

23         THE COURT:  Quite a few.  Hundreds?

24         MR. SCHWARTZ:  Yeah, probably.

25         THE COURT:  How do you conduct legal research?

1                MR. SCHWARTZ:  Well, I locate -- I pinpoint the issue.

2    I search the issue.  I find cases that stand for my

3    proposition.  If I'm opposing a motion that I have to do

4    research, I look up the cases that the other side has cited,

5    and I put -- I find opposition cases to them.

6                THE COURT:  Do you read the cases before you cite

7    them?

8                MR. SCHWARTZ:  Of course.

9                THE COURT:  Well, OK.

10               What research tools do you do to find the cases?

11               MR. SCHWARTZ:  We use Fastcase.

12               THE COURT:  Have you always used Fastcase?

13               MR. SCHWARTZ:  Well, before -- it used to be called

14   something else.  I think it was called Loislaw.  I believe

15   that's the only computer search tool we ever used in the

16   office.  Before that, it was probably books.

17               THE COURT:  Now, when did Fastcase or Loislaw become

18   available?

19               MR. SCHWARTZ:  I can't tell you the exact time frame.

20   It would be 15 years, 20 years.

21               THE COURT:  You've been practicing for how many years?

22               MR. SCHWARTZ:  Thirty.

23               THE COURT:  What did you use before Loislaw or

24   Fastcase came along?

25               MR. SCHWARTZ:  We might have used another --

1            THE COURT:  I'm not asking what you might have done.

2    I'm asking you what you did.

3            MR. SCHWARTZ:  I can't remember if I used a prior

4    Internet search tool or I did it the old-fashioned way, with

5    books.

6            THE COURT:  Now, there are other ways to find cases

7    other than Westlaw, Lexis, and Fastcase, correct?

8            MR. SCHWARTZ:  Correct.

9            THE COURT:  Now, have you ever logged onto Westlaw?

10           MR. SCHWARTZ:  I would say that I did when I was in

11   law school or just maybe just out of law school.

12           THE COURT:  Same question as to Lexis.

13           MR. SCHWARTZ:  Don't think I have ever logged onto

14   Lexis.

15           THE COURT:  And you're aware of that you can gain

16   access to Westlaw through a bar association library.  I say

17   that because that's in your declaration to me, isn't it?

18           MR. SCHWARTZ:  Yes.

19           THE COURT:  Now, are you aware that if you have a

20   citation to a case, you can plug it in on free data bases to

21   pull up that case?

22           MR. SCHWARTZ:  Yes.

23           THE COURT:  You don't need Westlaw for that, right?

24           MR. SCHWARTZ:  Right.

25           THE COURT:  You don't need Lexis for that, right?

```
 1                  MR. SCHWARTZ:  Right.

 2                  THE COURT:  And you don't need Fastcase or Loislaw for

 3     that, correct?

 4                  MR. SCHWARTZ:  Right.

 5                  THE COURT:  Now, did you prepare the memorandum of

 6     March 1, 2023?

 7                  MR. SCHWARTZ:  Yes.

 8                  THE COURT:  How did you go about finding the cases

 9     that you cited in your memoranda?

10                  MR. SCHWARTZ:  First, I went to Fastcase, which is the

11     research tool that our office subscribes to.  It did not have

12     access to federal cases that I needed to find, so I began to

13     attempt to try to find another source to find the cases.  I

14     tried Google.  Again, I didn't have access to Westlaw or Lexis.

15     And it had occurred to me that I heard about this new site

16     which I assumed -- I falsely assumed was like a super search

17     engine called ChatGPT, and that's what I used.

18                  THE COURT:  What did ChatGPT produce for you, sir?

19                  MR. SCHWARTZ:  First, I asked it questions about the

20     topic that I was researching, in this case the Montreal

21     Convention and the issue of statute of limitations, and then I

22     asked it to provide case law, and it did.

23                  THE COURT:  Case law under the Montreal Convention or

24     case law supporting the position you wanted to take in

25     opposition?
```

1          MR. SCHWARTZ:  Case law supporting the position I

2    wanted to take in opposition, which was, how does the statute

3    of limitations -- what is the statute of limitations according

4    to the Montreal Convention?  And then ultimately the issue of

5    whether or not a bankruptcy tolls that statute of limitations.

6          THE COURT:  So you were not asking ChatGPT for an

7    object; you were asking them to produce cases that support the

8    proposition you wanted to argue, right?

9          MR. SCHWARTZ:  Right.  First, I asked it for an

10   analysis, and then I asked it for the cases.

11         THE COURT:  What did it say when it gave you an

12   analysis?

13         MR. SCHWARTZ:  Well, it told me what the Montreal

14   Convention stood for.  It told me that in many cases the

15   bankruptcy can toll the statute of limitations, what the

16   statute of limitations was.  And then I asked it for case law

17   to support what its analysis -- what the analysis that was

18   given to me was.

19         THE COURT:  Did it say to you that a bankruptcy stay

20   can toll the statute of limitations under the Montreal

21   Convention?

22         MR. SCHWARTZ:  Yes.

23         THE COURT:  What did it cite for that?  You have your

24   ChatGPT research.  Show me what it cites for that.

25         MR. SCHWARTZ:  In Re Crash Over Southern Indian Ocean.

```
1              THE COURT:  Wait a minute.  Just get me to the page of

2    your submission.

3              MR. SCHWARTZ:  It's indicated, page 40 on the bottom

4    right.

5              THE COURT:  Page 40 on the bottom.

6              MR. SCHWARTZ:  Yes.

7              THE COURT:  Can you use the numbers, the filing

8    numbers, so I know.

9              MR. SCHWARTZ:  Page 3 of 16.

10             THE COURT:  3 of 16.

11             This was in response to a query, not what's the law.

12   You're the user here, right, on page 3?

13             MR. SCHWARTZ:  Yes.

14             THE COURT:  And the question you asked ChatGPT was:

15   Provide case law in support that statute of limitations is

16   tolled by bankruptcy of defendant under the Montreal

17   Convention.

18             MR. SCHWARTZ:  Correct.

19             THE COURT:  And they did that.

20             MR. SCHWARTZ:  Correct.

21             THE COURT:  But I asked you before, did you ever ask

22   them the question, what is the law?  Not provide me with a

23   case.  The computer complied.  It provided you with a case.  It

24   wrote a case.  It followed your command.

25             MR. SCHWARTZ:  Prior to that, I asked it to argue that
```

1    the statute of limitations is tolled by the bankruptcy of the

2    defendant pursuant to the Montreal Convention.

3             THE COURT:  What case did they cite to that?

4             MR. SCHWARTZ:  Didn't cite any cases.

5             THE COURT:  Now, there came a time that you were told

6    that Varghese supported the proposition, correct?

7             MR. SCHWARTZ:  Correct.

8             THE COURT:  Did you read Varghese?

9             MR. SCHWARTZ:  I read the excerpts that were produced,

10   yes.

11            THE COURT:  Are you accustomed to citing cases without

12   reviewing the entirety of the text of the case?

13            MR. SCHWARTZ:  No.

14            THE COURT:  Then what caused your departure here?

15            MR. SCHWARTZ:  I just never could imagine that ChatGPT

16   would produce fabricated cases, and my assumption was that I'm

17   using a search engine that's searching sources that I don't

18   have access to, and -- mistakenly, and I take full

19   responsibility for it.  And looking back, obviously, very

20   extremely regretful that I didn't take those further steps.

21   But due to the newness of the technology and my obvious

22   inexperience in using the technology and my false assumptions

23   as to what this website does, it just never occurred to me that

24   it would be making up cases.  I just assumed it was not able to

25   access the full opinions.

1      THE COURT:  But you just said to me, you are not

2   accustomed to citing cases without reviewing the entirety of

3   the case, yet you did not have the entirety of the case,

4   correct?

5      MR. SCHWARTZ:  Correct.

6      THE COURT:  Now, you knew, and you told me this

7   already, that you can obtain the full text of a circuit court

8   case on the Internet.  Maybe it doesn't do great research, but

9   if you have the citation to the case, you can pull up that case

10  on the Internet, correct, on Google, correct?

11     MR. SCHWARTZ:  Correct.

12     THE COURT:  Did you say, well they gave me part of

13  Varghese, let me look at the full Varghese decision?

14     MR. SCHWARTZ:  I did.

15     THE COURT:  And what did you find when you went to

16  look up the full Varghese decision?

17     MR. SCHWARTZ:  I couldn't find it.

18     THE COURT:  And yet you cited it in the brief to me.

19     MR. SCHWARTZ:  I did, again, operating under the false

20  assumption and disbelief that this website could produce

21  completely fabricated cases.  And if I knew that, I obviously

22  never would have submitted these cases.

23     I obviously should have taken further steps to go and

24  find the Federal Reporter, or go to, more obviously, Westlaw or

25  Lexis and verify that these cases were accurate.  In hindsight,

 1   God, I wish I did that, and I didn't do it.

 2          Again, I had no intent to deceive this Court or the

 3   defendants.  I was operating under a misconception and a

 4   disbelief that these cases could not be real, and that this

 5   website is obtaining those cases from some source that I can't

 6   get access to.  And I did not follow up, and I should have

 7   followed up even earlier, and I should have verified it.

 8          THE COURT:  But, Mr. Schwartz, I think you are selling

 9   yourself too short.  You tell me that you know that if you have

10   a citation to a circuit court case, you can pull up that case

11   on the Internet, and you are not accustomed to citing partial

12   cases, and it did occur to you.  You told me to look to see the

13   full case.  And you looked for the full case on the free

14   Internet and you couldn't find it.  Is that accurate?

15          MR. SCHWARTZ:  Are we talking -- yeah.  A search

16   engine such as Google or such?

17          THE COURT:  Yes.  This was prior to filing the brief

18   on March 15.

19          MR. SCHWARTZ:  Yes.  But -- yes.  But I didn't deem

20   Google -- I thought that there are cases that I am not going to

21   be able to find on Google and that the cases could exist.  I

22   know that Google is not as -- there might be cases that are in

23   legitimate search tools that are not going to be found on

24   Google.

25          THE COURT:  But there are six cases that could not be

1    found on Google, right?

2              MR. SCHWARTZ:  Right.

3              THE COURT:  Now, let me ask you the same thing I asked

4    Mr. LoDuca.  You heard my questions.  This nonexistent case,

5    Varghese, you concede it's a nonexistent case, correct?

6              MR. SCHWARTZ:  Yes.  Obviously now, yes.

7              THE COURT:  You didn't have much to go on?  You had an

8    excerpt from it, right?

9              MR. SCHWARTZ:  Right.

10             THE COURT:  And in the first two pages, principally

11   the first page, you see it's written that Susan Varghese is

12   suing for the wrongful death of George Varghese, right, in the

13   first sentence.  And then on the first page you see that it's

14   Anish Varghese, a gentleman, who missed his connecting flight

15   back to New York and was forced to purchase a new ticket to

16   return home and incurred additional expenses and sued in the

17   Southern District of Florida alleging breach of contract and

18   breach of implied covenant of good faith and fair dealing,

19   something that is utterly unlike the wrongful death of George

20   Varghese, correct?

21             MR. SCHWARTZ:  Correct.

22             THE COURT:  Now, can we agree that's legal gibberish?

23             MR. SCHWARTZ:  Looking at it now, yes.  But at the

24   time, if it was a partial excerpt, I maybe thought that the

25   excerpt -- I thought that the excerpts were taken from

1    different portions of the case.

2             THE COURT:  Let's move on in the narrative here.

3             So then March 15, 2023 arrives.  You receive a copy of

4    the reply filed by Avianca, correct?

5             MR. SCHWARTZ:  Correct.

6             THE COURT:  What was your reaction when you read that

7    reply that flat-out said you had cited nonexistent cases?

8             MR. SCHWARTZ:  I don't think it said that they were

9    nonexistent.  It said that they could not locate them, again,

10   operating under the false perception that this website could

11   not possibly be fabricating cases on its own.

12            I again just thought that I am going to go back to the

13   source that I have and copy those cases and in the affidavit

14   indicate that I couldn't find one and they are not full cites.

15   Again, the words fake or false cases was not mentioned here

16   like they were false.  I continued to be duped by ChatGPT and,

17   again, it's embarrassing, putting it that way.  But I wanted to

18   be transparent to the Court.  The Court asked me to provide the

19   cases --

20            THE COURT:  We are not up to that yet.  We are up to

21   the March 15 at the moment.  We are focusing on the March 15

22   submission and your reaction to it.

23            Have you ever heard of or litigated against the firm

24   of Condon & Forsyth?

25            MR. SCHWARTZ:  No.

1              THE COURT:  Had you ever heard of them before this

2    case?

3              MR. SCHWARTZ:  No.

4              THE COURT:  Did you pick up the phone and call

5    opposing counsel and offer to provide copies of the cases?

6              MR. SCHWARTZ:  I did not.

7              THE COURT:  What was your reaction when your adversary

8    is putting the citations to the cases in quotations?  The

9    undersigned has not been able to locate this case, referring to

10   Varghese, by caption or citation nor any case bearing any

11   resemblance to it.  Plaintiff offers lengthy quotations from

12   the "Varghese" case, including we have previously held -- this

13   is the quote:  "That the automatic stay provision of the

14   bankruptcy code may toll the statute of limitations under the

15   Warsaw Convention, which is the precursor to the Montreal

16   Convention.  We see no reason why the same rules should not

17   apply under the Montreal Convention."

18             And Avianca says, their lawyers say:  The undersigned

19   has not been able to locate this quotation nor anything like

20   this in any case.  The quotation purports to cite, quote,

21   Zicherman v. Korean Airlines, and it's an Eleventh Circuit

22   case.  The undersigned has not been able to locate this case,

23   although there was a Supreme Court case, captioned Zicherman v.

24   Korean Airlines Company, that case was decided in 1996, not the

25   2008 of the Eleventh Circuit case, and it originated from the

1    Southern District of New York and was appealed to the Second

2    Circuit, and it did not address the limitations period set

3    forth in the Warsaw Convention.

4               What was your reaction when you read that?

5               MR. SCHWARTZ:  My reaction was, ChatGPT is finding

6    that case somewhere.  Maybe it's unpublished.  Maybe it was

7    appealed.  Maybe access is difficult to get.  I just never

8    thought it could be made up.

9               THE COURT:  Mr. Schwartz, don't sell yourself short

10   here.  You know what the symbol in a citation F.3d means,

11   right?  A number and then F.3d and then another number, and the

12   name of the court and the year.  Right, you know what that

13   means?

14              MR. SCHWARTZ:  Yup.

15              THE COURT:  What is your understanding of what it

16   means for a case to have a citation of F.3d 2d?

17              MR. SCHWARTZ:  I see F.3d.

18              THE COURT:  The Zicherman case.  And Varghese.  F.3d.

19   What does that mean to you?

20              MR. SCHWARTZ:  Third Department -- federal district,

21   third department.  I probably didn't pay enough attention to

22   that, to the cites.

23              THE COURT:  Have you ever heard of Federal Reporter?

24              MR. SCHWARTZ:  I have.

25              THE COURT:  That's a book, right?

```
 1                MR. SCHWARTZ:  Right.

 2                THE COURT:  And F.3d is the third edition of the

 3    Federal Reporter, correct?

 4                MR. SCHWARTZ:  Right.

 5                THE COURT:  And if something is in the Federal

 6    Reporter, it's, by definition, not an unpublished case,

 7    correct?

 8                MR. SCHWARTZ:  Right.

 9                THE COURT:  So you knew these were not unpublished

10    cases that you were citing, correct, or at least Varghese and

11    Zicherman, right?

12                MR. SCHWARTZ:  Yeah.

13                THE COURT:  Yes?

14                MR. SCHWARTZ:  Yes.

15                THE COURT:  How could you reasonably assume or think

16    that maybe they were unpublished?  You just told me that the

17    citation would indicate to you that they were published.

18                MR. SCHWARTZ:  Due to my unfamiliarity with federal

19    court cases, you know, it probably did not occur to me.  Again,

20    it's just not entering my mind to suspect that the case is

21    fabricated.  So I'm not inspecting it under any kind of

22    assumption that it's fabricated.  The cite looks legitimate.

23    The judge that they named is a real Eleventh Circuit judge.

24                THE COURT:  How did you know that?  How did you know

25    that at the time?
```

1        MR. SCHWARTZ:  I think I looked up the judge and

2   saw -- at some point during this process; not at this point,

3   but later.

4        THE COURT:  I'm asking you, before you filed --

5        MR. SCHWARTZ:  Not at this point yet.

6        THE COURT:  Or when you received this reply brief.

7        MR. SCHWARTZ:  I just was not thinking that the case

8   could be fabricated, so I was not looking at it from that point

9   of view.

10       THE COURT:  This is a very short memo.  It's a

11  five-page memo.  They say:  Plaintiff also cites to, quote,

12  Ehrlich v. American Airlines, 360 N.J. Super. 360 (App. Div.

13  2003).  The undersigned could not locate this case, but notes

14  there is a Second Circuit case captioned Ehrlich v. American

15  Airlines regarding the ability of a passenger to recover

16  psychological damages following an incident in international

17  transportation, and they give the citation to Ehrlich v.

18  American Airlines.

19       What was your reaction when you read that?

20       MR. SCHWARTZ:  The same, Judge.

21       THE COURT:  Now, is it accurate, sir, that you were

22  the person who was on vacation between April 11 and 12 of 2023

23  and April 18, when Mr. LoDuca's affidavit was due?

24       MR. SCHWARTZ:  Yes.

25       THE COURT:  When did you depart on vacation,

approximately, relative to April 12?

          MR. SCHWARTZ:  Yes.  I believe April 18.  I don't have

a calendar to remember.  If I could see the days of the week --

probably, later that week, after the 12th, some time that week.

          THE COURT:  And you returned on the 18th, is that

accurate?

          MR. SCHWARTZ:  Yes.

          THE COURT:  And what did you do -- first of all, what

was your reaction when you read the Court's order of April 11

and 12 asking for copies of these decisions, in light of what

you had read in the March 15 reply memo?  What was your

reaction to the orders?

          MR. SCHWARTZ:  That I would go back to the source of

where I found the cases and produce them for the Court as best

as I could, because that is where I got the cases, and, again,

still not imagining that they could be fabricated.

          THE COURT:  Did you think the Court issued that order

without first checking itself to see whether the cases existed?

          MR. SCHWARTZ:  No.

          THE COURT:  That didn't cross your mind.  You thought

that the Court just reads somebody's brief and they say these

cases don't exist and the judge says, well, I guess I will

issue an order -- two orders, not one order.

          MR. SCHWARTZ:  I thought the Court searched for the

cases, could not find them, and I just wanted to comply with

 1    the Court's order and produce the cases that I found.

 2              THE COURT:  So you thought that it was likely that the

 3    Court also couldn't find these cases, right?

 4              MR. SCHWARTZ:  I would say so, yes.

 5              THE COURT:  What did you do at this point to assure

 6    yourself that the cases you were assembling were accurate, did

 7    exist, and that the good judge and the lawyers at Condon &

 8    Forsyth were just incompetent at locating Federal Circuit

 9    cases?

10              MR. SCHWARTZ:  I did not do enough, and I should have

11    went to the Federal Reporters.  I should have gone to a law

12    library.  There are many things I could have done to confirm

13    the veracity of these cases, and I wish I had done it at that

14    time.  And I failed miserably in doing that, and I, again -- I

15    hate to keep saying the same thing, but it's the truth, and I'm

16    being completely transparent with the Court in that I did

17    not -- could not comprehend that ChatGPT could fabricate cases.

18    So I complied with the court order and went back to the only

19    place that I could find the cases.

20              THE COURT:  Let me ask you, did you do any other

21    research in opposition to the motion to dismiss other than

22    through ChatGPT?

23              MR. SCHWARTZ:  Other than initially going to Fastcase

24    and failing there, no.

25              THE COURT:  You found nothing on Fastcase.

 1              MR. SCHWARTZ:  Fastcase was insufficient as to being

 2    able to access, so, no, I did not.

 3              THE COURT:  You did not find anything on Fastcase?

 4              MR. SCHWARTZ:  No.

 5              THE COURT:  In your declaration in response to the

 6    order to show cause, didn't you tell me that you used ChatGPT

 7    to supplement your research?

 8              MR. SCHWARTZ:  Yes.

 9              THE COURT:  Well, what research was it supplementing?

10              MR. SCHWARTZ:  Well, I had gone to Fastcase, and I was

11    able to authenticate two of the cases through Fastcase that

12    ChatGPT had given me.  That was it.

13              THE COURT:  But ChatGPT was not supplementing your

14    research.  It was your research, correct?

15              MR. SCHWARTZ:  Correct.  It became my last resort.  So

16    I guess that's correct.

17              THE COURT:  Who typed the affidavit of April 25?

18              MR. SCHWARTZ:  I believe that was me, in conjunction

19    with my paralegal.

20              THE COURT:  Is it in fact the case that there are

21    multiple type faces and fonts in this affidavit?

22              MR. SCHWARTZ:  It appears so, yes.

23              THE COURT:  And why was that?

24              MR. SCHWARTZ:  I think those were just copied and

25    pasted from the source and put into a document.

```
 1              THE COURT:  Tell me what happened with regard to the

 2    notarization of this affidavit.

 3              MR. SCHWARTZ:  The affidavit -- we often use old

 4    documents and just conform them that are already saved in our

 5    Word program.  So this was an older affidavit that we just

 6    changed the caption and the content, and the notarization was

 7    changed but mistakenly.  We use this as a template, and we just

 8    forgot to change the month.

 9              THE COURT:  Now, I received a submission just the

10    other day on your behalf, and it attached a draft of that

11    affidavit.  Can you get that in front of you, if you will, sir.

12    It's document 46-2 on ECF.

13              MR. SCHWARTZ:  OK.

14              THE COURT:  Take a look at the block in which -- it

15    states:  Sworn to before me.

16              MR. SCHWARTZ:  Right.

17              THE COURT:  Will you agree that the second line

18    appears different than in the executed affidavit?

19              MR. SCHWARTZ:  When I pulled it up afterwards, that's

20    how it came up on my computer.  So that probably was -- it was

21    in the other form.  I don't know why the computer printed it

22    like that.

23              THE COURT:  Did you correct it between the draft and

24    the final?  Because one has plus H and the other has TH, a

25    superscript.
```

1          MR. SCHWARTZ:  Yes.  I must have, yes.  But the

2    computer saved it like this.

3          THE COURT:  So you corrected the TH, but you didn't

4    correct the month January versus April?

5          MR. SCHWARTZ:  I corrected the year, which was

6    originally 2011, I corrected the day, and I mistakenly forgot

7    to have the month corrected.

8          THE COURT:  Tell me what happened.  How did this

9    affidavit come to be executed?

10         MR. SCHWARTZ:  The affidavit was presented to Mr.

11   LoDuca.

12         THE COURT:  By whom?

13         MR. SCHWARTZ:  By me.

14         THE COURT:  Where?

15         MR. SCHWARTZ:  In my office.

16         THE COURT:  Right.

17         MR. SCHWARTZ:  He signed it in front of me, and I

18   notarized it.

19         THE COURT:  Let me ask you this.  You prepared the

20   affidavit and then what, did you call him and ask him to come

21   to your office?

22         MR. SCHWARTZ:  I probably went in person into his

23   office.

24         THE COURT:  But you presented him with the affidavit

25   in your office, though.  Whose office did you present the

1    affidavit in?

2            MR. SCHWARTZ:  His office.

3            THE COURT:  Where is his office in relation to yours?

4            MR. SCHWARTZ:  Twenty feet away.

5            THE COURT:  You showed him the affidavit?

6            MR. SCHWARTZ:  Yes.

7            THE COURT:  Had you provided him with a draft prior to

8    that?

9            MR. SCHWARTZ:  I don't believe so.

10           THE COURT:  What did Mr. LoDuca say or do?

11           MR. SCHWARTZ:  He looked it over, and he signed it.

12           THE COURT:  Is there anything else you wish to tell

13   me?

14           MR. SCHWARTZ:  Yes.

15           THE COURT:  Go ahead.

16           MR. SCHWARTZ:  I would like to sincerely apologize to

17   your Honor, to this Court, to my defendants, to my firm, to

18   Mr. Corvino, to Mr. LoDuca.  I deeply regret my actions in this

19   matter which inflicted a hearing today.  I have suffered both

20   professionally and personally due to the widespread publicity

21   that this issue has generated.  I am both embarrassed and

22   humiliated and extremely remorseful.

23           To say that has been a humbling experience would be an

24   understatement.  I have never been involved in anything like

25   this previously in my 30-plus-year career.  I have never come

1  close to being sanctioned or been threatened by sanctions in

2  any court or tribunal.  I greatly regret my actions and I hope

3  I can put this matter behind me.

4          I can assure this Court that nothing like this will

5  ever happen again.  I have already taken a CLE course on

6  artificial intelligence, and I have researched it extensively.

7  And I, as well as my firm, are going to be given instruction in

8  course and have safeguards put in place by my attorneys to

9  assure that nothing like this will ever happen again.

10          Again, I couldn't more deeply apologize to the Court.

11 Thank you.

12          THE COURT:  Thank you, Mr. Schwartz.

13          Mr. Schwartz, I realize this is a difficult moment for

14 you, a difficult moment for Mr. LoDuca, and it's easy for

15 something to slip one's mind.  But I noticed that among those

16 who you apologized to, one name was missing and that was

17 Roberto Mata, your client.

18          MR. SCHWARTZ:  I was remiss -- I do apologize to my

19 client.

20          THE COURT:  Let me ask you, did you tell your client

21 what happened here?

22          MR. SCHWARTZ:  I did.

23          THE COURT:  When?

24          MR. SCHWARTZ:  More than once.  Most recently, two

25 days ago.

```
 1                THE COURT:  Did you reach out to him or did he reach
 2      out to you?
 3                MR. SCHWARTZ:  I reached out to him.
 4                THE COURT:  Thank you.
 5                MR. MAULSBY:  Your Honor, could we just ask a brief
 6      question of Mr. Schwartz just to clarify one thing?
 7                THE COURT:  Of course.  Go right ahead.
 8                MR. MAULSBY:  Mr. Schwartz, I just want to go back to
 9      your use of the firm's Fastcase subscription for a moment.  You
10      said that you used Fastcase in the first instance to try to do
11      research in this case, is that right?
12                MR. SCHWARTZ:  Yes.
13                MR. MAULSBY:  Did you run into any limitations with
14      Fastcase when you were doing that?
15                MR. SCHWARTZ:  Yes.
16                THE COURT:  What were those limitations?
17                MR. SCHWARTZ:  Fastcase did not have access to federal
18      case law on this issue or any other federal access.
19                MR. MAULSBY:  So you attempted to research in Fastcase
20      and found you weren't able to access federal cases when you did
21      text searches?
22                MR. SCHWARTZ:  That is correct.
23                MR. MAULSBY:  Thank you, your Honor.
24                MS. FOTI:  Your Honor, one thing, your Honor.
25                Mr. LoDuca, in connection with the letter to the Court
```

1   seeking adjournment for a vacation, do you recall reading that

2   letter?

3              MR. LoDUCA:  Yes.

4              MS. FOTI:  Do you recall noticing that the letter

5   referred to the undersigned as being on vacation, or did you

6   believe you were representing that another individual was going

7   to be on vacation?

8              MR. LoDUCA:  My intent of the letter was because

9   Mr. Schwartz was away, but I was aware of what was in the

10  letter when I signed it.

11             MS. FOTI:  Did you intend to mislead the Court?

12             MR. LoDUCA:  No.  I just attempted to get Mr. Schwartz

13  the additional time he needed because he was out of the office

14  at the time.

15             MS. FOTI:  Thank you.

16             THE COURT:  Does the law firm representative wish to

17  say anything?  I don't really have any questions.

18             MR. CORVINO:  Yes, your Honor.

19             My name is Thomas Corvino.  I'm the sole equity

20  partner for the firm.

21             A little background.  We are a four-attorney firm

22  practicing in New York City, primarily before the courts of the

23  State of New York and the New York State Workers Compensation

24  Board.  We do not regularly litigate in federal court.  Neither

25  myself nor the firm have ever been sanctioned before by any

1     court or tribunal, disciplined or sanctioned in any way.

2          On behalf of the firm I want to apologize to everyone

3     involved with this, the Court, our client, our adversaries.

4     Deeply regret what's occurred.  It was never our intention to

5     deceive the Court.  We have gone over for some time now how --

6     what Mr. Schwartz's mindset was, which led to all of this.

7          I have worked with Mr. Schwartz for in excess of 30

8     years.  He's at all times been diligent.  He has done fine

9     legal research.  His legal writing skills I thought were

10    excellent.  The firm had no reason to believe that he wasn't

11    capable of representing the client's interests in this matter

12    or doing the support work to continue to represent the client's

13    interests in this court once the case was removed to this

14    court.

15         With respect to the firm's resources for research,

16    since we practice primarily in state court, Fastcase has been

17    perfectly sufficient for our needs, has been, and it was

18    preceded by the entity described earlier as Loislaw, but never

19    experienced any shortcomings with it.

20         Originally, it contained both a state and federal

21    access feature, in addition to other services that we paid for.

22    I was under the impression we still had state and federal

23    access, became aware of it only at the point the Court issued

24    the order to show cause.

25         When we did our own research with Fastcase and

contacted them, it appears there was a billing error some years

ago where they stopped billing the firm for certain services

but continued to bill us for others.  So I was paying invoices

for Fastcase, believed it to be fully in effect.  What they

actually had done was limit our access to federal case law

while allow us to still have access to state and the other

services we had subscribed for.

       With respect to remedial measures being taken by the

firm, as just stated, all the attorneys are aware that we have

access to both state and federal and any other resources they

think necessary to effectively represent our clients.  It's the

matter on which I have always seeked to run the firm and

represent our clients.

       We retain ethics counsel for both these matters and to

provide CLE on the issues of research and how artificial

intelligence is affecting the landscape.  Likewise, there will

be mandatory training for the attorneys with respect to

notarization, something that -- these clerical errors should

not occur.

       I accept a level of responsibility of not having

gotten involved in a more on-hands manner when the research was

being done.  But the manner in which I have run the firm

historically is that the attorneys conduct their own research,

work on their own files, and, again, 30 years of competent,

more than competent practice by Steven -- I have worked with

1   Peter for 26 plus years -- led me to be comfortable that they

2   are capable of conducting the research, preparing their briefs,

3   and competently and effectively representing our clients.

4        I can, again, express my remorse, and I know my

5   attorneys feel the same way.  Again, it's obvious, the

6   reputational damage that's being sustained by the firm already

7   to this point because of how newsworthy this issue is.  I

8   assure you that that and all of what's taken place will ensure

9   that we will put remedial measures in place and this will not

10  happen again.

11       THE COURT:  Thank you, Mr. Corvino.

12       I am going to give Mr. Minkoff and Ms. Foti an

13  opportunity to sum up, but I wanted to find out if Avianca has

14  any position they want to take.

15       MR. BANINO:  Your Honor, we don't have the difficult

16  job you do to determine the sanctions for what happened with

17  regard to this motion.

18       But like you, just to revert it to the clients who are

19  involved here, Avianca's position is still that this case

20  should be dismissed on the merits.  Plaintiff's counsel has

21  known for more than a year that they have a time-bar problem,

22  and in that year they have not been able to come up with

23  credible opposition or case law in effect today.  I think

24  Mr. Schwartz admitted he wasn't able to come up with any cases

25  in opposition to our motion.

1          We request that our motion be granted to dismiss.

2          THE COURT:  Thank you.

3          Ms. Foti, any concluding remarks?

4          MS. FOTI:  Yes, your Honor.  Thank you.

5          Your Honor, I don't want to minimize the conduct here.

6     Clearly, my client should have taken more care and should have

7     had more conversations with Mr. Schwartz.

8          But I think it's crucial for the Court to focus on my

9     client's intent.  His intent was to do what he believed was the

10    right thing, and he was helping Mr. Schwartz.  He was asked to

11    appear in this case on behalf of the firm.  He was helping

12    Mr. Schwartz appear on behalf of his client.  He relied on

13    Mr. Schwartz.  They have worked together for 27 years.  He had

14    no reason to doubt that Mr. Schwartz was doing the research

15    appropriately.

16         The only time he even became aware that there was an

17    issue in the actual research was at the time your Honor issued

18    the order to show cause of May 4.  I understand that the order

19    asking for copies of the cases is something that may have

20    raised an issue or should have raised an issue, why can't the

21    Court get these cases, but it did not.  He did not think that

22    there was a chance that these were fake cases.  I think that's

23    what is crucial here to think about.

24         We can't look in hindsight of what was happening and

25    then say, oh, you should have known at the time that there was

1   an issue here that these cases did not exist, when that is not

2   even something in my client's mind at all.  All he could think

3   of is, maybe there is an issue about getting these cases, I am

4   going to turn it over to Mr. Schwartz, who is a reliable and a

5   really experienced attorney.  I have no reason to doubt that he

6   is going to do what the Court asked him to do.

7          And then he produces a pile of cases.  I understand

8   there were portions of cases, but still it did not occur to my

9   client that these were fake cases.  There could be whatever

10  reasons that these not be produced completely based on the

11  resources the firm had.

12         But under Rule 11, and under 1927, and in your

13  inherent powers, I suggest that the case law is very clear that

14  my client, if the Court is to sanction him, there has to be a

15  finding that he acted in bad faith.

16         He did not act in bad faith.  I think that's clear

17  from the submissions.  I think it's clear from his testimony

18  that he was attempting to take responsibility and do what he

19  needed to do and had no reason at all to doubt that what was

20  being presented to the Court were legitimate cases.

21         I would suggest, your Honor, that there is not a

22  foundation here in order to find that Mr. LoDuca should be

23  sanctioned, not under Rule 11, not under 1927, not under your

24  inherent powers.

25         Particularly, I want to focus on one case that I think

 1  is very instructive, which is the Braun case, *Braun ex rel.*

 2  *Advanced Battery Text, Inc., v. Zhiguo Fu*.  It's 11 CV 04383 WL

 3  4389893 at *19.  It's a Southern District case.  And in that

 4  case an associate signed an affidavit that contained

 5  misrepresentations, relying on other colleagues.  And it was

 6  clear that the associate believed what he was presenting to the

 7  Court was accurate information.  And the Court said that he was

 8  entitled to rely on that information provided by the colleagues

 9  and found that he should not be sanctioned.

10        I would suggest that that is the same case we have

11  here.  My client was allowed to rely on his colleague, and he

12  did so, and he did not act in bad faith.  And there are years

13  and years of practice.  He has been in practice for 37 years,

14  has never once been subject to sanctions.

15        And this is a terrible situation.  He takes full

16  responsibility.  We, again, do not want to minimize the

17  conduct, but I do not believe it's appropriate for him to be

18  sanctioned.

19        THE COURT:  Thank you, Ms. Foti.

20        Mr. Minkoff or your colleague.

21        MR. MINKOFF:  We are both going to speak.  I am just

22  going to start out --

23        THE COURT:  Why would that be?  Do you have different

24  clients?

25        MR. MINKOFF:  No, we don't, your Honor, but I don't

1   want to waste the Court's time.

2           THE COURT:  Why can't one attorney for the two

3   respondents who you represent present your argument?

4           MR. MINKOFF:  We just wanted to take different

5   perspectives.  I wanted to give sort of an overall perspective

6   on this case and what it means and its significance, and

7   Mr. Maulsby will delve more into the evidence.

8           THE COURT:  That's not usual practice.  You agree?

9           MR. MINKOFF:  Actually, your Honor, I don't

10  necessarily agree.  I have divided arguments up before in other

11  courts.  If your Honor doesn't want us to do that, give me a

12  moment to speak --

13          THE COURT:  It would be customary to ask to do that.

14          MR. MINKOFF:  I am asking.

15          THE COURT:  Now you're asking that I'm granting it.

16  The point is, you ask.

17          MR. MINKOFF:  Yes.

18          THE COURT:  Then I grant it.  You don't presume.

19          MR. MINKOFF:  I apologize.

20          THE COURT:  You can stand while you deliver your

21  argument, Mr. Minkoff.

22          MR. MINKOFF:  Thank you, your Honor.

23          Your Honor, our clients understand that we, as their

24  lawyers, understand that this Court's reaction to the filing of

25  a brief that had false case law in it, false case law that was

1   obtained from ChatGPT, there is no question that never should

2   have happened and our clients are mortified and apologetic that

3   it did.

4        But the fact is, as Ms. Foti pointed out, there was no

5   intentional misconduct here.  This was the result of ignorance

6   and carelessness.  It was not intentional and it was certainly

7   not subjective bad faith.  So under Rule 11, under section

8   1927, under the inherent authority of this Court, there is no

9   basis for sanctions here.

10        Now, as I said, I wanted to just -- Mr. Maulsby will

11   delve into the evidence a little more deeply, but I just wanted

12   to talk about the significance of this case.  And the fact that

13   this case is significant is indicated by the amount of press

14   attention, the amount of people here in the courtroom today,

15   the amount of articles, the amount of buzz online.

16        And the reason for that, at least as far as the legal

17   profession goes, is that this case is Schadenfreude for any

18   lawyer.  There but for the grace of God go I.

19        And the reason is that lawyers have historically had a

20   hard time with technology, especially new technology, and this

21   was very new technology.  And it's not getting any easier.  And

22   we have lived, in the course certainly of my 40-year career,

23   through lots of new technology coming along that lawyers have

24   to learn to use.  Sometimes their firms require them to use it

25   and they have to figure it out for themselves.  Doesn't always

1    work the way it should.

2        We saw that way back when Westlaw and Lexis were

3    competing with each other for the marketplace.  And both of

4    them were purporting to be the source and it turned out that

5    neither of them had all the cases and you had to look in both

6    sources.

7        It's not getting any easier because then at least

8    there were just two sources of research, mainly Westlaw, Lexis,

9    and the books, three sources.  Now there are many online

10   sources, including Fastcase, including Justia, a number of

11   other online sources that lawyers have to use, and we have to

12   navigate that.

13       Predictive coding is another example of a technology

14   that came along.  It was supposed to solve all the discovery

15   problems, and we all learned that it didn't work that way.

16   But, again, at the beginning, there were a couple of vendors

17   who did it, couple of programs.  Now there are literally

18   hundreds of AI programs.  There are hundreds of AI, maybe

19   thousands of AI vendors that law firms use.  Some know what

20   they are doing, some don't, and the lawyers have to figure it

21   out.  And there aren't too many lawyers that practice in this

22   court that have not been burned in that context.  So what

23   happened here is, in our view, another iteration of that same

24   problem.

25       This is not a new problem.  The state bar association

1   has been well aware of this, created a committee on the law and

2   technology about five or six years ago, precisely to try to

3   teach -- because they knew that lawyers weren't learning this

4   stuff and weren't doing a good job of that.  And the bar

5   association dedicated itself to trying to teach lawyers and to

6   try to keep up with the technological changes.  But the fact is

7   that there is no bar association, no law firm, no lawyer who

8   could have known all there was to know about ChatGPT and it's

9   foibles three months after it came out.  It came out in

10  November, late November -- I think November 22 of 2022, and

11  Mr. Schwartz was using it three months later.

12         That was the problem here.  Mr. Schwartz, someone who

13  rarely does federal research, found himself in a pinch, chose

14  to work with this brand-new technology.  As he said, he thought

15  he was dealing with a standard search engine.  It wasn't.  What

16  he was doing was playing with live ammo.  He was playing with

17  something, with a generative technology that didn't have access

18  to the databases that he thought it did, and it didn't have

19  access to the actual case law, and was fully capable of making

20  the case law up, which is what it did.

21         He had no idea about that risk and that danger until

22  it was too late, and he didn't know because the technology lied

23  to him.  He asked it for cases.  It gave him cases.  It just

24  made them up.

25         It is obvious, in hindsight, after the examination

1    that this Court has done that those cases weren't real, but at

2    the time, trying to do -- put something together and dealing

3    with citations that seemed supportive, it was not immediately

4    obvious at all, and certainly there were no disclaimers saying

5    that this would happen, that this was likely to happen.  And

6    when he challenged it, went back to it and said -- and tested

7    it, it doubled down.  It kept lying to him.

8            These dangers were not generally known back in March

9    or even April, and the reason -- one of the reasons that they

10   are now more generally known is because of what your Honor has

11   done.  Your Honor has made this order, and the world now knows

12   about the dangers of ChatGPT.

13           Should this Court be outraged that lawyers submitted

14   false cases to it?  Absolutely.  And because the fact that

15   there is a program out there that's available to lawyers that

16   literally makes up cases is in fact outrageous.  Should the

17   Court be upset at my clients for their ignorance and

18   carelessness in dealing with this?  Again, absolutely, they

19   should.  And the way they handled it after the problems were

20   discovered.  Yes, they were careless.

21           But should they be sanctioned.  We submit that the

22   answer for that is, no, they shouldn't.  They made a careless,

23   honest mistake.  They thought they were using a search engine

24   and they weren't using a search engine.  And it turns out that,

25   yes, they should have reacted more quickly.  But they did not

1    act with subjective bad faith or with mal intent.

2         Now, this Court has done its job of warning the public

3    about these risks, warning the profession about these risks.

4         THE COURT:  That's not my job, and I didn't set out to

5    do that.

6         MR. MINKOFF:  I understand that it's not your job as a

7    judge to do it, but you did it.

8         THE COURT:  That was not intended as a warning.  That

9    was intended as an order to show cause to bring these

10   respondents before the Court to answer for their actions and

11   nothing more.

12        MR. MINKOFF:  I understand that, your Honor.  But

13   whether your Honor intended it or not, the effect is what I

14   said, which is that the public is now on notice of this

15   problem, which my client was not on notice of and did not know

16   about at the time.

17        Now, just as AI teaches itself, now it is up to

18   lawyers to learn about these dangers.

19        THE COURT:  Thank you, Mr. Minkoff.

20        MR. MINKOFF:  Thank you, your Honor.

21        THE COURT:  Sir.

22        MR. MAULSBY:  Your Honor, I'd like to pick up where

23   Mr. Minkoff and Ms. Foti left off, on the issue of sanctions

24   and on the issue of subjective bad faith.

25        We all strongly believe that the appropriate standard

1    here is subjective bad faith.

2           And, to unpack that a step further, we believe the law

3    is clear that subjective bad faith here requires evidence of

4    actual knowledge that the conduct was wrong, that the conduct

5    was frivolous.  That means here that that there is actual

6    knowledge.  There has to be actual knowledge that Mr. Schwartz

7    knew he was providing fabricated cases and, by extension, the

8    firm, or knew arguably that ChatGPT would provide false cases

9    or fabricated cases.  That's the same standard under inherent

10   authority, under 1927.  That didn't happen here.  The courts

11   have equated subjective bad faith to a finding of contempt, of

12   a knowing disobedience of a court order.  That simply didn't

13   happen here.

14          I think you have heard plenty today that we all agree,

15   including Mr. Schwartz, that he made a significant mistake, and

16   he did.  He should not have used ChatGPT for legal research.

17   He should have noticed the red flags along the way.  But this

18   isn't a situation where he willfully ignored warnings.  Your

19   Honor elicited testimony from Mr. Schwartz today where it is

20   clear he deviated from his normal practices, but again, that's

21   not subjective bad faith.  That's a mistake, a careless

22   mistake.  This is not a situation where he was willfully

23   ignoring something.

24          He recognizes he should have been more careful and

25   that he should have gotten a better command of the technology

1  and an understanding of what it was, especially before using it

2  in active litigation.  But, again, that's not subjective bad

3  faith.

4          Your Honor -- we have put cases in our papers -- has

5  confronted this scenario before a couple of times.  Not with

6  respect to new technology, but with respect to what the

7  standard of subjective bad faith is.  The *Rivas* case cited in

8  our papers, the attorney blatantly violated the removal

9  statute.

10          Your Honor, through a hearing, elicited testimony

11  where the attorney acknowledged, yes, I know this is what the

12  statute says; yes, I understand that's what it means, and I did

13  the exact opposite.  There is a knowing disregard for plain

14  law.  Then their position was foreclosed *a priori*.

15          *Weddington* was the other case that your Honor dealt

16  with in a similar situation.  The lawyer had a document in his

17  hand.  There were emails in the firm that said the client was

18  domiciled in New York, and they said the exact opposite thing

19  on the piece of paper -- or in a pleading.  Excuse me.

20          The difference here, though, Judge, even with the

21  backward looking, the practice should have been better, the

22  respondents should have picked up on the warning signs, fine.

23  The difference here, though, is that, unlike those other cases,

24  our clients had a countervailing fact.  They had something

25  telling them, this is a case.  This is a real case.  Of course

1    there were warning signs.  Of course they should have realized

2    sooner that wasn't the case.  But that's what separates it from

3    the subjective bad-faith cases where courts have found that.

4           By contrast, the *Braun* case, where the Court didn't

5    find sanctions -- excuse me.  The Court did not find subjective

6    bad faith because there was no knowledge element.

7           Mr. Schwartz didn't know how ChatGPT worked.  His

8    declaration, his chat history shows this.  He was conducting

9    searches, albeit not in the proper way, and he understood that

10   ChatGPT was collecting information from publicly available

11   sources.  Obviously, that was wrong.  He knows that now.  But

12   he didn't at the time.

13          And there weren't as many warnings as one might

14   expect.  Obviously, reading from top to bottom, as your Honor

15   did with the Varghese case, there were warnings, but, at the

16   same time, there were indicia of reliability that he relied on,

17   coupled with the subjective belief that this piece of

18   technology can't just be lying to me.  He couldn't conceive of

19   it.

20          But now he knows that's what ChatGPT is designed to

21   do, not to provide false information; to be an exercise in

22   language.  But he didn't know that at the time.  And there

23   weren't as many warnings, if you look at the chat history, when

24   he was using the technology.  As Mr. Minkoff said, it is

25   relatively new to him.  It's still relatively new.

```
 1              When he entered his questions, it gave him answers.

 2    You saw in our declaration, when we answered those same

 3    questions later, we got significantly more disclaimers.  This

 4    isn't legal advice.  Talk to a lawyer.

 5              And we submit, your Honor, that's relevant for two

 6    reasons.

 7              First, it supports Mr. Schwartz's state of mind at the

 8    time.  He didn't have a document in his hand, like the lawyers

 9    in the other cases, saying this is wrong.  He was just getting

10    answers and couldn't conceive that these could be false

11    answers, because he thought they were being pulled, like a

12    database or like a search engine.

13              Second, it shows how quickly the technology is

14    constantly changing, as Mr. Minkoff told you a couple of

15    minutes ago.

16              THE COURT:  Let's not reiterate -- you are both from

17    the same firm.  You are partners?

18              MR. MAULSBY:  Yes.

19              THE COURT:  I have granted you the opportunity to

20    supplement Mr. Minkoff's arguments.  Please try to refrain from

21    reiterating his arguments.  If you have something new to say,

22    I'm all ears.

23              MR. MAULSBY:  Understand.  I will.

24              The second reason why this is relevant, Judge, that

25    the warnings have since been bolstered, is that somewhere along
```

1    the way, whether it's the way the program is designed to work

2    or the company that made it, there is a recognition that the

3    public needs a stronger warning so that if they are going in

4    and looking for case law or looking for a legal answer that

5    they are not deceived into thinking that this is a factual

6    answer.

7           The remaining question gets to this idea of whether

8    sanctions will serve a useful purpose here, which is an element

9    under Rule 11.  The intended purpose of sanctions is to send a

10   deterrent message.

11          You have three lawyers that you heard from, three

12   lawyers before you today who are totally and utterly

13   humiliated.

14          Since the Court's order was issued, there has been

15   widespread attention, and the name of the firm and these two

16   lawyers have been irreparably harmed.  I understand that that

17   doesn't by itself satisfy Rule 11.  But at the same time, these

18   lawyers have already become the cautionary tale, in at least

19   every law firm I know, about what happens when a lawyer misuses

20   technology they don't understand.

21          THE COURT:  I think this point has been made.

22          MR. MAULSBY:  The firm has taken appropriate remedial

23   measures --

24          THE COURT:  I think that point was made also.  Your

25   firm put on a CLE for the firm.  Is that right?

1            MR. MAULSBY:  That's one of them, Judge.

2            THE COURT:  I heard from the principal of the firm.

3    Is this something that's in the record that you are going to

4    tell me, or is this something not in the record?

5            MR. MAULSBY:  I'm summing the record, your Honor.

6            THE COURT:  This is something in the record.

7            MR. MAULSBY:  Yes.

8            THE COURT:  What is it in the record and tell me where

9    I find it.

10            MR. MAULSBY:  I'm sorry.

11            THE COURT:  Tell me where I find what you are about to

12    tell me in the record.

13            MR. MAULSBY:  Mr. Corvino's declaration talked about

14    the remedial measures.

15            THE COURT:  I read it.

16            MR. MAULSBY:  I may not be understanding the question.

17    I'm sorry.

18            THE COURT:  I have Mr. Corvino's declaration.  I have

19    heard from him.  I'm all ears if you have something new you

20    want to say.  But reiterating your written submissions is not

21    particularly helpful.

22            MR. MAULSBY:  That's fine, your Honor.

23            I was trying to make the argument that in the context

24    of Rule 11, the information in the record, in particular here

25    the remedial measures, goes to whether sanctions are

1   appropriate under Rule 11.

2          So it is our position that, given the remedial

3   measures, given the fact that the firm has done and these

4   lawyers have done everything they are supposed to do when they

5   make a mistake, they acknowledged responsibility, instituted

6   remedial measures, that any further sanction would be unduly

7   punitive.  The deterrent message has been sent.

8          For those reasons, we are asking your Honor not to

9   impose sanctions here, as we don't believe that it is necessary

10  or appropriate.  Thank you.

11         THE COURT:  Thank you.  A few closing comments.

12         First of all, I want to thank Mr. Minkoff and Mr.

13  Maulsby and Ms. Foti for their very fine presentations.  I want

14  to thank Avianca's counsel for being present.  I want to thank

15  Mr. Corvino, Mr. LoDuca, and Mr. Schwartz for their presence

16  here this afternoon.

17         I will be taking this under advisement and issuing a

18  written decision.

19         I want to make an important observation.  It's not

20  fair to pick apart people's words, but I'll just note that,

21  repeatedly, this has been described as a mistake.  And framing

22  this as a mistake, I understand why it's framed that way, and

23  the mistake is to have submitted the brief on March 1 that

24  cited nonexistent cases.

25         But that's not what this is all about.  That's part of

1    what it is about.  That is the beginning of the narrative, not

2    the end, not what was in everybody's mind at the time they

3    drafted the brief and uploaded it on ECF.  I doubt we would be

4    here today if the narrative ended there.

5            There was a reply brief filed by Avianca.  The record

6    will reflect whether that brief put Mr. Schwartz and Mr. LoDuca

7    on actual notice that their cases were nonexistent.  There was

8    an order from the Court on April 11 calling upon Mr. LoDuca,

9    not a law firm, not an entity, not the plaintiff, Mr. LoDuca to

10   submit copies of the cases.  We know how Mr. LoDuca responded

11   to that.  We know how Mr. Schwartz prepared the response.  We

12   know what they submitted and what they said about it.  We know

13   a lot more now.  But this case is not just about the March 1

14   submission.  It's what happened thereafter is an important part

15   and an essential part of that narrative.

16           So I thank everyone for being here and participating

17   and the matter is under advisement.

18           One moment, please.

19           I am going to mark the wet-ink affidavit as Court

20   Exhibit 1, unless somebody has an objection to that.

21           MS. FOTI:  No, your Honor.

22           THE COURT:  Thank you all very much.  We are

23   adjourned.

24           (Adjourned)

25