UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ROBERTO MATA,

                         Plaintiff,                        22-cv-1461 (PKC)

        -against-

                                          OPINION AND ORDER
                                        <u>ON SANCTIONS</u>
AVIANCA, INC.,

                         Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        In researching and drafting court submissions, good lawyers appropriately obtain

assistance from junior lawyers, law students, contract lawyers, legal encyclopedias and databases

such as Westlaw and LexisNexis.  Technological advances are commonplace and there is

nothing inherently improper about using a reliable artificial intelligence tool for assistance.  But

existing rules impose a gatekeeping role on attorneys to ensure the accuracy of their filings.

Rule 11, Fed. R. Civ. P.  Peter LoDuca, Steven A. Schwartz and the law firm of Levidow,

Levidow & Oberman P.C. (the "Levidow Firm") (collectively, "Respondents") abandoned their

responsibilities when they submitted non-existent judicial opinions with fake quotes and citations

created by the artificial intelligence tool ChatGPT, then continued to stand by the fake opinions

after judicial orders called their existence into question.

        Many harms flow from the submission of fake opinions.[1]  The opposing party

wastes time and money in exposing the deception.  The Court's time is taken from other

---

[1] The potential mischief is demonstrated by an innocent mistake made by counsel for Mr. Schwartz and the Levidow Firm, which counsel promptly caught and corrected on its own.  In the initial version of the brief in response to the Orders to Show Cause submitted to the Court, it included three of the fake cases in its Table of Authorities.  (ECF 45.)

important endeavors.  The client may be deprived of arguments based on authentic judicial precedents.  There is potential harm to the reputation of judges and courts whose names are falsely invoked as authors of the bogus opinions and to the reputation of a party attributed with fictional conduct.  It promotes cynicism about the legal profession and the American judicial system.  And a future litigant may be tempted to defy a judicial ruling by disingenuously claiming doubt about its authenticity.

The narrative leading to sanctions against Respondents includes the filing of the March 1, 2023 submission that first cited the fake cases.  But if the matter had ended with Respondents coming clean about their actions shortly after they received the defendant's March 15 brief questioning the existence of the cases, or after they reviewed the Court's Orders of April 11 and 12 requiring production of the cases, the record now would look quite different.  Instead, the individual Respondents doubled down and did not begin to dribble out the truth until May 25, after the Court issued an Order to Show Cause why one of the individual Respondents ought not be sanctioned.

For reasons explained and considering the conduct of each individual Respondent separately, the Court finds bad faith on the part of the individual Respondents based upon acts of conscious avoidance and false and misleading statements to the Court.  (See, e.g., Findings of Fact ¶¶ 17, 20, 22-23, 40-41, 43, 46-47 and Conclusions of Law ¶¶ 21, 23-24.)  Sanctions will therefore be imposed on the individual Respondents.  Rule 11(c)(1) also provides that "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its . . . associate, or employee."  Because the Court finds no exceptional circumstances, sanctions will be jointly imposed on the Levidow Firm.  The sanctions are "limited to what

suffices to deter repetition of the conduct or comparable conduct by others similarly situated."
Rule 11(c)(4).

Set forth below are this Court's Findings of Fact and Conclusions of Law
following the hearing of June 8, 2023.

## FINDINGS OF FACT

1.      Roberto Mata commenced this action on or about February 2, 2022, when
he filed a Verified Complaint in the Supreme Court of the State of New York, New York
County, asserting that he was injured when a metal serving cart struck his left knee during a
flight from El Salvador to John F. Kennedy Airport.  (ECF 1.)  Avianca removed the action to
federal court on February 22, 2022, asserting federal question jurisdiction under the Convention
for the Unification of Certain Rules Relating to International Carriage by Air, Done at Montreal,
Canada, on 28 May 1999, reprinted in S. Treaty Doc. 106-45 (1999) (the "Montreal
Convention").  (ECF 1.)

2.      Steven A. Schwartz of the Levidow Firm had been the attorney listed on
the state court complaint.  But upon removal from state court to this Court, Peter LoDuca of the
Levidow Firm filed a notice of appearance on behalf of Mata on March 31, 2022.  (ECF 8.)  Mr.
Schwartz is not admitted to practice in this District.  Mr. LoDuca has explained that because Mr.
Schwartz is not admitted, Mr. LoDuca filed the notice of appearance while Mr. Schwartz
continued to perform all substantive legal work.  (LoDuca May 25 Aff't ¶¶ 3-4 (ECF 32);
Schwartz May 25 Aff't ¶ 4 (ECF 32-1).)

3.      On January 13, 2023, Avianca filed a motion to dismiss urging that Mata's
claims are time-barred under the Montreal Convention.  (ECF 16.)

4.      On January 18, 2023, a letter signed by Mr. Schwartz and filed by Mr. LoDuca requested a one-month extension to respond to the motion, from February 3, 2023, to March 3, 2023.  (ECF 19.)  The letter stated that "the undersigned will be out of the office for a previously planned vacation" and cited a need for "extra time to properly respond to the extensive motion papers filed by the defendant."  (Id.)  The Court granted the request.  (ECF 20.)

5.      On March 1, 2023, Mr. LoDuca filed an "Affirmation in Opposition" to the motion to dismiss (the "Affirmation in Opposition").[2]  (ECF 21.)  The Affirmation in Opposition cited and quoted from purported judicial decisions that were said to be published in the Federal Reporter, the Federal Supplement and Westlaw.  (Id.)  Above Mr. LoDuca's signature line, the Affirmation in Opposition states, "I declare under penalty of perjury that the foregoing is true and correct."  (Id.)

6.      Although Mr. LoDuca signed the Affirmation in Opposition and filed it on ECF, he was not its author.  (Tr. 8-9.)  It was researched and written by Mr. Schwartz.  (Tr. 8.) Mr. LoDuca reviewed the affirmation for style, stating, "I was basically looking for a flow, make sure there was nothing untoward or no large grammatical errors."  (Tr. 9.)  Before executing the Affirmation, Mr. LoDuca did not review any judicial authorities cited in his affirmation.  (Tr. 9.) There is no claim or evidence that he made any inquiry of Mr. Schwartz as to the nature and extent of his research or whether he had found contrary precedent.  Mr. LoDuca simply relied on a belief that work produced by Mr. Schwartz, a colleague of more than twenty-five years, would be reliable.  (LoDuca May 25 Aff't ¶¶ 6-7.)  There was no claim made by any Respondent in response to the Court's Orders to Show Cause that Mr. Schwartz had prior experience with the

---

[2] Plaintiff's opposition was submitted as an "affirmation" and not a memorandum of law.  The Local Civil Rules of this District require that "the cases and other authorities relied upon" in opposition to a motion to dismiss be set forth in a memorandum of law.  Local Civil Rule 7.1(a)(2), 7.1(b).  An affirmation is a creature of New York state practice that is akin to a declaration under penalty of perjury.  Compare N.Y. C.P.L.R. 2106 with 28 U.S.C. § 1746.

Montreal Convention or bankruptcy stays.  Mr. Schwartz has stated that "my practice has always been exclusively in state court . . . ."  (Schwartz June 6 Decl. ¶ 6.)  Respondents' memorandum of law asserts that Mr. Schwartz attempted "to research a federal bankruptcy issue with which he was completely unfamiliar."  (ECF 49 at 21.)

7.      Avianca filed a five-page reply memorandum on March 15, 2023.  (ECF 24.)  It included the following statement: "Although Plaintiff ostensibly cites to a variety of cases in opposition to this motion, the undersigned has been unable to locate most of the case law cited in Plaintiff's Affirmation in Opposition, and the few cases which the undersigned has been able to locate do not stand for the propositions for which they are cited."  (ECF 24 at 1.)  It impliedly asserted that certain cases cited in the Affirmation in Opposition were non-existent:  "Plaintiff does not dispute that this action is governed by the Montreal Convention, and Plaintiff has not cited any existing authority holding that the Bankruptcy Code tolls the two-year limitations period or that New York law supplies the relevant statute of limitations."  (ECF 24 at 1; emphasis added.)  It then detailed by name and citation seven purported "decisions" that Avianca's counsel could not locate, and set them apart with quotation marks to distinguish a non-existent case from a real one, even if cited for a proposition for which it did not stand.  (ECF 24.)

8.      Despite the serious nature of Avianca's allegations, no Respondent sought to withdraw the March 1 Affirmation or provide any explanation to the Court of how it could possibly be that a case purportedly in the Federal Reporter or Federal Supplement could not be found.

9.      The Court conducted its own search for the cited cases but was unable to locate multiple authorities cited in the Affirmation in Opposition.

10.     Mr. LoDuca testified at the June 8 sanctions hearing that he received Avianca's reply submission and did not read it before he forwarded it to Mr. Schwartz.  (Tr. 10.) Mr. Schwartz did not alert Mr. LoDuca to the contents of the reply.  (Tr. 12.)

11.     As it was later revealed, Mr. Schwartz had used ChatGPT, which fabricated the cited cases.   Mr. Schwartz testified at the sanctions hearing that when he reviewed the reply memo, he was "operating under the false perception that this website [i.e., ChatGPT] could not possibly be fabricating cases on its own." (Tr. at 31.)  He stated, "I just was not thinking that the case could be fabricated, so I was not looking at it from that point of view." (Tr. at 35.)  "My reaction was, ChatGPT is finding that case somewhere.  Maybe it's unpublished.  Maybe it was appealed.  Maybe access is difficult to get.  I just never thought it could be made up." (Tr. at 33.)

12.     Mr. Schwartz also testified at the hearing that he knew that there were free sites available on the internet where a known case citation to a reported decision could be entered and the decision displayed.  (Tr. 23-24, 28-29.)  He admitted that he entered the citation to "Varghese" but could not find it:

> THE COURT: Did you say, well they gave me part of Varghese, let me look at the full Varghese decision?
>
> MR. SCHWARTZ: I did.
>
> THE COURT: And what did you find when you went to look up the full Varghese decision?
>
> MR. SCHWARTZ: I couldn't find it.
>
> THE COURT: And yet you cited it in the brief to me.
>
> MR. SCHWARTZ: I did, again, operating under the false assumption and disbelief that this website could produce completely fabricated cases.  And if I knew that, I obviously never would have submitted these cases.

(Tr. 28.)[3]

13.     On April 11, 2023, the Court issued an Order directing Mr. LoDuca to file an affidavit by April 18, 2023[4] that annexed copies of the following decisions cited in the Affirmation in Opposition:  <u>Varghese v. China Southern Airlines Co., Ltd.</u>, 925 F.3d 1339 (11th Cir. 2019); <u>Shaboon v. Egyptair</u>, 2013 IL App (1st) 111279-U (Ill. App. Ct. 2013); <u>Peterson v. Iran Air</u>, 905 F. Supp. 2d 121 (D.D.C. 2012); <u>Martinez v. Delta Airlines, Inc.</u>, 2019 WL 4639462 (Tex. App. Sept. 25, 2019); <u>Estate of Durden v. KLM Royal Dutch Airlines</u>, 2017 WL 2418825 (Ga. Ct. App. June 5, 2017); <u>Ehrlich v. American Airlines, Inc.</u>, 360 N.J. Super. 360 (App. Div. 2003); <u>Miller v. United Airlines, Inc.</u>, 174 F.3d 366, 371-72 (2d Cir. 1999); and <u>In re Air Crash Disaster Near New Orleans, LA</u>, 821 F.2d 1147, 1165 (5th Cir. 1987).  (ECF 25.)  The Order stated: "Failure to comply will result in dismissal of the action pursuant to Rule 41(b), Fed. R. Civ. P."  (ECF 25.)

14.     On April 12, 2023, the Court issued an Order that directed Mr. LoDuca to annex an additional decision, which was cited in the Affirmation in Opposition as <u>Zicherman v. Korean Air Lines Co., Ltd.</u>, 516 F.3d 1237, 1254 (11th Cir. 2008).  (ECF 27.)

15.     Mr. Schwartz understood the import of the Orders of April 11 and 12 requiring the production of the actual cases:  "I thought the Court searched for the cases [and] could not find them . . . ."  (Tr. 36.)

16.     Mr. LoDuca requested an extension of time to respond to April 25, 2023. (ECF 26.)  The letter stated: "This extension is being requested as the undersigned is currently

---

[3] Mr. Schwartz's testimony appears to acknowledge that he knew that "<u>Varghese</u>" could not be found before the March 1 Affirmation was filed citing the fake case.  His answer also could refer to the April 25 Affidavit submitting the actual cases.  Either way, he knew before making a submission to the Court that the full text of "<u>Varghese</u>" could not be found but kept silent.
[4] The Court's Order directed the filing to be made by April 18, 2022, not 2023.

out of the office on vacation and will be returning April 18, 2023." (Id.)  Mr. LoDuca signed the

letter and filed it on ECF.  (Id.)

       17.     Mr. LoDuca's statement was false and he knew it to be false at the time he

made the statement.  Under questioning by the Court at the sanctions hearing, Mr. LoDuca

admitted that he was not out of the office on vacation. (Tr. 13-14, 19.)  Mr. LoDuca testified that

"[m]y intent of the letter was because Mr. Schwartz was away, but I was aware of what was in

the letter when I signed it.  . . .  I just attempted to get Mr. Schwartz the additional time he

needed because he was out of the office at the time." (Tr. 44.)  The Court finds that Mr. LoDuca

made a knowingly false statement to the Court that he was "out of the office on vacation" in a

successful effort to induce the Court to grant him an extension of time.  (ECF 28.)  The lie had

the intended effect of concealing Mr. Schwartz's role in preparing the March 1 Affirmation and

the April 25 Affidavit and concealing Mr. LoDuca's lack of meaningful role in confirming the

truth of the statements in his affidavit.  This is evidence of the subjective bad faith of Mr.

LoDuca.

       18.     Mr. LoDuca executed and filed an affidavit on April 25, 2023 (the "April

25 Affidavit") that annexed what were purported to be copies or excerpts of all but one of the

decisions required by the Orders of April 11 and 12.  Mr. LoDuca stated "[t]hat I was unable to

locate the case of Zicherman v. Korean Air Lines Co., Ltd., 516 F.3d 1237 (11th Cir. 2008)

which was cited by the Court in Varghese." (ECF 29.)

       19.     The April 25 Affidavit stated that the purported decisions it annexed "may

not be inclusive of the entire opinions but only what is made available by online database." (Id.

¶ 4.)  It did not identify any "online database" by name.  It also stated "[t]hat the opinion in

<u>Shaboon v. Egyptair</u> 2013 IL App (1st) 111279-U (Ill. App. Ct. 2013) is an unpublished

opinion." (<u>Id.</u> ¶ 5.)

20.     In fact, Mr. LoDuca did not author the April 25 Affidavit, had no role in

its preparation and no knowledge of whether the statements therein were true.  Mr. Schwartz was

the attorney who drafted the April 25 Affidavit and compiled its exhibits.  (Tr. 38.)

21.     At the sanctions hearing, Mr. Schwartz testified that he prepared Mr.

LoDuca's affidavit, walked it into "his office" twenty feet away, and "[h]e looked it over, and he

signed it." (Tr. 41.)[5]  There is no evidence that Mr. LoDuca asked a single question.  Mr.

LoDuca had not been provided with a draft of the affidavit before he signed it.  Mr. LoDuca

knew that Mr. Schwartz did not practice in federal court and, in response to the Order to Show

Cause, he has never contended that Mr. Schwartz had experience with the Montreal Convention

or bankruptcy stays.  Indeed, at the sanctions hearing, Mr. Schwartz testified that he thought a

citation in the form "F.3d" meant "federal district, third department." (Tr. 33.)[6]

22.     Facially, the April 25 Affidavit did not comply with the Court's Orders of

April 11 and 12 because it did not attach the full text of any of the "cases" that are now admitted

to be fake.  It attached only excerpts of the "cases."  And the April 25 Affidavit recited that one

"case," "<u>Zicherman v. Korean Air Lines Co., Ltd.</u>, 516 F.3d 1237 (11th Cir. 2008)", notably with

a citation to the Federal Reporter, could not be found.  (ECF 29.)  No explanation was offered.

23.     Regarding the Court's Orders of April 11 and 12 requiring an affidavit

from Mr. LoDuca, Mr. LoDuca testified, "Me, I didn't do anything other than turn over to Mr.

---

[5] The declaration of Mr. Schwartz claimed that the April 25 Affidavit was executed in his own office, not Mr. LoDuca's office.  (Schwartz June 6 Dec. ¶ 27 ("Mr. LoDuca then came into my office and signed the affidavit in front of me . . . .").)
[6] The Court finds this claim from a lawyer who has practiced in the litigation arena for approximately 30 years to be not credible and was contradicted by his later testimony.  (<u>See</u> Tr. 34 ("THE COURT: And F.3d is the third edition of the Federal Reporter, correct?  MR. SCHWARTZ: Right.").)

Schwartz to locate the cases that [the Court] had requested."  (Tr. 13.)  He testified that he read the April 25 Affidavit and "saw the cases that were attached to it.  Mr. Schwartz had assured me that this was what he could find with respect to the cases.  And I submitted it to the Court."  (Tr. 14.)  Mr. LoDuca had observed that the "cases" annexed to his April 25 Affidavit were not being submitted in their entirety, and explained that "I understood that was the best that Mr. Schwartz could find at the time based on the search that he or – the database that he had available to him."  (Tr. 15.)  Mr. LoDuca testified that it "never crossed my mind" that the cases were bogus.  (Tr. 16.)

24.     The Court reviewed the purported decisions annexed to the April 25 Affidavit, which have some traits that are superficially consistent with actual judicial decisions.  The Court need not describe every deficiency contained in the fake decisions annexed to the April 25 Affidavit.  It makes the following exemplar findings as to the three "decisions" that were purported to be issued by federal courts.

25.     The "Varghese" decision is presented as being issued by a panel of judges on the United States Court of Appeals for the Eleventh Circuit that consisted of Judges Adalberto Jordan, Robin S. Rosenbaum and Patrick Higginbotham,[7] with the decision authored by Judge Jordan.  (ECF 29-1.)  It bears the docket number 18-13694.  (Id.)  "Varghese" discusses the Montreal Convention's limitations period and the purported tolling effects of the automatic federal bankruptcy stay, 11 U.S.C. § 362(a).  (ECF 29-1.)

26.     The Clerk of the United States Court of Appeals for the Eleventh Circuit has confirmed that the decision is not an authentic ruling of the Court and that no party by the name of "Vargese" or "Varghese" has been party to a proceeding in the Court since the

---

[7] Judge Higginbotham is a Senior Judge of the United States Court of Appeals for the Fifth Circuit, not the Eleventh Circuit.  Judges Jordan and Rosenbaum sit on the Eleventh Circuit.

institution of its electronic case filing system in 2010.  A copy of the fake "Varghese" opinion is attached as Appendix A.

27.     The "Varghese" decision shows stylistic and reasoning flaws that do not generally appear in decisions issued by United States Courts of Appeals.  Its legal analysis is gibberish.  It references a claim for the wrongful death of George Scaria Varghese brought by Susan Varghese.  (Id.)  It then describes the claims of a plaintiff named Anish Varghese who, due to airline overbooking, was denied boarding on a flight from Bangkok to New York that had a layover in Guangzhou, China.  (Id.)  The summary of the case's procedural history is difficult to follow and borders on nonsensical, including an abrupt mention of arbitration and a reference to plaintiff's decision to file for Chapter 7 bankruptcy as a tactical response to the district court's dismissal of his complaint.  (Id.)  Without explanation, "Varghese" later references the plaintiff's Chapter 13 bankruptcy proceeding.  (Id.)  The "Varghese" defendant is also said to have filed for bankruptcy protection in China, also triggering a stay of proceedings.  (Id.)  Quotation marks are often unpaired.  The "Varghese" decision abruptly ends without a conclusion.

28.     The "Varghese" decision bears the docket number 18-13694, which is associated with the case George Cornea v. U.S. Attorney General, et al.  The Federal Reporter citation for "Varghese" is associated with J.D. v Azar, 925 F.3d 1291 (D.C. Cir. 2019).

29.     The "Varghese" decision includes internal citations and quotes from decisions that are themselves non-existent:

        a.  It cites to "Holliday v. Atl. Capital Corp., 738 F.2d 1153 (11th Cir.

            1984)", which does not exist.  The case appearing at that citation is Gibbs

            v. Maxwell House, 738 F.2d 1153 (11th Cir. 1984).

b.   It cites to "Gen. Wire Spring Co. v. O'Neal Steel, Inc., 556 F.2d 713, 716 (5th Cir. 1977)", which does not exist.  The case appearing at that citation is United States v. Clerkley, 556 F.2d 709 (4th Cir. 1977).

c.   It cites to "Hyatt v. N. Cent. Airlines, 92 F.3d 1074 (11th Cir. 1996)", which does not exist.  There are two brief orders appearing at 92 F.3d 1074 issued by the Eleventh Circuit in other cases.

d.   It cites to "Zaunbrecher v. Transocean Offshore Deepwater Drilling, Inc., 772 F.3d 1278, 1283 (11th Cir. 2014)", which does not exist.  The case appearing at that citation is Witt v. Metropolitan Life Ins. Co., 772 F.3d 1269 (11th Cir. 2014).

e.   It cites to "Zicherman v. Korean Air Lines Co., 516 F.3d 1237, 1254 (11th Cir. 2008)", which does not exist as cited.  A Supreme Court decision with the same name, Zicherman v. Korean Air Lines Co., 516 U.S. 217 (1996), held that the Warsaw Convention does not permit a plaintiff to recover damages for loss of society resulting from the death of a relative, and did not discuss the federal bankruptcy stay.  The Federal Reporter citation for "Zicherman" is for Miccosukee Tribe v. United States, 516 F.3d 1235 (11th Cir. 2008).

f.   It cites to "In re BDC 56 LLC, 330 B.R. 466, 471 (Bankr. D.N.H. 2005)", which does not exist as cited.  A Second Circuit decision with the same name, In re BDC 56 LLC, 330 F.3d 111 (2d Cir. 2003), did not discuss the federal bankruptcy stay.  The case appearing at the Bankruptcy Reporter

citation is <u>In re 652 West 160th LLC</u>, 330 B.R. 455 (Bankr. S.D.N.Y. 2005).

g.  Other "decisions" cited in "<u>Varghese</u>" have correct names and citations but do not contain the language quoted or support the propositions for which they are offered.  <u>In re Rimstat, Ltd.</u>, 212 F.3d 1039 (7th Cir. 2000), is a decision relating to Rule 11 sanctions for attorney misconduct and does not discuss the federal bankruptcy stay.  <u>In re PPI Enterprises (U.S.), Inc.</u>, 324 F.3d 197 (3d Cir. 2003), does not discuss the federal bankruptcy stay, and is incorrectly identified as an opinion of the Second Circuit.  <u>Begier v. I.R.S.</u>, 496 U.S. 53 (1990), does not discuss the federal bankruptcy stay, and addresses whether a trustee in bankruptcy may recover certain payments made by the debtor to the Internal Revenue Service.  <u>Kaiser Steel Corp. v. W. S. Ranch Co.</u>, 391 U.S. 593 (1968) (per curiam), does not discuss the federal bankruptcy stay, and held that a federal proceeding should have been stayed pending the outcome of New Mexico state court proceedings relating to the interpretation of the state constitution.  <u>El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng</u>, 525 U.S. 155 (1999), does not contain the quoted language discussing the purpose of the Montreal Convention.  <u>In re Gandy</u>, 299 F.3d 489 (5th Cir. 2002), affirmed a bankruptcy court's denial of a motion to compel arbitration.

30.  The April 25 Affidavit annexes a decision identified as "<u>Miller v. United Airlines, Inc.</u>, 174 F.3d 366 (2d Cir. 1999)."  (ECF 29-7.)  As submitted, the "<u>Miller</u>" decision seems to be an excerpt from a longer decision and consists only of two introductory paragraphs.

(Id.)  It bears the docket number 98-7926, and purports to be written by Judge Barrington D. Parker of the Second Circuit, with Judges Joseph McLaughlin and Dennis Jacobs also on the panel.  (Id.)  It abruptly ends with the phrase "Section 11 of the Bankruptcy Act of 1898".  (Id.)

31.    "Miller" purports to apply the Warsaw Convention to a claim arising out of the real and tragic 1991 crash of United Airlines Flight 585, which was a domestic flight from Denver to Colorado Springs.[8]  "Miller" references a Chapter 11 bankruptcy petition filed by United Airlines on December 4, 1992.  (Id.)  There is no public record of any United Airlines bankruptcy proceeding in or around that time.[9]  (Id.)  "Miller" identifies Alberto R. Gonzales, purportedly from the law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP, as one of the attorneys for the defendant.  (Id.)  Alberto R. Gonzales is the name of the former United States Attorney General, who served from 2005 to 2007.[10]

32.    The "Miller" decision does not exist.  Second Circuit docket number 98-7926 is associated with the case Vitale v. First Fidelity, which was assigned to a panel consisting of Judges Richard Cardamone, Amalya Kearse and Chester Straub.  The Federal Reporter citation for "Miller" is to Greenleaf v. Garlock, Inc., 174 F.3d 352 (3d Cir. 1999).

33.    The April 25 Affidavit also annexes a decision identified as "Petersen v. Iran Air, 905 F. Supp. 2d 121 (D.D.C. 2012)", which bears an additional citation to 2012 U.S. Dist. LEXIS 17409.  (ECF 29-3.)  It is identified as a decision by Judge Reggie B. Walton and has the docket number 10-0542.  (Id.)  "Petersen" appears to confuse the District of Columbia

---

[8] See National Transportation Safety Board, "Aircraft Accident Report: Uncontrolled Descent and Collision With Terrain, United Airlines Flight 585," https://www.ntsb.gov/investigations/AccidentReports/Reports/AAR0101.pdf (last accessed June 21, 2023).

[9] It appears that United Airlines filed for Chapter 11 bankruptcy protection in 2002.  See Edward Wong, "Airline Shock Waves: The Overview; Bankruptcy Case Is Filed by United," N.Y. Times, Dec. 10, 2002, Sec. A p. 1, https://www.nytimes.com/2002/12/10/business/airline-shock-waves-the-overview-bankruptcy-case-is-filed-by-united.html (last accessed June 21, 2023).

[10] See, e.g., https://georgewbush-whitehouse.archives.gov/government/gonzales-bio html (last accessed June 21, 2023).

with the state of Washington.  (Id. ("Therefore, Petersen's argument that the state courts of Washington have concurrent jurisdiction is unavailing.").)  As support for its legal conclusion, "Petersen" cites itself as precedent:  "'Therefore, the Court has concurrent jurisdiction with any other court that may have jurisdiction under applicable law, including any foreign court.' (Petersen v. Iran Air, 905 F. Supp. 2d 121, 126 (D.D.C. 2012))".  (ECF 29-3.)

34.     The "Petersen" decision does not exist.  Docket number 10-cv-542 (D.D.C.) is associated with the case Cummins-Allison Corp. v. Kappos, which was before Judge Ellen S. Huvelle.  The Federal Supplement citation is to United States v. ISS Marine Services, 905 F. Supp. 2d 121 (D.D.C. 2012), a decision by Judge Beryl A. Howell.  The Lexis citation is to United States v. Baker, 2012 U.S. Dist. LEXIS 17409 (W.D. Mich. Feb. 13, 2012), in which Judge Janet T. Neff adopted the Report and Recommendation of a Magistrate Judge.

35.     The "Shaboon", "Martinez" and "Durden" decisions contain similar deficiencies.

36.     Respondents have now acknowledged that the "Varghese", "Miller", "Petersen", "Shaboon", "Martinez" and "Durden" decisions were generated by ChatGPT and do not exist.  (See, e.g., ECF 32, 32-1.)

37.     Mr. Schwartz has endeavored to explain why he turned to ChatGPT for legal research.  The Levidow Firm primarily practices in New York state courts.  (Schwartz June 6 Decl. ¶ 10; Tr. 45.)  It uses a legal research service called Fastcase and does not maintain Westlaw or LexisNexis accounts.  (Tr. 22-23.)  When Mr. Schwartz began to research the Montreal Convention, the firm's Fastcase account had limited access to federal cases.  (Schwartz June 6 Decl. ¶ 12; Tr. 24.)  "And it had occurred to me that I heard about this new site which I assumed -- I falsely assumed was like a super search engine called ChatGPT, and that's what I

used." (Tr. 24; <u>see also</u> Schwartz June 6 Decl. ¶ 15.)  Mr. Schwartz had not previously used

ChatGPT and became aware of it through press reports and conversations with family members.

(Schwartz June 6 Decl. ¶ 14.)

   38. Mr. Schwartz testified that he began by querying ChatGPT for broad legal

guidance and then narrowed his questions to cases that supported the argument that the federal

bankruptcy stay tolled the limitations period for a claim under the Montreal Convention.  (Tr. 25-

27.)  ChatGPT generated summaries or excerpts but not full "opinions."  (Tr. 27 & ECF 46-1;

Schwartz June 6 Decl. ¶ 19.)

   39. The June 6 Schwartz Declaration annexes the history of Mr. Schwartz's

prompts to ChatGPT and the chatbot's responses.  (ECF 46-1.)  His first prompt stated, "argue

that the statute of limitations is tolled by bankruptcy of defendant pursuant to montreal

convention".  (<u>Id.</u> at 2.)  ChatGPT responded with broad descriptions of the Montreal

Convention, statutes of limitations and the federal bankruptcy stay, advised that "[t]he answer to

this question depends on the laws of the country in which the lawsuit is filed"[11] and then stated

that the statute of limitations under the Montreal Convention is tolled by a bankruptcy filing.  (<u>Id.</u>

at 2-3.)  ChatGPT did not cite case law to support these statements.  Mr. Schwartz then entered

various prompts that caused ChatGPT to generate descriptions of fake cases, including  "provide

case law in support that statute of limitations is tolled by bankruptcy of defendant under montreal

convention", "show me specific holdings in federal cases where the statute of limitations was

tolled due to bankruptcy of the airline", "show me more cases" and "give some cases where

te [sic] montreal convention allowed tolling of the statute of limitations due to bankruptcy".  (<u>Id.</u>

---

[11] In fact, courts have generally held that the Montreal Convention seeks to create uniformity in the limitations periods enforced across its signatory countries.  <u>See</u>, <u>e.g.</u>, <u>Ireland v. AMR Corp.</u>, 20 F. Supp. 3d 341, 347 (E.D.N.Y. 2014) (citing <u>Fishman v. Delta Air Lines, Inc.</u>, 132 F.3d 138, 144 (2d Cir. 1998)).

at 2, 10, 11.)  When directed to "provide case law", "show me specific holdings", "show me

more cases" and "give me some cases", the chatbot complied by making them up.

       40.     At the time that he prepared the Affirmation in Opposition, Mr. Schwartz

did not have the full text of any "decision" generated by ChatGPT.  (Tr. 27.)  He cited and

quoted only from excerpts generated by the chatbot.  (Tr. 27.)

       41.     In his affidavit filed on May 25, Mr. Schwartz stated that he relied on

ChatGPT "to supplement the legal research performed."  (ECF 32-1 ¶ 6; emphasis added).)  He

also stated that he "greatly regrets having utilized generative artificial intelligence to supplement

the legal research performed herein . . . ."  (Id. ¶ 13; emphasis added.)  But at the hearing, Mr.

Schwartz acknowledged that ChatGPT was not used to "supplement" his research:

> THE COURT: Let me ask you, did you do any other research in
> opposition to the motion to dismiss other than through ChatGPT?
>
> MR. SCHWARTZ: Other than initially going to Fastcase and failing
> there, no.
>
> THE COURT: You found nothing on Fastcase.
>
> MR. SCHWARTZ: Fastcase was insufficient as to being able to
> access, so, no, I did not.
>
> THE COURT: You did not find anything on Fastcase?
>
> MR. SCHWARTZ: No.
>
> THE COURT: In your declaration in response to the order to show
> cause, didn't you tell me that you used ChatGPT to supplement your
> research?
>
> MR. SCHWARTZ: Yes.
>
> THE COURT: Well, what research was it supplementing?
>
> MR. SCHWARTZ: Well, I had gone to Fastcase, and I was able to
> authenticate two of the cases through Fastcase that ChatGPT had
> given me. That was it.

> THE COURT: But ChatGPT was not supplementing your research.
> It was your research, correct?
>
> MR. SCHWARTZ: Correct. It became my last resort. So I guess
> that's correct.

(Tr. 37-38.) Mr. Schwartz's statement in his May 25 affidavit that ChatGPT "supplemented" his

research was a misleading attempt to mitigate his actions by creating the false impression that he

had done other, meaningful research on the issue and did not rely exclusive on an AI chatbot,

when, in truth and in fact, it was the only source of his substantive arguments.[12]  These

misleading statements support the Court's finding of subjective bad faith.

      42.      Following receipt of the April 25 Affirmation, the Court issued an Order

dated May 4, 2023 directing Mr. LoDuca to show cause why he ought not be sanctioned pursuant

to: (1) Rule 11(b)(2) & (c), Fed. R. Civ. P., (2) 28 U.S.C. § 1927, and (3) the inherent power of

the Court, for (A) citing non-existent cases to the Court in his Affirmation in Opposition, and (B)

submitting to the Court annexed to April 25 Affidavit copies of non-existent judicial opinions.

(ECF 31.)  It directed Mr. LoDuca to file a written response and scheduled a show-cause hearing

for 12 p.m. on June 8, 2023.  (Id.)  Mr. LoDuca submitted an affidavit in response, which also

annexed an affidavit from Mr. Schwartz.  (ECF 32, 32-1.)

      43.      Mr. Schwartz made the highly dubious claim that, before he saw the first

Order to Show Cause of May 4, he "still could not fathom that ChatGPT could produce multiple

fictitious cases . . . ."  (Schwartz June 6 Decl. ¶ 30.)  He states that when he read the Order of

May 4, "I realized that I must have made a serious error and that there must be a major flaw with

---

[12] Cf. Lewis Carroll, Alice's Adventures in Wonderland, 79 (Puffin Books ed. 2015) (1865):
    "Take some more tea," the March Hare said to Alice, very earnestly.
    "I've had nothing yet," Alice replied in an offended tone, "so I can't take more."
    "You mean you can't take *less*," said the Hatter: "it's very easy to take *more* than nothing."

the search aspects of the ChatGPT program."  (Schwartz June 6 Decl. ¶ 29.)  The Court rejects

Mr. Schwartz's claim because (a) he acknowledges reading Avianca's brief claiming that the

cases did not exist and could not be found (Tr. 31-33); (b) concluded that the Court could not

locate the cases when he read the April 11 and 12 Orders (Tr. 36-37); (c) had looked for

"Varghese" and could not find it (Tr. 28); and (d) had been "unable to locate" "Zicherman" after

the Court ordered its submission (Apr. 25 Aff't ¶ 3).

44.     The Schwartz Affidavit of May 25 contained the first acknowledgement

from any Respondent that the Affirmation in Opposition cited to and quoted from bogus cases

generated by ChatGPT.  (ECF 32-1.)

45.     The Schwartz Affidavit of May 25 included screenshots taken from a

smartphone in which Mr. Schwartz questioned ChatGPT about the reliability of its work (e.g.,

"Is Varghese a real case" and "Are the other cases you provided fake").  (ECF 32-1.)  ChatGPT

responded that it had supplied "real" authorities that could be found through Westlaw,

LexisNexis and the Federal Reporter.  (Id.)  The screenshots are annexed as Appendix B to this

Opinion and Order.

46.     When those screenshots were submitted as exhibits to Mr. Schwartz's

affidavit of May 25, he stated: "[T]he citations and opinions in question were provided by Chat

GPT which also provided its legal source and assured the reliability of its content.  Excerpts from

the queries presented and responses provided are attached hereto."  (Schwartz May 25 Aff't ¶ 8.)

This is an assertion by Mr. Schwartz that he was misled by ChatGPT into believing that it had

provided him with actual judicial decisions.  While no date is given for the queries, the

declaration strongly suggested that he questioned whether "Varghese" was "real" prior to either

the March 1 Affirmation in Opposition or the April 25 Affidavit.

47.     But Mr. Schwartz's declaration of June 6 offers a different explanation and interpretation, and asserts that those same ChatGPT answers confirmed his by-then-growing suspicions that the chatbot had been responding "without regard for the truth of the answers it was providing":

> Before the First OSC, however, I still could not fathom that ChatGPT could produce multiple fictitious cases, all of which had various indicia of reliability such as case captions, the names of the judges from the correct locations, and detailed fact patterns and legal analysis that sounded authentic.  The First OSC caused me to have doubts.  As a result, I asked ChatGPT directly whether one of the cases it cited, "*Varghese v. China Southern Airlines Co. Ltd.*, 925 F.3d 1339 (11th Cir. 2009)," was a real case.  Based on what I was beginning to realize about ChatGPT, I highly suspected that it was not.  However, ChatGPT again responded that Varghese "does indeed exist" and even told me that it was available on Westlaw and LexisNexis, contrary to what the Court and defendant's counsel were saying.  <u>This confirmed my suspicion that ChatGPT was not providing accurate information and was instead simply responding to language prompts without regard for the truth of the answers it was providing.</u>  However, by this time the cases had already been cited in our opposition papers and provided to the Court.

(Schwartz June 6 Decl. ¶ 30; emphasis added.)  These shifting and contradictory explanations, submitted even after the Court raised the possibility of Rule 11 sanctions, undermine the credibility of Mr. Schwartz and support a finding of subjective bad faith.

48.     On May 26, 2023, the Court issued a supplemental Order directing Mr. Schwartz to show cause at the June 8 hearing why he ought not be sanctioned pursuant to Rule 11(b)(2) and (c), 28 U.S.C. § 1927 and the Court's inherent powers for aiding and causing the citation of non-existent cases in the Affirmation in Opposition, the submission of non-existent judicial opinions annexed to the April 25 Affidavit and the use of a false and fraudulent notarization in the April 25 Affidavit.  (ECF 31.)  The same Order directed the Levidow Firm to also show cause why it ought not be sanctioned and directed Mr. LoDuca to show cause why he

ought not be sanctioned for the use of a false or fraudulent notarization in the April 25 Affidavit. (<u>Id.</u>)  The Order also directed the Respondents to file written responses.  (<u>Id.</u>)

49.     Counsel thereafter filed notices of appearance on behalf of Mr. Schwartz and the Levidow Firm, and, separately, on behalf of Mr. LoDuca.  (ECF 34-36, 39-40.)  Messrs. LoDuca and Schwartz filed supplemental declarations on June 6.  (ECF 44-1, 46.)  Thomas R. Corvino, who describes himself as the sole equity partner of the Levidow Firm, also filed a declaration.  (ECF 47.)

50.     On June 8, 2023, the Court held a sanctions hearing on the Order to Show Cause and the supplemental Order to Show Cause.  After being placed under oath, Messrs. LoDuca and Schwartz responded to questioning from the Court and delivered prepared statements in which they expressed their remorse.  Mr. Corvino, a member of the Levidow Firm, also delivered a statement.

51.     At no time has any Respondent written to this Court seeking to withdraw the March 1 Affirmation in Opposition or advise the Court that it may no longer rely upon it.

CONCLUSIONS OF LAW

1.     Rule 11(b)(2) states:  "By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law . . . ."

2.      "Under Rule 11, a court may sanction an attorney for, among other things, misrepresenting facts or making frivolous legal arguments."  <u>Muhammad v. Walmart Stores East, L.P.</u>, 732 F.3d 104, 108 (2d Cir. 2013) (per curiam).

3.      A legal argument may be sanctioned as frivolous when it amounts to an "'abuse of the adversary system . . . .'"  <u>Salovaara v. Eckert</u>, 222 F.3d 19, 34 (2d Cir. 2000) (quoting <u>Mareno v. Rowe</u>, 910 F.2d 1043, 1047 (2d Cir. 1990)).  "Merely incorrect legal statements are not sanctionable under Rule 11(b)(2)."  <u>Storey v. Cello Holdings, L.L.C.</u>, 347 F.3d 370, 391 (2d Cir. 2003).  "The fact that a legal theory is a long-shot does not necessarily mean it is sanctionable."  <u>Fishoff v. Coty Inc.</u>, 634 F.3d 647, 654 (2d Cir. 2011).  A legal contention is frivolous because it has "no chance of success" and there "is no reasonable argument to extend, modify or reverse the law as it stands."  <u>Id.</u> (quotation marks omitted).

4.      An attorney violates Rule 11(b)(2) if existing caselaw unambiguously forecloses a legal argument.  <u>See</u> <u>Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.</u>, 682 F.3d 170, 178 (2d Cir. 2012) (affirming Rule 11(b)(2) sanction for frivolous claims where plaintiff's trademark claims "clearly lacked foundation") (per curiam); <u>Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.</u>, 186 F.3d 157, 176 (2d Cir. 1999) (affirming Rule 11(b)(2) sanction where no authority supported plaintiff's theory of liability under SEC Rule 10b-13).

5.      The filing of papers "without taking the necessary care in their preparation" is an "abuse of the judicial system" that is subject to Rule 11 sanction.  <u>Cooter & Gell v. Hartmax Corp.</u>, 496 U.S. 384, 398 (1990).  Rule 11 creates an "incentive to stop, think and investigate more carefully before serving and filing papers."  <u>Id.</u> (quotation marks omitted). "Rule 11 'explicitly and unambiguously imposes an affirmative duty on each attorney to conduct

a reasonable inquiry into the viability of a pleading before it is signed.'"  AJ Energy LLC v.

Woori Bank, 829 Fed. App'x 533, 535 (2d Cir. 2020) (summary order) (quoting Gutierrez v.

Fox, 141 F.3d 425, 427 (2d Cir. 1998)).

      6.      Rule 3.3(a)(1) of the New York Rules of Professional Conduct, 22

N.Y.C.R.R. § 1200.0, states: "A lawyer shall not knowingly make a false statement of fact or law

to a tribunal or fail to correct a false statement of material fact or law previously made to the

tribunal by the lawyer . . . ."  A lawyer may make a false statement of law where he "liberally

us[ed] ellipses" in order to "change" or "misrepresent" a court's holding.  United States v.

Fernandez, 516 Fed. App'x 34, 36 & n.2 (2d Cir. 2013) (admonishing but not sanctioning

attorney for his "editorial license" and noting his affirmative obligation to correct false

statements of law) (summary order); see also United States v. Salameh, 1993 WL 168568, at *2-

3 & n.1 (S.D.N.Y. May 18, 1993) (admonishing but not sanctioning attorney for failing to

disclose that the sole decision cited in support of a legal argument was vacated on appeal)

(Duffy, J.).

      7.      It is a crime to knowingly forge the signature of a United States judge or

the seal of a federal court.  18 U.S.C. § 505.[13]  Writing for the panel, then-Judge Sotomayor

explained that "[section] 505 is concerned . . . with protecting the integrity of a government

function – namely, federal judicial proceedings."  United States v. Reich, 479 F.3d 179, 188 (2d

Cir. 2007).  "When an individual forges a judge's signature in order to pass off a false document

---

[13] The statute states: "Whoever forges the signature of any judge, register, or other officer of any court of the United States, or of any Territory thereof, or forges or counterfeits the seal of any such court, or knowingly concurs in using any such forged or counterfeit signature or seal, for the purpose of authenticating any proceeding or document, or tenders in evidence any such proceeding or document with a false or counterfeit signature of any such judge, register, or other officer, or a false or counterfeit seal of the court, subscribed or attached thereto, knowing such signature or seal to be false or counterfeit, shall be fined under this title or imprisoned not more than five years, or both."  18 U.S.C. § 505.

as an authentic one issued by the courts of the United States, such conduct implicates the

interests protected by § 505 whether or not the actor intends to deprive another of money or

property." Id. Reich affirmed the jury's guilty verdict against an attorney-defendant who drafted

and circulated a forged Order that was purported to be signed by a magistrate judge, which

prompted his adversary to withdraw an application pending before the Second Circuit. Id. at

182-83, 189-90; see also United States v. Davalos, 2008 WL 4642109 (S.D.N.Y. Oct. 20, 2008)

(sentencing defendant to 15 months' imprisonment for the use of counterfeit Orders containing

forged signatures of Second Circuit judges) (Sweet, J.).

   8. The fake opinions cited and submitted by Respondents do not include any

signature or seal, and the Court therefore concludes that Respondents did not violate section 505.

The Court notes, however, that the citation and submission of fake opinions raises similar

concerns to those described in Reich.

   9. The Court has described Respondents' submission of fake cases as an

unprecedented circumstance.  (ECF 31 at 1.)  A fake opinion is not "existing law" and citation to

a fake opinion does not provide a non-frivolous ground for extending, modifying, or reversing

existing law, or for establishing new law.[14]  An attempt to persuade a court or oppose an

adversary by relying on fake opinions is an abuse of the adversary system.  Salovaara, 222 F.3d

at 34.

   10. An attorney's compliance with Rule 11(b)(2) is not assessed solely at the

moment that the paper is submitted.  The 1993 amendments to Rule 11 added language that

certifies an attorney's Rule 11 obligation continues when "later advocating" a legal contention

---

[14] To the extent that the Affirmation in Opposition cited existing authorities, those decisions did not support the propositions for which they were offered, with the exception of Ashcroft v. Iqbal, 556 U.S. 662 (2009), and, in part, Doe v. United States, 419 F.3d 1058 (9th Cir. 2005).

first made in a written filing covered by the Rule.  Thus, "a litigant's obligations with respect to

the contents of these papers are not measured solely as of the time they are filed with or

submitted to the court, but include reaffirming to the court and advocating positions contained in

those pleadings and motions after learning that they cease to have any merit."  Rule 11, advisory

committee's note to 1993 amendment.  The failure to correct a prior statement in a pending

motion is the later advocacy of that statement and is subject to sanctions.  Galin v. Hamada, 283

F. Supp. 3d 189, 202 (S.D.N.Y. 2017) ("[A] court may impose sanctions on a party for refusing

to withdraw an allegation or claim even after it is shown to be inaccurate.") (Furman, J.) (internal

quotation marks, alterations, and citation omitted); Bressler v. Liebman, 1997 WL 466553, at *8

(S.D.N.Y. Aug. 14, 1997) (an attorney was potentially liable under Rule 11 when he "continued

to press the claims . . . in conferences after information provided by opposing counsel and

analysis by the court indicated the questionable merit of those claims.") (Preska, J.).

      11.     Rule 11(c)(3) states:  "On its own, the court may order an attorney, law

firm, or party to show cause why conduct specifically described in the order has not violated

Rule 11(b)."  "If, after notice and a reasonable opportunity to respond, the court determines that

Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law

firm, or party that violated the rule or is responsible for the violation.  Absent exceptional

circumstances, a law firm must be held jointly responsible for a violation committed by its

partner, associate, or employee."  Rule 11(c)(1).

      12.     Any Rule 11 sanction should be "made with restraint" because in

exercising sanctions powers, a trial court may be acting "as accuser, fact finder and sentencing

judge."  Storey v. Cello Holdings, L.L.C., 347 F.3d 370, 387 (2d Cir. 2003) (quotation marks and

citations omitted).  Sanctions should not be imposed "for minor, inconsequential violations of the

standards prescribed by subdivision (b)."  Rule 11, advisory committee's note to 1993 amendment.

13.     Mr. Schwartz is not admitted to practice in this District and did not file a notice of appearance.  However, Rule 11(c)(1) permits a court to "impose an appropriate sanction on any attorney . . . that violated the rule or is responsible for the violation."  The Court has authority to impose an appropriate sanction on Mr. Schwartz for a Rule 11 violation.

14.     When, as here, a court considers whether to impose sanctions sua sponte, it "is akin to the court's inherent power of contempt," and, "like contempt, sua sponte sanctions in those circumstances should issue only upon a finding of subjective bad faith."  Muhammad, 732 F.3d at 108.  By contrast, where an adversary initiates sanctions proceedings under Rule 11(c)(2), the attorney may take advantage of that Rule's 21-day safe harbor provision and withdraw or correct the challenged filing, in which case sanctions may issue if the attorney's statement was objectively unreasonable.  Muhammad, 732 F.3d at 108; In re Pennie & Edmonds LLP, 323 F.3d 86, 90 (2d Cir. 2003).  Subjective bad faith is "a heightened mens rea standard" that is intended to permit zealous advocacy while deterring improper submissions.  Id. at 91.

15.     A finding of bad faith is also required for a court to sanction an attorney pursuant to its inherent power.  See, e.g., United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, 948 F.2d 1338, 1345 (2d Cir. 1991).  "Because of their very potency, inherent powers must be exercised with restraint and discretion.  A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process."  Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991) (internal citation omitted).

16.     "[B]ad faith may be inferred where the action is completely without merit." In re 60 E. 80th St. Equities, Inc., 218 F.3d 109, 116 (2d Cir. 2000).  Any notice or warning provided to the attorney is relevant to a finding of bad faith.  See id. ("Here, not only were the claims meritless, but [appellant] was warned of their frivolity by the Bankruptcy Court before he filed the appeal to the District Court.").

17.     The Second Circuit has most often discussed subjective bad faith in the context of false factual statements and not unwarranted or frivolous legal arguments.  Subjective bad faith includes the knowing and intentional submission of a false statement of fact.  See, e.g., Rankin v. City of Niagara Falls, Dep't of Public Works, 569 Fed. App'x 25 (2d Cir. 2014) (affirming Rule 11 sanctions on attorney who obtained extensions by falsely claiming that the submission of a "substantive" summary judgment filing had been delayed by heavy workload) (summary order).  An attorney acts in subjective bad faith by offering "essential" facts that explicitly or impliedly "run contrary to statements" that the attorney made on behalf of the same client in other proceedings.  Revellino & Byzcek, LLP v. Port Authority of N.Y. & N.J., 682 Fed. App'x 73, 75-76 (2d Cir. 2017) (affirming Rule 11 sanctions where allegations in a federal civil rights complaint misleadingly omitted key facts asserted by the same attorney on behalf of the same client in a related state criminal proceeding) (summary order).

18.     An assertion may be made in subjective bad faith even when it was based in confusion.  United States ex rel. Hayes v. Allstate Ins. Co., 686 Fed. App'x 23, 28 (2d Cir. 2017) ("[C]onfusion about corporate complexities would not justify falsely purporting to have personal knowledge as to more than sixty defendants' involvement in wrongdoing.") (summary order).  A false statement of knowledge can constitute subjective bad faith where the speaker "'knew that he had no such knowledge . . . .'"  Id. at 27 (quoting United States ex rel. Hayes v.

Allstate Ins. Co., 2014 WL 10748104, at *6 (W.D.N.Y. Oct. 16, 2014), R & R adopted, 2016

WL 463732 (W.D.N.Y. Feb. 8, 2016)).

19.     "Evidence that would satisfy the knowledge standard in a criminal case

ought to be sufficient in a sanctions motion, and, thus, knowledge may be proven by

circumstantial evidence and conscious avoidance may be the equivalent of knowledge."

Cardona v. Mohabir, 2014 WL 1804793, at *3 (S.D.N.Y. May 6, 2014) (citing United States v.

Svoboda, 347 F.3d 471, 477-79 (2d Cir. 2003)); accord Estevez v. Berkeley College, 2022 WL

17177971, at *1 (S.D.N.Y. Nov. 23, 2022) ("[R]equisite actual knowledge may be demonstrated

by circumstantial evidence and inferred from conscious avoidance.") (Seibel, J.) (quotation

marks omitted).  The conscious avoidance test is met when a person "consciously avoided

learning [a] fact while aware of a high probability of its existence, unless the factfinder is

persuaded that the [person] actually believed the contrary."  United States v. Finkelstein, 229

F.3d 90, 95 (2d Cir. 2000) (internal citations omitted).  "The rationale for imputing knowledge in

such circumstances is that one who deliberately avoided knowing the wrongful nature of his

conduct is as culpable as one who knew."  Id.  It requires more than being "merely negligent,

foolish or mistaken," and the person must be "aware of a high probability of the fact in dispute

and consciously avoided confirming that fact."  Svoboda, 347 F.3d at 481-82 (quotation marks

and brackets omitted).

20.     Respondents point to the Report and Recommendation of Magistrate

Judge Freeman, as adopted by Judge McMahon, in Braun ex rel. Advanced Battery Techs., Inc.

v. Zhiguo Fu, 2015 WL 4389893, at *19 (S.D.N.Y. July 10, 2015), which declined to sanction a

law firm associate who drafted and signed a complaint that falsely alleged that the plaintiff in a

shareholder derivative suit was a shareholder of the nominal defendant.  That attorney acted in

reliance on the plaintiff's signed verification of the complaint, partner communications with the plaintiff, and contents of law firm files that appeared to contain false information.  Id. at *5-6, 19.  Braun concluded that this attorney did not act with subjective bad faith by innocently relying on the mistruths of others.  Id. at *19.  There is no suggestion in Braun that this attorney had a reason to know or suspect that he was relying on falsehoods or misinformation.

21.     Here, Respondents advocated for the fake cases and legal arguments contained in the Affirmation in Opposition after being informed by their adversary's submission that their citations were non-existent and could not be found.  (Findings of Fact ¶¶ 7, 11.)  Mr. Schwartz understood that the Court had not been able to locate the fake cases.  (Findings of Fact ¶ 15.)  Mr. LoDuca, the only attorney of record, consciously avoided learning the facts by neither reading the Avianca submission when received nor after receiving the Court's Orders of April 11 and 12.  Respondents' circumstances are not similar to those of the attorney in Braun.

22.     "In considering Rule 11 sanctions, the knowledge and conduct of each respondent lawyer must be separately assessed and principles of imputation of knowledge do not apply."  Weddington v. Sentry Indus., Inc., 2020 WL 264431, at *7 (S.D.N.Y. Jan. 17, 2020).

23.     The Court concludes that Mr. LoDuca acted with subjective bad faith in violating Rule 11 in the following respects:

a.     Mr. LoDuca violated Rule 11 in not reading a single case cited in his March 1 Affirmation in Opposition and taking no other steps on his own to check whether any aspect of the assertions of law were warranted by existing law.  An inadequate or inattentive "inquiry" may be unreasonable under the circumstances.  But signing and filing that affirmation after making no "inquiry" was an act of subjective bad faith.  This is especially so because he knew of Mr. Schwartz's lack of familiarity with federal law, the Montreal Convention and

bankruptcy stays, and the limitations of research tools made available by the law firm with which he and Mr. Schwartz were associated.

        b.      Mr. LoDuca violated Rule 11 in swearing to the truth of the April 25 Affidavit with no basis for doing so.  While an inadequate inquiry may not suggest bad faith, the absence of any inquiry supports a finding of bad faith.  Mr. Schwartz walked into his office, presented him with an affidavit that he had never seen in draft form, and Mr. LoDuca read it and signed it under oath.  A cursory review of his own affidavit would have revealed that (1) "Zicherman v. Korean Air Lines Co., Ltd., 516 F.3d 1237 (11th Cir. 2008)" could not be found, (2) many of the cases were excerpts and not full cases and (3) reading only the opening passages of, for example, "Varghese", would have revealed that it was internally inconsistent and nonsensical.

        c.      Further, the Court directed Mr. LoDuca to submit the April 25 Affidavit and Mr. LoDuca lied to the Court when seeking an extension, claiming that he, Mr. LoDuca, was going on vacation when, in truth and in fact, Mr. Schwartz, the true author of the April 25 Affidavit, was the one going on vacation.  This is evidence of Mr. LoDuca's bad faith.

        24.      The Court concludes that Mr. Schwartz acted with subjective bad faith in violating Rule 11 in the following respects:

        a.      Mr. Schwartz violated Rule 11 in connection with the April 25 Affidavit because, as he testified at the hearing, when he looked for "Varghese" he "couldn't find it," yet did not reveal this in the April 25 Affidavit.  He also offered no explanation for his inability to find "Zicherman".  Poor and sloppy research would merely have been objectively unreasonable.  But Mr. Schwartz was aware of facts that alerted him to the high probability that "Varghese" and "Zicherman" did not exist and consciously avoided confirming that fact.

b.       Mr. Schwartz's subjective bad faith is further supported by the
untruthful assertion that ChatGPT was merely a "supplement" to his research, his conflicting
accounts about his queries to ChatGPT as to whether "<u>Varghese</u>" is a "real" case, and the failure
to disclose reliance on ChatGPT in the April 25 Affidavit.

25.     The Levidow Firm is jointly and severally liable for the Rule 11(b)(2)
violations of Mr. LoDuca and Mr. Schwartz.  Rule 11(c)(1) provides that "[a]bsent exceptional
circumstances, a law firm must be held jointly responsible for a violation committed by its
partner, associate, or employee."  The Levidow Firm has not pointed to exceptional
circumstances that warrant a departure from Rule 11(c)(1).  Mr. Corvino has acknowledged
responsibility, identified remedial measures taken by the Levidow Firm, including an expanded
Fastcase subscription and CLE programming, and expressed his regret for Respondents'
submissions.  (Corvino Decl. ¶¶ 10-15; Tr. 44-47.)

26.     The Court declines to separately impose any sanction pursuant to 28
U.S.C. § 1927, which provides for a sanction against any attorney "who so multiplies the
proceedings in any case unreasonably and vexatiously . . . ."  "By its terms, § 1927 looks to
unreasonable and vexatious multiplications of proceedings; and it imposes an obligation on
attorneys throughout the entire litigation to avoid dilatory tactics.  The purpose of this statute is
to deter unnecessary delays in litigation."  <u>Int'l Bhd. of Teamsters</u>, 948 F.2d at 1345 (internal
citations and quotation marks omitted).  Respondents' reliance on fakes cases has caused several
harms but dilatory tactics and delay were not among them.

27.     Each of the Respondents is sanctioned under Rule 11 and, alternatively,
under the inherent power of this Court.

28.     A Rule 11 sanction should advance both specific and general deterrence. Cooter & Gell, 496 U.S. at 404.  "A sanction imposed under [Rule 11] must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."  Rule 11(c)(4).  "The court has available a variety of possible sanctions to impose for violations, such as striking the offending paper; issuing an admonition, reprimand, or censure; requiring participation in seminars or other educational programs; ordering a fine payable to the court; referring the matter to disciplinary authorities (or, in the case of government attorneys, to the Attorney General, Inspector General, or agency head), etc."  Rule 11, advisory committee's note to 1993 amendment.

29.     "'[B]ecause the purpose of imposing Rule 11 sanctions is deterrence, a court should impose the least severe sanctions necessary to achieve the goal.'"  (RC) 2 Pharma Connect, LLC v. Mission Pharmacal Co., 2023 WL 112552, at *3 (S.D.N.Y. Jan. 4, 2023) (Liman, J.) (quoting Schottenstein v. Schottenstein, 2005 WL 912017, at *2 (S.D.N.Y. Apr. 18, 2005)).  "[T]he Court has 'wide discretion' to craft an appropriate sanction, and may consider the effects on the parties and the full knowledge of the relevant facts gained during the sanctions hearing."  Heaston v. City of New York, 2022 WL 182069, at *9 (E.D.N.Y. Jan. 20, 2022) (Chen, J.) (quoting Oliveri v. Thompson, 803 F.2d 1265, 1280 (2d Cir. 1986)).

30.     The Court has considered the specific circumstances of this case.  The Levidow Firm has arranged for outside counsel to conduct a mandatory Continuing Legal Education program on technological competence and artificial intelligence programs.  (Corvino

Decl. ¶ 14.)  The Levidow Firm also intends to hold mandatory training for all lawyers and staff

on notarization practices.  (Corvino Decl. ¶ 15.)  Imposing a sanction of further and additional

mandatory education would be redundant.

31.     Counsel for Avianca has not sought the reimbursement of attorneys' fees

or expenses.  Ordering the payment of opposing counsel's fees and expenses is not warranted.

32.     In considering the need for specific deterrence, the Court has weighed the

significant publicity generated by Respondents' actions.  (See, e.g., Alger Decl. Ex. E.)  The

Court credits the sincerity of Respondents when they described their embarrassment and

remorse.  The fake cases were not submitted for any respondent's financial gain and were not

done out of personal animus.  Respondents do not have a history of disciplinary violations and

there is a low likelihood that they will repeat the actions described herein.

33.     There is a salutary purpose of placing the most directly affected persons

on notice of Respondents' conduct.  The Court will require Respondents to inform their client

and the judges whose names were wrongfully invoked of the sanctions imposed.  The Court will

not require an apology from Respondents because a compelled apology is not a sincere apology.

Any decision to apologize is left to Respondents.

34.     An attorney may be required to pay a fine, or, in the words of Rule 11, a

"penalty," to advance the interests of deterrence and not as punishment or compensation.  See,

e.g., Universitas Education, LLC v. Nova Grp., Inc., 784 F.3d 99, 103-04 (2d Cir. 2015).  The

Court concludes that a penalty of $5,000 paid into the Registry of the Court is sufficient but not

more than necessary to advance the goals of specific and general deterrence.

CONCLUSION

The Court Orders the following sanctions pursuant to Rule 11, or, alternatively, its inherent authority:

a.      Within 14 days of this Order, Respondents shall send via first-class mail a letter individually addressed to plaintiff Roberto Mata that identifies and attaches this Opinion and Order, a transcript of the hearing of June 8, 2023 and a copy of the April 25 Affirmation, including its exhibits.

b.      Within 14 days of this Order, Respondents shall send via first-class mail a letter individually addressed to each judge falsely identified as the author of the fake "Varghese", "Shaboon", "Petersen", "Martinez", "Durden" and "Miller" opinions.  The letter shall identify and attach this Opinion and Order, a transcript of the hearing of June 8, 2023 and a copy of the April 25 Affirmation, including the fake "opinion" attributed to the recipient judge.

c.      Within 14 days of this Opinion and Order, respondents shall file with this Court copies of the letters sent in compliance with (a) and (b).

d.      A penalty of $5,000 is jointly and severally imposed on Respondents and shall be paid into the Registry of this Court within 14 days of this Opinion and Order.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        June 22, 2023

# Appendix A

United States Court of Appeals,

Eleventh Circuit.

Susan Varghese, individually and as personal representative of the Estate of George Scaria Varghese, deceased,
Plaintiff-Appellant,

V.

China Southern Airlines Co Ltd,
Defendant-Appellee.

No. 18-13694

Before JORDAN, ROSENBAUM, and HIGGINBOTHAM, * Circuit Judges.

JORDAN, Circuit Judge:

Susan Varghese, individually and as personal representative of the Estate of George Scaria Varghese, deceased, appeals the district court's dismissal of her wrongful death claim against China Southern Airlines Co. Ltd. ("China Southern") under the Montreal Convention. Because the statute of limitations was tolled by the automatic stay of bankruptcy proceedings and the complaint was timely filed, we reverse and remand for further proceedings.

Factual background:

Anish Varghese ("Varghese"), a resident of Florida, purchased a round-trip airline ticket from China Southern Airlines Co Ltd ("China Southern") to travel from New York to Bangkok with a layover in Guangzhou, China. On the return leg of his journey, Varghese checked in at Bangkok for his flight to Guangzhou but was denied boarding due to overbooking. China Southern rebooked him on a later flight, which caused him to miss his connecting flight back to New York. As a result, Varghese was forced to purchase a new ticket to return home and incurred additional expenses.

Varghese filed a lawsuit against China Southern in the United States District Court for the Southern District of Florida, alleging breach of

contract, breach of the implied covenant of good faith and fair dealing, and

violation of the Montreal Convention. China Southern moved to dismiss the

complaint, arguing that the court lacked subject matter jurisdiction because

Varghese's claims were preempted by the Montreal Convention and that

Varghese failed to exhaust his administrative remedies with the Chinese

aviation authorities. While the motion to dismiss was pending, China Southern

filed for bankruptcy in China, which triggered an automatic stay of all

proceedings against it. The district court subsequently dismissed Varghese's

complaint without prejudice, noting that the automatic stay tolled the statute

of limitations on his claims. Varghese appealed the dismissal to the Eleventh

Circuit Court of Appeals.

"In response to the district court's dismissal of Varghese's complaint,

Varghese filed a Chapter 7 bankruptcy petition. The bankruptcy court issued

an automatic stay, which enjoined China Southern from continuing with the

arbitration proceedings. The bankruptcy court later granted China Southern's

motion to lift the stay, and Varghese filed a notice of appeal to this Court.

The automatic stay provision of the bankruptcy code "operates as an

injunction against the continuation of any action against the debtor." In re

Rimsat, Ltd., 212 F.3d 1039, 1044 (7th Cir. 2000) (citing 11 U.S.C. § 362(a)(1)).

Although the automatic stay provision does not specifically mention

arbitration proceedings, the Eleventh Circuit has held that it applies to

arbitration. See, e.g., Holliday v. Atl. Capital Corp., 738 F.2d 1153, 1154 (11th Cir.

1984) ("The filing of a petition under Chapter 11 of the Bankruptcy Code

operates as an automatic stay of all litigation and proceedings against the

debtor-in-possession."); Gen. Wire Spring Co. v. O'Neal Steel, Inc., 556

F.2d 713, 716 (5th Cir. 1977) ("The automatic stay of bankruptcy operates to

prevent a creditor from continuing to arbitrate claims against the bankrupt.").

In determining whether the automatic stay applies, the focus is on "the

character of the proceeding, rather than the identity of the parties."

In re PPI Enters. (U.S.), Inc., 324 F.3d 197, 204 (2d Cir. 2003). Here, the arbitration proceedings against Varghese were proceedings "against the debtor," and the automatic stay applied."

"China Southern contends that the district court erred in ruling that the filing of Varghese's Chapter 13 petition tolled the two-year limitations period under the Montreal Convention. We review a district court's determination that a limitations period was tolled for abuse of discretion. Hyatt v. N. Cent. Airlines, Inc., 92 F.3d 1074, 1077 (11th Cir. 1996).

China Southern argues that the Chapter 13 filing could not toll the Montreal Convention's limitations period because Varghese did not file a claim in bankruptcy. But, as the district court noted, the Eleventh Circuit has not yet addressed this issue, and the weight of authority from other circuits suggests that a debtor need not file a claim in bankruptcy to benefit from the automatic stay. See, e.g., In re Gandy, 299 F.3d 489, 495 (5th Cir. 2002); In re BDC 56 LLC, 330 B.R. 466, 471 (Bankr. D.N.H. 2005).

Moreover, the district court found that the automatic stay provision in Varghese's Chapter 13 petition tolled the limitations period under the Montreal Convention. We agree.

The Supreme Court has held that an automatic stay of a legal proceeding under the Bankruptcy Code tolls the limitations period applicable to the stayed proceeding. See, e.g., Begier v. IRS, 496 U.S. 53, 59-60, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). The Montreal Convention's limitations period is a "period of prescription," rather than a "statute of limitations." See Zaunbrecher v. Transocean Offshore Deepwater Drilling, Inc., 772 F.3d 1278, 1283 (11th Cir. 2014). But the difference between a "period of prescription" and a "statute of limitations" does not affect the automatic stay's tolling effect. See id. at 1283 n.3. Therefore, we hold that the filing of Varghese's Chapter 13 petition tolled the Montreal Convention's two-year limitations period, which did not begin to run until the automatic stay was lifted."

Appellants argue that the district court erred in dismissing their claims as untimely. They assert that the limitations period under the Montreal Convention was tolled during the pendency of the Bankruptcy Court proceedings. We agree.

The Bankruptcy Code provides that the filing of a bankruptcy petition operates as a stay of proceedings against the debtor that were or could have been commenced before the bankruptcy case was filed. 11 U.S.C. § 362(a). The tolling effect of the automatic stay on a statute of limitations is generally a matter of federal law. See Kaiser Steel Corp. v. W.S. Ranch Co., 391 U.S. 593, 598, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968). We have previously held that the automatic stay provisions of the Bankruptcy Code may toll the statute of limitations under the Warsaw 'V Convention, which is the precursor to the Montreal Convention. See Zicherman v. Korean Air Lines Co., Ltd., 516 F.3d 1237, 1254 (11th Cir. 2008).

We see no reason why the same rule should not apply under the Montreal Convention. Congress enacted the Montreal Convention to 'modernize and unify the Warsaw Convention system by establishing new and uniform rules governing the international carriage of persons, baggage, and cargo.' El Al

Israel Airlines, Ltd. v. Tseng, 525 U.S. 155, 161, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). In doing so, Congress sought to provide passengers with greater certainty and predictability in the event of an accident. Id. at 166, 119 S.Ct. 662. Allowing the tolling of the limitations period during the pendency of bankruptcy proceedings furthers this goal by ensuring that passengers have a meaningful opportunity to bring their claims for compensation."

DO NOT CITE OR
QUOTE AS
LEGAL AUTHORITY

# Appendix B

Is varghese a real case

Yes, Varghese v. China Southern Airlines Co Ltd, 925 F.3d 1339 (11th Cir. 2019) is a real case.




What is your source



Tolling Montreal Convention Statute

I apologize for the confusion earlier. Upon double-checking, I found that the case Varghese v. China Southern Airlines Co. Ltd., 925 F.3d 1339 (11th Cir. 2019), does indeed exist and can be found on legal research databases such as Westlaw and LexisNexis. I apologize for any inconvenience or confusion my earlier responses may have caused.

3:43



Tolling Montreal Convention Statute



Are the other cases you provided fake



No, the other cases I provided are real and can be found in reputable legal databases such as LexisNexis and Westlaw.